

MARIA E. STRATTON, CSB# 090986
Federal Public Defender
LINDA L. GRIFFIS, CSB# 100827
LAUREN ESKENAZI, CSB# 181285
Deputy Federal Public Defenders
Roybal Federal Building
255 E. Temple Street, Suite 167
Los Angeles, California 90012-4758
Telephone (213) 894-7519
Facsimile (213) 894-7566

Attorneys for Petitioner
DENNIS MAYFIELD

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

#### SOUTHERN DIVISION

|  |  |
|---|---|
| DENNIS MAYFIELD,<br><br>       Petitioner,<br><br>       v.<br><br>ARTHUR CALDERON, as Warden of<br>San Quentin State Prison,<br><br>       Respondent. | NO. SA CV 97-3742-AHS<br><br>**DEATH PENALTY CASE**<br><br>**PETITION FOR WRIT OF HABEAS CORPUS**<br><br>[PETITIONER'S NOTICE OF UNEXHAUSTED CLAIMS FILED CONCURRENTLY HEREWITH]<br><br>**VOLUME 1 OF 4** |

DEATH **PENALTY**

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

ENTERED ON ICMS 9/28/98

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTIONAL ALLEGATIONS . . . . . . . . . . . . . . . 2

III.   PROCEDURAL HISTORY   . . . . . . . . . . . . . . . . . . 15

IV.    OVERVIEW OF TRIAL PROCEDURES . . . . . . . . . . . . . . 16

       A.   THE AMENDED INFORMATION . . . . . . . . . . . . . . 16

       B.   PRE-TRIAL PROCEDURES . . . . . . . . . . . . . . . . 21

       C.   JURY SELECTION . . . . . . . . . . . . . . . . . . . 22

       D.   PETITIONER'S MOTION TO EXCLUDE STATEMENTS . . . . . 23

       E.   THE GUILT PHASE OF THE TRIAL   . . . . . . . . . . . 23

            1.   THE STATE'S CASE-IN-CHIEF   . . . . . . . . . . 24

            2.   THE DEFENSE CASE . . . . . . . . . . . . . . . . 27

            3.   THE STATE'S REBUTTAL . . . . . . . . . . . . . . 27

            4.   THE VERDICT   . . . . . . . . . . . . . . . . . 28

       F.   THE PENALTY PHASE OF THE TRIAL   . . . . . . . . . . 29

            1.   PETITIONER'S MOTION TO RELIEVE COUNSEL
                 AND HEARING REGARDING THE SCOPE OF THE STATE'S
                 EVIDENCE . . . . . . . . . . . . . . . . . . . . 29

            2.   THE STATE'S PENALTY PHASE CASE . . . . . . . . . 30

            3.   PETITIONER'S CASE IN MITIGATION   . . . . . . . 31

            4.   THE PENALTY PHASE VERDICT   . . . . . . . . . . 31

            5.   POST-TRIAL MOTIONS   . . . . . . . . . . . . . . 31

V.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 33

       A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . 33

       B.   PRETRIAL HEARING REGARDING ADMISSIBILITY OF
            PETITIONER'S STATEMENTS . . . . . . . . . . . . . . 36

            1.   TESTIMONY OF DEPUTY STEIN . . . . . . . . . . . 36

            2.   TESTIMONY OF LIEUTENANT COLFER . . . . . . . . . 41

      3.   TESTIMONY OF SERGEANT HANKERSON . . . . . . . .   41

      4.   TESTIMONY OF DEPUTY EMERSON   . . . . . . . . .   43

      5.   TESTIMONY OF DETECTIVE AMICONE . . . . . . . .   43

      6.   TESTIMONY OF LIEUTENANT STODELLE   . . . . . .   44

      7.   TESTIMONY OF OFFICER WHEELER   . . . . . . . .   46

      8.   TESTIMONY OF DISPATCHER DAVIS   . . . . . . .   47

      9.   TRIAL COURT'S RULING           . . . . . . . .   47

 C.   GUILT PHASE TRIAL . . . . . . . . . . . . . . . .   48

      1.   PROSECUTION'S CASE-IN-CHIEF . . . . . . . . .   48

           a.   Shooting Incident At Shell Station   . . . .   48

                (1)   Perspective Of Clerk Carlos Price   . .   48

                (2)   Perspective Of Tyrone Thomas . . . . .   49

                (3)   Perspective Of Howard Bell . . . . . .   51

                (4)   Perspective Of Candette Wolfley   . . .   52

                (5)   Events At The Rear Of The Station   . .   54

           b.   Police Response And Chase Of Petitioner . .   57

           c.   Events At The Haverstick Residence   . . . .   61

           d.   Petitioner's Surrender And Interaction
                With Deputy Stein . . . . . . . . . . . .   64

           e.   Crime Scene Investigation . . . . . . . .   68

           f.   Autopsy And Scientific Evidence . . . . .   69

           g.   Jury Visit To Crime Scene . . . . . . . .   74

      2.   DEFENSE CASE . . . . . . . . . . . . . . . .   76

           a.   Howard Bell And Tyrone Thomas . . . . . .   76

           b.   Interaction Between Petitioner And Deputy
                Stein . . . . . . . . . . . . . . . . .   77

           c.   Observations Of Roy Mayfield, Sr. . . . . .   78

d.   Petitioner's Testimony . . . . . . . . . .   79

    (1)  Direct Testimony . . . . . . . . . .   79

    (2)  Cross-Examination  . . . . . . . . .   86

e.   Testimony Of Detective Hankerson  . . . . .   95

f.   Shell Station Videotape  . . . . . . . . .   96

g.   Wall Near Sunstone Apartments . . . . . . .   96

3.   REBUTTAL . . . . . . . . . . . . . . . . .   97

    a.   District Attorney's Videotape . . . . . .   97

    b.   Events Following Shell Station Shooting . .   98

    c.   Statement Made By Roy Mayfield, Sr. To
         Detective Amicone . . . . . . . . . . .   99

         (1)  Evidentiary Hearing On Admissibility Of
              Statement . . . . . . . . . . . .   99

         (2)  Trial Testimony Regarding Statement . 104

    d.   Dr. Root's Testimony  . . . . . . . . . . 105

4.   SURREBUTTAL . . . . . . . . . . . . . . . . 106

II.  PENALTY PHASE OF PETITIONER'S TRIAL . . . . . . . . . 115

    A.   PRELIMINARY MATTERS . . . . . . . . . . . . . . 115

    B.   PROSECUTION CASE . . . . . . . . . . . . . . . 116

    C.   DEFENSE CASE . . . . . . . . . . . . . . . . . 120

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . 125

JURY ISSUE CLAIMS . . . . . . . . . . . . . . . . . . . . 125

I.   THE NON-RANDOM SELECTION OF THE JURY CONSTITUTED A
     MATERIAL DEPARTURE FROM STATUTORY PROCEDURES AND
     VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS . . . . . . 125

    A.   FACTUAL BACKGROUND . . . . . . . . . . . . . . 125

B.   THE EXCLUSION OF VENIRE PERSONS WHOSE LAST NAMES BEGAN WITH THE LETTERS "N" THROUGH "Z" WAS A "MATERIAL DEPARTURE" FROM PRESCRIBED PROCEDURES . . . 129

II.  THE PROSECUTOR'S DISCRIMINATORY EXERCISE OF PEREMPTORY CHALLENGES VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS . . 134

A.   INTRODUCTION . . . . . . . . . . . . . . 135

B.   FACTUAL BACKGROUND . . . . . . . . . . 137

C.   PETITIONER MADE A PRIMA FACIE CASE OF WHEELER ERROR . . . . . . . . . . . . . 143

1.   THE TRIAL COURT'S INQUIRY ABOUT THE PROSECUTOR'S JUSTIFICATIONS FOR EXCUSAL OF THE BLACK JURORS ESTABLISHED AN IMPLIED FINDING OF A PRIMA FACIE CASE . . . . . . . . . . . . . . 143

2.   DEFENSE COUNSEL ESTABLISHED A PRIMA FACIE CASE BY DEMONSTRATING A STRONG LIKELIHOOD THAT THE JURORS WERE EXCLUDED ON GROUNDS OF GROUP BIAS . . . . 144

D.   THE PROSECUTOR FAILED TO REBUT THE PRIMA FACIE CASE FOR GROUP BIAS . . . . . . . . . . . . 148

E.   THE TRIAL COURT'S REFUSAL TO GRANT A MISTRIAL IS REVERSIBLE ERROR . . . . . . . . . . . . 153

III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN EXCLUDING PROSPECTIVE JURORS LUNA AND VILLASENOR WITHOUT DETERMINING THEIR WILLINGNESS TO PERFORM THEIR DUTIES IN ACCORDANCE WITH THEIR INSTRUCTIONS AND THEIR OATH IN VIOLATION OF PETITIONER'S RIGHT TO AN IMPARTIAL JURY GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS . . . . . . . . 154

A.   INTRODUCTION . . . . . . . . . . . 155

B.   VOIR DIRE OF PROSPECTIVE JUROR VIRGINIA LUNA . . . 157

C.   VOIR DIRE OF PROSPECTIVE JUROR ADELINE VILLASENOR . . 160

D.   THE EXCUSAL OF PROSPECTIVE JURORS LUNA AND VILLASENOR VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS . . . . . . . . . . . . . . 162

IV.  THE PROSECUTOR COMMITTED MISCONDUCT BOTH IN JURY SELECTION AND IN CLOSING ARGUMENT BY STATING HIS PERSONAL BELIEF REGARDING GUILT AND THE CREDIBILITY OF A WITNESS . . . . . 166

A.   INTRODUCTION . . . . . . . . . . . 166

B.   FACTS . . . . . . . . . . . . . . . 167

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

C.   PROSECUTORIAL MISCONDUCT . . . . . . . . . . 169

D.   OBJECTIONS NOT WAIVED . . . . . . . . . . . 170

E.   CONCLUSION . . . . . . . . . . . . . . . . 172

V.   JURY MISCONDUCT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS
     WHEN MULTIPLE JURORS SLEPT DURING THE GUILT AND PENALTY PHASES
     OF HIS TRIAL AND EXTRANEOUS EVIDENCE IN THE FORM OF A POSTED
     SIGN ENCOURAGING PETITIONER'S CONVICTION WAS CONSIDERED BY THE
     JURY . . . . . . . . . . . . . . . . . . . . . . 173

     A.   SLEEPING JURORS . . . . . . . . . . . . . . 174

     B.   JUROR CONTAMINATION BY EXTRA-RECORD SIGN . . . . . . 176

GUILT PHASE CLAIMS . . . . . . . . . . . . . . . . 181

VI.  THE SPECIAL CIRCUMSTANCE FINDING MUST BE REVERSED BECAUSE
     THE EVIDENCE SHOWS THAT OFFICER WOLFLEY WAS NOT LAWFULLY
     ENGAGED IN THE PERFORMANCE OF HIS DUTIES AT THE TIME OF HIS
     DEATH AND THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY
     ON THE MEANING OF "IN THE PERFORMANCE OF HIS DUTIES" . . . 181

     A.   PENAL CODE SECTION 190.2, SUBDIVISION (a)(7) . . . . 183

     B.   OFFICER WOLFLEY WAS NOT ENGAGED IN THE LAWFUL
          PERFORMANCE OF HIS DUTIES AT THE TIME OF THE
          SHOOTING . . . . . . . . . . . . . . . . . . . 184
          1.   INTRODUCTION . . . . . . . . . . . . . . . 184

          2.   OFFICER WOLFLEY ILLEGALLY DETAINED
               PETITIONER . . . . . . . . . . . . . . . 188

               (a)  Detention, Not Investigatory Stop . . . . . 188

               (b)  No Reasonable Suspicion For Detention . . . 189

          3.   ASSUMING ARGUENDO THAT OFFICER WOLFLEY
               STOPPED, BUT DID NOT DETAIN, PETITIONER,
               THE MANNER OF THE STOP WAS UNREASONABLE . . . . 193

          4.   ASSUMING ARGUENDO THE PETITIONER WAS NOT
               DETAINED UNDER THE "REASONABLE PERSON" STANDARD,
               A "COLORABLE BASIS" STANDARD SHOULD APPLY AND
               UNDER SUCH STANDARD PETITIONER HAD A COLORABLE
               BASIS FOR BELIEVING HE WAS DETAINED . . . . . . 194

          5.   OFFICER WOLFLEY'S INITIAL DETENTION MATERIALIZED
               INTO AN ARREST . . . . . . . . . . . . . . 195

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

6.   CONCLUSION . . . . . . . . . . . . . . . . 196

C.   THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY THAT
WOLFLEY WAS ENGAGED IN THE PERFORMANCE OF HIS DUTIES
IF HE WAS UNLAWFULLY ATTEMPTING TO DETAIN PETITIONER   196

D.   CONCLUSION . . . . . . . . . . . . . . . . 199

VII. THE FIRST-DEGREE MURDER CONVICTION MUST BE REVERSED
BECAUSE PROOF OF PREMEDITATION-DELIBERATION WAS
LEGALLY INSUFFICIENT AND INSUFFICIENT EVIDENCE
SUPPORTING THE JURY'S VERDICT VIOLATES DUE PROCESS . . . . 199

A.   INTRODUCTION . . . . . . . . . . . . . . . 200

B.   THE PROSECUTION'S PROOF OF PREMEDITATION-DELIBERATION
WAS LEGALLY INSUFFICIENT UNDER THE ANDERSON
TEST . . . . . . . . . . . . . . . . . . . 204

     1.   PROOF OF PREMEDICATION-DELIBERATION PRESENTED AT
          TRIAL . . . . . . . . . . . . . . . . 204

          a.   Petitioner's Post-Arrest Statements . . . . 204

          b.   Scientific Evidence . . . . . . . . . 210

               (1)  Prosecution's Evidence . . . . . 210

               (2)  Defense Evidence . . . . . . . 213

               (3)  Recall Of Dr. Root . . . . . . 216

               (4)  Conclusion . . . . . . . . : . . 217

          c.   Other Statements Of Petitioner . . . . . 218

     2.   LACK OF PLANNING ACTIVITY . . . . . . . . . 218

          a.   Evidence Constituting "Some Evidence Of
               Planning" . . . . . . . . . . . . . 219

          b.   Evidence Constituting "Extremely Strong"
               Evidence of Planning . . . . . . . . 222

          c.   The Evidence Below Did Not Constitute Any
               Evidence, Much Less "Extremely Strong"
               Evidence, Of Planning. . . . . . . . . 225

     3.   EVIDENCE OF MOTIVE AND MANNER OF KILLING
          INDICATING PREMEDITATION WAS LACKING. . . . . 226

          a.   The Lack Of Motive Evidence . . . . . . 226

        b.    The Manner Of Killing Did Not Indicate A
            Preconceived Plan. . . . . . . . . . . . . 228

    4.   CONCLUSION . . . . . . . . . . . . . . . 229

  C.   CONCLUSION . . . . . . . . . . . . . . . . . 234

VIII.   THE PROSECUTION FAILED TO MEET ITS CONSTITUTIONAL
      OBLIGATIONS TO PROVIDE EXCULPATORY INFORMATION; TO WIT,
      EVIDENCE OF THE DECEASED OFFICER'S USE OF EXCESSIVE
      FORCE, PROPENSITY FORVIOLENCE, AND ENGAGEMENT IN RACIAL
      ACTS AGAINST BLACKS. . . . . . . . . . . . . . . . . . . 235

IX.   PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHTS
     BY COUNSEL'S FAILURE TO PRESENT EVIDENCE THAT THE
     RIALTO POLICE DEPARTMENT, AND PARTICULARLY THE
     DECEASED OFFICER, HAD A HISTORY OF RACIAL BIAS
     AND/OR HARASSMENT TOWARDS BLACKS . . . . . . . . . . . . 238

  A.   TRIAL TESTIMONY . . . . . . . . . . . . . . 239

  B.   THE HISTORY OF RACISM IN THE RIALTO POLICE
      DEPARTMENT . . . . . . . . . . . . . . . . 244

  C.   SERGEANT WOLFLEY'S RACIAL BIAS AND HARASSMENT
      OF BLACKS . . . . . . . . . . . . . . . . 249

  D.   TRIAL COUNSEL'S INEFFECTIVENESS . . . . . . . . . . 260

X.   EVIDENCE OF MARITAL DISPUTE BETWEEN SERGEANT WOLFLEY
    AND HIS WIFE JUST PRIOR TO THE OFFICER'S CONFRONTATION
    WITH PETITIONER WOULD HAVE BEEN BOTH RELEVANT AND
    ADMISSIBLE . . . . . . . . . . . . . . . . . . . . . 270

XI.   THE ADMISSION OF PETITIONER'S STATEMENTS TO POLICE VIOLATED
    HIS CONSTITUTIONAL RIGHT AS THE STATEMENTS SHOULD HAVE BEEN
    SUPPRESSED:  (1) EVIDENCE OF THE POST-ARREST STATEMENTS
    ALLEGEDLY MADE TO DEPUTY STEIN WAS INHERENTLY IMPROBABLE;
    AND (2) SUCH STATEMENTS, IF MADE, AND ALL STATEMENTS
    MADE BY PETITIONER DURING NEGOTIATIONS FROM THE
    HAVERSTICK RESIDENCE, WERE OBTAINED IN VIOLATION
    OF PETITIONER'S CONSTITUTIONAL RIGHTS . . . . . . . . . 274

  A.   INTRODUCTION . . . . . . . . . . . . . . . . . 274

  B.   SUPPORTING FACTS . . . . . . . . . . . . . . 276

     1.   FACTS RELATING TO POST-ARREST STATEMENTS
        ALLEGEDLY MADE TO DEPUTY STEIN . . . . . . . 276

     2.   FACTS RELATING TO STATEMENTS MADE DURING
        THE HOSTAGE NEGOTIATIONS . . . . . . . . . . 283

C.   THE TRIAL COURT'S RULING ON THE SUPPRESSION MOTION
     AND THE STATE STANDARD OF REVIEW ON APPEAL . . . . . 287

     1.   THE TRIAL COURT'S RULING . . . . . . . . . . . 287

     2.   STANDARD OF REVIEW . . . . . . . . . . . . . 287

D.   THERE IS NO SUBSTANTIAL EVIDENCE TO SUPPORT STEIN'S
     TESTIMONY REGARDING STATEMENTS ATTRIBUTED TO PETITIONER
     AND OFFICER STEIN'S TESTIMONY REGARDING STATEMENTS
     ATTRIBUTED TO PETITIONER IS INHERENTLY INCREDIBLE.  . 289

E.   THE POST-ARREST STATEMENTS ALLEGEDLY MADE TO DEPUTY
     STEIN SHOULD HAVE BEEN SUPPRESSED BECAUSE PETITIONER WAS
     NOT ADVISED OF HIS MIRANDA RIGHTS . . . . . . . . . 297

F.   STATEMENTS MADE BY PETITIONER DURING THE HOSTAGE
     NEGOTIATIONS SHOULD HAVE BEEN SUPPRESSED BECAUSE
     PETITIONER WAS NOT ADVISED OF HIS MIRANDA RIGHTS
     BEFORE QUESTIONING BY LAW ENFORCEMENT PERSONNEL
     AND THEIR AGENTS . . . . . . . . . . . . . . . 300

     1.   PETITIONER WAS "IN CUSTODY" . . . . . . . . . 301

     2.   PETITIONER'S INCRIMINATING STATEMENTS WERE MADE IN
          RESPONSE TO POLICE INTERROGATION. . . . . . . 303

G.   PREJUDICE . . . . . . . . . . . . . . . . . . 307

XII. THE ADMISSION OF DEPUTY STEIN'S FALSE AND/OR PERJURED
     TESTIMONY, WHICH WAS SUBSTANTIALLY MATERIAL OR PROBATIVE
     ON THE ISSUES OF GUILT OR INNOCENCE AND PUNISHMENT,
     VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS . . . 309

A.   FACTUAL BACKGROUND . . . . . . . . . . . . . . 310

B.   THE FALSITY OF DEPUTY STEIN'S TESTIMONY IS DEMONSTRATED
     BY THE CONCLUSIONS OF MEMORY EXPERTS, BY THE
     CONTRADICTIONS OF OTHER PERCIPIENT WITNESS POLICE
     OFFICERS, AND BY STEIN'S SUSPICIOUS ACTIONS . . . . . 312

     1.   TWO MEMORY EXPERTS HAVE CONCLUDED THAT IT WAS
          SCIENTIFICALLY IMPOSSIBLE FOR DEPUTY STEIN TO
          HAVE HELD PETITIONER'S ALLEGED STATEMENT IN HIS
          MEMORY . . . . . . . . . . . . . . . . . . 312

     2.   THE TESTIMONY OF OTHER PERCIPIENT WITNESS POLICE
          OFFICERS DEMONSTRATES THE FALSITY OF DEPUTY STEIN'S
          TESTIMONY. . . . . . . . . . . . . . . . . 319

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

3.   DEPUTY STEIN'S TESTIMONY WAS FURTHER CONTRADICTED BY OTHER TESTIMONY AND BY STEIN'S SUSPICIOUS ACTIONS   . . . . . . . . . . . . . . 321

C.   WITHOUT DEPUTY STEIN'S FALSE TESTIMONY, THE PROSECUTION'S PROOF OF PREMEDITATION-DELIBERATION WOULD HAVE BEEN RENDERED INSUFFICIENT . . . . . . . 322

XIII.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS BY COUNSEL'S FAILURE TO PRESENT EXPERT TESTIMONY DEMONSTRATING THAT DEPUTY STEIN'S TESTIMONY ABOUT PETITIONER'S ALLEGED "CONFESSIONS" WAS FALSE   . . . . 324

XIV.   COUNSEL HAS PRESENTED NEWLY DISCOVERED EVIDENCE THAT WOULD PROBABLY PRODUCE AN ACQUITTAL OF PETITIONER AND THAT ALSO UNDERMINES THE ENTIRE STRUCTURE OF THE CASE UPON WHICH THE PROSECUTION WAS BROUGHT   . . . . . . . 329

XV.   THE COURT COMMITTED PREJUDICIAL ERROR BY ADMITTING HEARSAY TESTIMONY ABOUT STATEMENTS PETITIONER ALLEGEDLY MADE TO HIS FATHER BECAUSE THE STATEMENTS WERE: (1) OBTAINED IN VIOLATION OF PETITIONER'S FIFTH AMENDMENT RIGHTS AND THE DICTATES OF MIRANDA AND PROGENY; (2) OBTAINED IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL AND STATUTORY PROTECTIONS AGAINST UNREASONABLE SEARCH AND SEIZURE AND GUARANTEEING A RIGHT TO PRIVACY; (3) IMPROPERLY INTRODUCED AS REBUTTAL EVIDENCE; (4) ERRONEOUSLY ADMITTED UNDER CERTAIN EXCEPTIONS TO THE HEARSAY RULE; AND (5) INTRODUCED IN A MANNER SHOWING THE INEFFECTIVENESS OF TRIAL COUNSEL . . . . . . . 331

A.   INTRODUCTION . . . . . . . . . . . . . . . . 332

B.   FACTS RELATING TO MR. MAYFIELD, SR.'S STATEMENT . . . 335

1.   EVIDENTIARY HEARING   . . . . . . . . . . . 335

a.   The Testimony . . . . . . . . . . . 335

b.   The Contentions And Findings   . . . . . . 339

2.   TRIAL TESTIMONY   . . . . . . . . . . . . 340

C.   MR. MAYFIELD, SR.'S STATEMENTS TO DETECTIVE AMICONE ABOUT PETITIONER'S ADMISSIONS WERE ERRONEOUSLY ADMITTED INTO EVIDENCE IN VIOLATION OF PETITIONER'S FIFTH AMENDMENT RIGHTS AND THE DICTATES OF MIRANDA AND ITS PROGENY.   . . . . . . . . . . . . . . 342

1.   INTRODUCTION . . . . . . . . . . . . . . 342

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

2.   MR. MAYFIELD, SR. BECAME AN "IMPLIED AGENT" OF THE POLICE FOR PURPOSES OF INTERROGATING PETITIONER, AND THE ELICITING OF INCRIMINATING STATEMENTS VIOLATED PETITIONER'S RIGHT TO SILENCE AND TO COUNSEL GUARANTEED BY THE FIFTH AMENDMENT. . . . 345

3.   PETITIONER'S STATEMENTS TO HIS FATHER SHOULD HAVE BEEN SUPPRESSED BECAUSE THEY WERE INVOLUNTARY  . . . . . . . . . . . . . . . 353

4.   IT WAS IMPROPER TO IMPEACH PETITIONER'S FATHER WITH A STATEMENT CONTAINING ADMISSIONS THAT WERE OBTAINED IN VIOLATION OF PETITIONER'S MIRANDA RIGHTS . . . . . . . . . . . . . . . . . . 354

5.   PREJUDICE . . . . . . . . . . . . . . . 355

D.   THE TESTIMONY ABOUT MR. MAYFIELD, SR.'S STATEMENT WAS TAINTED BY THE TAPING EPISODE WHICH VIOLATED PETITIONER'S RIGHTS TO PRIVACY UNDER STATE LAW AS WELL AS THE FOURTH AMENDMENT PROTECTION AGAINST UNREASONABLE SEARCH AND SEIZURE . . . . . . . . . . . . . . . . . 356

1.   INTRODUCTION . . . . . . . . . . . . . 356

2.   THE RIGHT TO PRIVACY GUARANTEED BY THE CALIFORNIA CONSTITUTION, ARTICLE I, SECTION I AND PENAL CODE SECTION 2600 . . . . . . . . . . . . . . 357

3.   FOURTH AMENDMENT PROTECTION AGAINST UNREASONABLE SEARCH AND SEIZURE AND FEDERAL WIRETAP STATUTE  . . . . . . . . . . . 358

4.   THE CONSTITUTIONAL AND STATUTORY ILLEGALITIES REQUIRED THAT THE SUBJECT TESTIMONY BE EXCLUDED AS A FRUIT OF THOSE ILLEGALITIES. . . . . . . 362

E.   THE PRESENTATION OF EVIDENCE RELATING TO PETITIONER'S ADMISSION DURING REBUTTAL IMPROPERLY GAVE THE PROSECUTION AN UNFAIR ADVANTAGE AND PREJUDICED PETITIONER'S CASE . . . . . . . . . . . . . . 365

1.   INTRODUCTION . . . . . . . . . . . . . 365

2.   IMPROPER REBUTTAL EVIDENCE . . . . . . . 367

3.   CONCLUSION . . . . . . . . . . . . . . 372

F.   THE COURT ERRONEOUSLY ADMITTED THE DOUBLE HEARSAY TESTIMONY OF DETECTIVE AMICONE SINCE THE "PRIOR INCONSISTENT STATEMENT" AND "ADMISSION" EXCEPTIONS WERE NOT APPLICABLE . . . . . . . . . . . . . 372

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

x

1.   INTRODUCTION . . . . . . . . . . . . . . . . . . 372

2.   THE "PRIOR INCONSISTENT STATEMENT" EXCEPTION WAS
NOT APPLICABLE BECAUSE THE STATEMENT OF MR.
MAYFIELD, SR. AS QUOTED IN THE POLICE REPORT WAS
ESSENTIALLY CONSISTENT, NOT INCONSISTENT, WITH MR.
MAYFIELD, SR.'S RECOLLECTION OF HIS STATEMENT. . 373

3.   THE "ADMISSION" EXCEPTION WAS NOT APPLICABLE
BECAUSE THE PROSECUTION FAILED TO SHOW THAT
PETITIONER ACTUALLY MADE A STATEMENT THAT TENDED
TO PROVE HIS GUILT . . . . . . . . . . . . . . . 376

4.   ASSUMING ARGUENDO, THE PRIOR INCONSISTENT STATEMENT
EXCEPTION WAS APPLICABLE, THE COURT IMPROPERLY
PERMITTED THE PROSECUTOR TO IMPEACH MR. MAYFIELD,
SR. ON A COLLATERAL MATTER AND ERRONEOUSLY
FAILED TO EXCLUDE THE STATEMENT ON EVIDENCE CODE
SECTION 352 GROUNDS . . . . . . . . . . . . . . 379

G.  EVEN IF THE TESTIMONY OF DETECTIVE AMICONE WAS
PROPERLY ADMITTED, DEFENSE COUNSEL INEFFECTIVELY
FAILED TO ELICIT IN CROSS-EXAMINATION CRITICAL
EXCULPATORY EVIDENCE . . . . . . . . . . . . . . 380

H.  CONCLUSION . . . . . . . . . . . . . . . . . . 385

XVI. THE HEARSAY STATEMENTS OF BILL HAVERSTICK AND YVONNE HESTER
MADE DURING NEGOTIATIONS WITH PETITIONER WERE ERRONEOUSLY
ADMITTED AS ADOPTIVE ADMISSIONS, SPONTANEOUS DECLARATIONS,
OR STATE OF MIND EVIDENCE AND VIOLATED PETITIONER'S
CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . . 386

A.  INTRODUCTION . . . . . . . . . . . . . . . . . 386

B.  THE HEARSAY STATEMENTS WERE INADMISSIBLE AS ADOPTIVE
ADMISSIONS . . . . . . . . . . . . . . . . 390

C.  THE HEARSAY STATEMENTS BY HAVERSTICK WERE INADMISSIBLE
AS SPONTANEOUS STATEMENTS . . . . . . . . . . . . 395

D.  THE HEARSAY STATEMENTS WERE INADMISSIBLE AS EVIDENCE OF
HAVERSTICK'S STATE OF MIND . . . . . . . . . . . 397

E.  THE IMPROPER ADMISSION OF HEARSAY VIOLATED PETITIONER'S
SIXTH AMENDMENT RIGHT OF CONFRONTATION DUE TO THE
UNRELIABILITY OF THE DECLARANT'S STATEMENTS, HIS RIGHT
TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS,
AND HIS RIGHT TO A RELIABLE VERDICT GUARANTEED BY THE
EIGHTH AMENDMENT . . . . . . . . . . . . . . . . 400

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

F.    THE COURT ABUSED ITS DISCRETION IN ADMITTING THE TAPE
      WITHOUT CONDUCTING THE WEIGHING PROCESS REQUIRED BY
      EVIDENCE CODE 352 . . . . . . . . . . . . . . . . . . 402

G.    PREJUDICE . . . . . . . . . . . . . . . . . . . . . . 404

XVII.   THE ADMISSION OF THE PRELIMINARY HEARING TESTIMONY OF
        DECEASED WITNESS WILLIAM HAVERSTICK VIOLATED
        PETITIONER'S CONSTITUTIONAL RIGHTS BECAUSE PETITIONER
        HAD NOT HAD A MEANINGFUL OPPORTUNITY TO CROSS-EXAMINE
        THE WITNESS. MOREOVER, THE COURT COMMITTED ADDITIONAL
        EVIDENTIARY ERRORS IN ADMITTING CERTAIN PARTS OF THE
        PRIOR TESTIMONY . . . . . . . . . . . . . . . . . . 405

A.    INTRODUCTION  . . . . . . . . . . . . . . . . . . 406

B.    FACTUAL BACKGROUND  . . . . . . . . . . . . . . . 407

C.    THE ADMISSION OF THE PRELIMINARY HEARING TRANSCRIPT
      VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO CONFRONT
      WITNESS HAVERSTICK BECAUSE PETITIONER HAD NOT HAD A
      MEANINGFUL OPPORTUNITY TO CROSS-EXAMINE HIM AT THE
      PRELIMINARY HEARING . . . . . . . . . . . . . . . . . 409

      1.    MR. HAVERSTICK'S MEMORY LAPSE DEPRIVED
            PETITIONER OF A MEANINGFUL CROSS-EXAMINATION . . 412

      2.    AT THE PRELIMINARY HEARING, PETITIONER DID NOT
            HAVE "AN INTEREST AND MOTIVE SIMILAR" TO THAT
            WHICH HE HAD AT TRIAL  . . . . . . . . . . . . . 414

D.    THE COURT COMMITTED ADDITIONAL ERROR BY ADMITTING
      CERTAIN PARTS OF THE PRELIMINARY HEARING TESTIMONY
      OVER PROPER EVIDENTIARY OBJECTIONS. . . . . . . . . . 417

      1.    EVIDENTIARY ERROR NUMBER ONE . . . . . . . . . 417

      2.    EVIDENTIARY ERROR NUMBER TWO . . . . . . . . . 419

      3.    EVIDENTIARY ERROR NUMBER THREE . . . . . . . . 420

      4.    EVIDENTIARY ERROR NUMBER FOUR . . . . . . . . . 421

E.    CONCLUSION  . . . . . . . . . . . . . . . . . . . 422

XVIII.  THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING
        THE EXPERT OPINION OF DR. ROOT THAT THE SHOOTING COULD
        NOT HAVE OCCURRED AS TESTIFIED BY PETITIONER WHERE DR.
        ROOT'S TESTIMONY WAS NOT A PROPER SUBJECT FOR EXPERT
        OPINION AND THERE WAS AN INSUFFICIENT FOUNDATION  . . 423

A.    FACTS RELATING TO THE EXPERT OPINION  . . . . . . . 423

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

B.   DR. ROOT'S TESTIMONY WAS NOT THE PROPER SUBJECT FOR
     EXPERT OPINION. . . . . . . . . . . . . . . . . . . . 427

C.   DR. ROOT'S OPINION THAT THE SHOT COULD NOT HAVE BEEN
     FIRED AS TESTIFIED TO BY PETITIONER WAS BEYOND HIS
     EXPERTISE AS A PATHOLOGIST. . . . . . . . . . . . . . 430

D.   DR. ROOT'S EXPERT OPINION WAS PREJUDICIAL TO PETITIONER
     AND REQUIRES REVERSAL OF HIS CONVICTIONS. . . . . . . 431

XIX. TRIAL COUNSEL'S PERFORMANCE WAS INEFFECTIVE BECAUSE
     HE FAILED TO INTRODUCE EXCULPATORY EVIDENCE TURNED OVER IN
     DISCOVERY AS WELL AS CONDUCT AN INDEPENDENT INVESTIGATION FOR
     PURPOSES OF IMPEACHING THE PROSECUTION'S THEORY BASED ON
     GUNSHOT RESIDUE . . . . . . . . . . . . . . . . . . . 432

A.   THE EVIDENCE INTRODUCED BY THE PROSECUTION WITH RESPECT
     TO THE DISTANCE BETWEEN PETITIONER AND SERGEANT WOLFLEY
     AT THE TIME OF THE SHOOTING WAS UNRELIABLE AND
     INSUFFICIENT TO SUPPORT A THEORY OF PREMEDITATION.   . 433

B.   TRIAL COUNSEL FAILED TO TEST SERGEANT WOLFLEY'S CLOTHING
     FOR GUN POWDER RESIDUE.   . . . . . . . . . . . . . . 437

C.   COUNSEL FAILED TO INTRODUCE EXCULPATORY EVIDENCE
     CONTAINED IN THE RECORD THAT WOULD HAVE IMPEACHED THE
     PROSECUTION'S THEORY. . . . . . . . . . . . . . . . . 442

XX.  PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO BE PRESENT AT
     TRIAL, HIS RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES,
     HIS RIGHT TO A FAIR TRIAL, AND HIS RIGHT TO THE EFFECTIVE
     ASSISTANCE OF COUNSEL WHEN EVIDENCE WAS TAKEN, IN HIS
     ABSENCE, DURING THE JURY'S VISIT TO THE CRIME SCENE . . . 444

A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 445

B.   FACTS RELATING TO THE JURY'S VISIT TO THE
     CRIME SCENE . . . . . . . . . . . . . . . . . . . . . 446

C.   PETITIONER'S RIGHT TO BE PRESENT AT TRIAL GUARANTEED BY
     THE DUE PROCESS CLAUSE OF THE FOURTEENTH AND THE
     CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT, ARTICLE I,
     SECTION 15 OF THE CALIFORNIA CONSTITUTION AND CALIFORNIA
     PENAL CODE SECTIONS 977, 1043 AND 1119 WAS VIOLATED
     DURING THE JURY'S VISIT TO THE CRIME SCENE . . . . . 454

     1.   THE TAKING OF EVIDENCE DURING THE JURY VISIT,
          COUPLED WITH THE COURT'S EXTENSIVE PARTICIPATION
          IN THE VIEWING, DENIED PETITIONER HIS FEDERAL
          FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE
          PRESENT DURING THE PRESENTATION OF
          EVIDENCE . . . . . . . . . . . . . . . . . . . . 454

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

2.   THE TAKING OF EVIDENCE DURING THE JURY'S VISIT TO
     THE CRIME SCENE DENIED PETITIONER HIS SIXTH
     AMENDMENT RIGHT TO CONFRONT WITNESSES
     AGAINST HIM  . . . . . . . . . . . . . . . . . . 459

3.   THE TAKING OF EVIDENCE DURING THE JURY'S VISIT
     TO THE CRIME SCENE DENIED PETITIONER HIS STATE
     CONSTITUTIONAL AND STATUTORY RIGHTS TO BE PRESENT
     DURING THE PRESENTATION OF EVIDENCE  . . . . . . 461

     a.   Right To Be Present . . . . . . . . . . . . 461

     b.   Petitioner's Waiver Of His Presence At The
          Crime Scene Was Invalid Under Both Federal And
          State Law Because He Was Not Aware That
          Evidence Would Be Taken During The Visit And
          Because The Waiver Was Not In Writing.  . . 462

4.   ASSUMING ARGUENDO THAT THE WAIVER WAS OTHERWISE
     PROPER, PETITIONER ASSERTS THAT FEDERAL DUE
     PROCESS, THE EIGHTH AMENDMENT RIGHT TO RELIABLE
     VERDICTS, AND THE CALIFORNIA STATUTORY ENACTMENTS
     PROHIBIT THE WAIVER OF A NON-DISRUPTIVE CAPITAL
     DEFENDANT'S PRESENCE AT A TRIAL PROCEEDING.  . . 466

     a.   Federal Decisional Law . . . . . . . . . . 466

     b.   The State Court's Determination That Federal
          Due Process Permits Waiver Is Wrong.  . . . 468

     c.   California's Codification Of The Presence
          Requirement Has Never Contemplated Allowing
          Capital Defendants To Voluntarily Absent
          Themselves From Critical Trial
          Proceedings . . . . . . . . . . . . . . . . 469

          (1)  History Of Sections 1043 And 977 . . . 469

          (2)  Legislative History Of The
               1970 Amendment To Section 1043 . . . . 473

D.   THE TRIAL COURT'S ACTIVE PARTICIPATION DURING THE JURY
     VISIT WAS WAS MISCONDUCT AND DENIED PETITIONER HIS DUE
     PROCESS RIGHT TO A FAIR TRIAL AND HIS EIGHTH AMENDMENT
     RIGHT TO A RELIABLE VERDICT.  . . . . . . . . . 479

E.   TRIAL COUNSEL'S FAILURE TO OBJECT TO THE TRIAL COURT'S
     ACTION DURING THE VISIT AND HIS WILLINGNESS TO ENTER
     INTO STIPULATIONS AND RECEIVE EVIDENCE IN THE ABSENCE
     OF HIS CLIENT, DENIED PETITIONER HIS SIXTH AMENDMENT
     RIGHT TO COUNSEL  . . . . . . . . . . . . . . . 481

F.   CONCLUSION . . . . . . . . . . . . . . . . . . . 482

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

XXI. PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR
TRIAL AND HIS SIXTH AMENDMENT RIGHT TO CROSS-EXAMINE
WITNESSES WHEN THE TRIAL COURT ADMITTED INTO EVIDENCE A
VIDEOTAPE OF THE CRIME SCENE IN WHICH THE PROSECUTOR
APPEARED. . . . . . . . . . . . . . . . . . . . . . . . . 483

   A.  THE VIDEOTAPE SHOULD HAVE BEEN EXCLUDED BECAUSE THE
PROSECUTION FAILED TO LAY A PROPER FOUNDATION FOR ITS
ADMISSIBILITY. . . . . . . . . . . . . . . . . . . . 486

      1.  THE VIDEOTAPE WAS NOT AN ACCURATE
REPRESENTATION OF THE SCENE ON MARCH 3, 1986 . . 487

      2.  THE VIDEOTAPE WAS MISLEADING TO THE JURY BECAUSE
IT DID NOT ACCURATELY REPRESENT THE CRIME SCENE
AND WAS AN ARTIFICIAL RECREATION OF PETITIONER'S
TESTIMONY . . . . . . . . . . . . . . . . . . . 490

   B.  PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR
TRIAL AND HIS RIGHT TO CROSS-EXAMINE WITNESSES BY THE
ADMISSION OF AN IRRELEVANT VIDEOTAPE IN WHICH THE
PROSECUTOR APPEARED IN AN ATTEMPT TO IMPEACH
PETITIONER'S TESTIMONY . . . . . . . . . . . . . . . 492

   C.  THE PROBATIVE VALUE OF THE VIDEOTAPE WAS
SUBSTANTIALLY OUTWEIGHED BY ITS PREJUDICIAL
EFFECT . . . . . . . . . . . . . . . . . . . . . . . 495

   D.  THE ERRONEOUS ADMISSION OF THE VIDEOTAPE REQUIRES
REVERSAL OF PETITIONER'S CONVICTIONS . . . . . . . . 498

XXII.  THE PROSECUTOR'S CROSS-EXAMINATION OF PETITIONER
AMOUNTED TO PROSECUTORIAL MISCONDUCT AND THE COURT
ERRED IN DENYING PETITIONER'S MOTION FOR MISTRIAL . . 499

   A.  INTRODUCTION . . . . . . . . . . . . . . . . . . . 500

   B.  DEFENSE OBJECTIONS TO PROSECUTOR'S CROSS-EXAMINATION
OF PETITIONER . . . . . . . . . . . . . . . . . . . 501

   C.  LEGAL PRINCIPLES . . . . . . . . . . . . . . . . . 528

      1.  BASELESS INSINUATION THROUGH QUESTIONING . . . . 528

      2.  SETTING UP IMPROPER IMPEACHMENT . . . . . . . 529

      3.  OBJECTIONABLE QUESTIONS . . . . . . . . . . . . 529

      4.  ABUSING THE WITNESS . . . . . . . . . . . . . . 530

   D.  CONCLUSION . . . . . . . . . . . . . . . . . . . . 531

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

XXIII.    PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS BY
          COUNSEL'S FAILURE TO INVESTIGATE ANDS PRESENT FULLY
          EVIDENCE OF PETITIONER'S BACKGROUND, PHYSICAL AND
          MENTAL CONDITION, AND FAMILY AND SOCIAL HISTORY, WHICH
          DEMONSTRATE THE EXISTENCE OF MENTAL DEFENSES IN THE GUILT
          PHASE AND SIGNIFICANT MITIGATING EVIDENCE IN THE PENALTY
          PHASE. . . . . . . . . . . . . . . . . . . . . . 532

     A.   TRIAL COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND
          PRESENT FULLY EVIDENCE OF PETITIONER'S BACKGROUND,
          PHYSICAL AND MENTAL CONDITION, AND FAMILY AND SOCIAL
          HISTORY. . . . . . . . . . . . . . . . . . . . . 533

     B.   PETITIONER'S SOCIAL HISTORY, READILY AVAILABLE TO TRIAL
          COUNSEL, DEMONSTRATED THE EXISTENCE OF MENTAL DEFENSES IN
          THE GUILT PHASE AND SIGNIFICANT MITIGATING EVIDENCE IN
          THE PENALTY PHASE OR, AT THE VERY LEAST, THE NECESSITY TO
          DO MEDICAL AND PSYCHOLOGICAL TESTING OF PETITIONER AND
          FURTHER SOCIAL HISTORY INVESTIGATION. . . . . . . . 542

     C.   TRIAL COUNSEL'S INEFFECTIVENESS . . . . . . . . . . 544

XXIV.     THE LACK OF ANY SATISFACTORY EXPLANATION FOR DEFENSE
          COUNSEL'S WIDESPREAD AND HIGHLY PREJUDICIAL ERRORS IN THE
          GUILT PHASE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL
          REQUIRING REVERSAL. . . . . . . . . . . . . . . . . 553

     A.   INTRODUCTION . . . . . . . . . . . . . . . . . . 554

     B.   PETITIONER'S COUNSEL ACTED TO ELICIT DAMAGING
          EVIDENCE AGAINST HIS CLIENT. . . . . . . . . . . . 555

          1.   PETITIONER'S COUNSEL'S MOTION TO DISMISS THE ROBBERY
               COUNT DENIED PETITIONER THE EFFECTIVE ASSISTANCE OF
               COUNSEL BECAUSE IT ENABLED THE PROSECUTOR TO IMPEACH
               PETITIONER WITH A PRIOR ROBBERY CONVICTION THAT HAD
               EARLIER BEEN RULED INADMISSIBLE. . . . . . . . 557

          2.   DEFENSE COUNSEL PURSUED CROSS-EXAMINATION OF
               CERTAIN WITNESSES WHICH ELICITED DAMAGING TESTIMONY
               AND SHOWED THE LACK OF CONSISTENT THEORY OF THE
               CASE . . . . . . . . . . . . . . . . . . . . 560

               a.   Cross-Examination Of Tyrone Thomas . . . . 560

               b.   Howard Bell's Ingestion Of PCP . . . . . . 561

               c.   Candette Wolfley's New Baby And Sergeant
                    Wolfley's New Promotion . . . . . . . . . 562

               d.   Eliciting Or Acquiescing In The Presentation
                    Of Damaging Evidence Constitutes Ineffective
                    Assistance Of Counsel . . . . . . . . . . 563

C.   PETITIONER'S COUNSEL FAILED TO PRESENT SIGNIFICANT
     EXCULPATORY EVIDENCE THAT SERGEANT WOLFLEY, NOT
     PETITIONER, HAD POSSESSION OF THE GUN WHEN THE FATAL
     SHOT WAS FIRED . . . . . . . . . . . . . . . . . . 563

D.   DEFENSE COUNSEL FAILED TO OBJECT TO INADMISSIBLE
     EVIDENCE AND IMPROPER ARGUMENT AND ACTED AGAINST THE
     INTERESTS OF HIS CLIENT . . . . . . . . . . . . . 566

     1.   LEGAL PRINCIPLES . . . . . . . . . . . . . 566

     2.   INSTANCES OF INEFFECTIVENESS BY PETITIONER'S
          COUNSEL . . . . . . . . . . . . . . . . . . 567

          a.   Defense Counsel's Failure To Move To Exclude
               The Knife Evidence Before The Jury Was Infected
               By It . . . . . . . . . . . . . . . . . 567

          b.   Defense Counsel's Failure To Object To Deputy
               Stein Reading Petitioner's Incriminating Post-
               Arrest Statements From His Police Report During
               The Evidence Code Section 402 Hearing . . . 568

          c.   Defense Counsel Voiced No Objection To The
               Taking Of Evidence, To The Court's Responding
               To Juror's Questions And To Entering Into
               Evidentiary Stipulations Without Petitioner's
               Presence During The Jury Visit Of The Crime
               Scene . . . . . . . . . . . . . . . . . . 571

          d.   Defense Counsel Failed To Voice Objection To
               Highly Improper Racial Comments Made By The
               Prosecutor During Closing Argument In The Guilt
               Phase And Stipulated To Irrelevant Racial
               References In The Penalty Phase . . . . . 572

E.   CONCLUSION . . . . . . . . . . . . . . . . . . . . 573

XXV.     PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED AS A
         RESULT OF NUMEROUS TRIAL ERRORS BY HIS COUNSEL. . . . 574

     A.   PETITIONER'S TRIAL COUNSEL ACTED TO ELICIT DAMAGING
          EVIDENCE AGAINST PETITIONER DURING THE GUILT PHASE
          OF THE TRIAL. . . . . . . . . . . . . . . . . 575

     B.   PETITIONER'S COUNSEL FAILED TO PRESENT SIGNIFICANT
          EXCULPATORY EVIDENCE TO THE GUILT PHASE JURY. . . . 578

     C.   PETITIONER'S COUNSEL FAILED TO OBJECT TO INADMISSIBLE
          EVIDENCE AND IMPROPER ARGUMENT BY THE PROSECUTION. . 581

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

D.   PETITIONER'S COUNSEL'S INEFFECTIVENESS BOLSTERED THE PROSECUTION'S CONTENTION THAT TYRONE THOMAS TOLD SERGEANT WOLFLEY THAT PETITIONER WAS ARMED WITH A GUN AND WAS GOING TO KILL THOMAS. . . . . . . . . . 585

E.   PETITIONER'S COUNSEL FAILED TO ADEQUATELY PREPARE PETITIONER FOR HIS TESTIMONY AT TRIAL. . . . . . . 591

F.   IF A COURT OF LAW DETERMINES THAT ANY ISSUES RAISED BY PETITIONER HAVE BEEN WAIVED DUE TO TRIAL COUNSEL'S FAILURE TO MAKE A TIMELY AND PROPER OBJECTION, PETITIONER WAS PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT AND PENALTY PHASE OF THE TRIAL . . . . . . . . . . . . . . . . . . . . 593

XXVI.   THE DENIAL OF PETITIONER'S MOTION TO SEVER COUNTS ONE, TWO, FIVE, SEVEN, AND EIGHT FROM COUNTS THREE, FOUR, AND NINE DENIED PETITIONER HIS CONSTITUTIONAL AND STATUTORY RIGHTS . . . . . . . . . . . . . . . . 595

XXVII.   THE KIDNAPPING FOR EXTORTION CONVICTION MUST BE REVERSED BECAUSE THE COURT ERRONEOUSLY DEFINED THE OFFENSE AND THE EVIDENCE WAS NON-EXISTENT AND/OR INSUFFICIENT TO SUPPORT THE CONVICTION. . . . . . . 599

XXVIII.   THE ATTEMPTED MURDER CONVICTIONS IN COUNTS TWO AND THREE MUST BE REVERSED BECAUSE THE EVIDENCE WAS NON-EXISTENT AND/OR INSUFFICIENT TO PROVE THAT PETITIONER HAD THE SPECIFIC INTENT TO KILL OFFICER CIRILO (COUNT TWO) OR WILLIAM HAVERSTICK (COUNT THREE). . . . . . . . . . 608

A.   EVIDENCE RELATING TO THE ATTEMPTED MURDERS OF OFFICER CIRILO AND WILLIAM HAVERSTICK . . . . . . . . . . 609

1.   COUNT TWO -- OFFICER CIRILO . . . . . . . . 609

2.   COUNT THREE -- WILLIAM HAVERSTICK . . . . . . 610

B.   THE EVIDENCE IS INSUFFICIENT TO PROVE A SPECIFIC INTENT TO KILL CIRILO OR HAVERSTICK . . . . . . . . 612

XXIX.   THE COURT'S MODIFICATION OF CALJIC 2.70 AND 2.71 ERRONEOUSLY NEGATED THE CAUTIONARY REQUIREMENT OF THESE INSTRUCTIONS RESULTING IN REVERSIBLE ERROR. . . 615

XXX. CALJIC NO. 9.57 WAS MISLEADING AND UNCONSTITUTIONAL IN THAT IT FAILED TO ADEQUATELY INSTRUCT THE JURY THAT PETITIONER COULD BE FOUND GUILTY OF THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER IF THE JURY FOUND THAT HE USED UNREASONABLE FORCE IN RESPONSE TO THE OFFICER'S USE OF EXCESSIVE OR UNREASONABLE FORCE. . . . . 622

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

XXXI.     THE TRIAL COURT'S REFUSAL TO INSTRUCT WITH
          CALJIC NO. 5.01 DENIED PETITIONER HIS RIGHTS
          TO HAVE THE JURY CONSIDER HIS DEFENSE. . . . . . . 627

XXXII.    THE TRIAL COURT'S REFUSAL TO INSTRUCT WITH CALJIC NO.
          5.51 AND TO SUPPLEMENT CALJIC NO. 5.00 WITH CALJIC NO.
          8.46 DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS. . . 631

     A.   CALJIC NO. 5.51 . . . . . . . . . . . . . . . 633

     B.   CALJIC NO. 8.46   . . . . . . . . . . . . . 634

     C.   THE TRIAL COURT'S FAILURE TO INSTRUCT WITH CALJIC NOS.
          5.51 AND 8.46 REQUIRES REVERSAL OF PETITIONER'S MURDER
          CONVICTION . . . . . . . . . . . . . . 635

XXXIII.   THE TRIAL COURT ERRED IN READING CALJIC NO. 8.73
          BECAUSE HE INSTRUCTION MISSTATES THE LAW IN REGARD
          TO THE PROVOCATION WHICH MAY BE SUFFICIENT TO REDUCE
          THE DEGREE OF MURDER FROM FIRST TO SECOND. . . . . 636

XXXIV.    PETITIONER'S TRIAL WAS RENDERED UNFAIR WHEN PETITIONER
          WAS UNLAWFULLY RESTRAINED IN FRONT OF THE JURY. . . . . 642

XXXV.     THE PRESENCE OF UNIFORMED OFFICERS IN COURTROOM FOR
          PURPOSES OTHER THAN PROVIDING SECURITY VIOLATED
          PETITIONER'S CONSTITUTIONAL RIGHTS. . . . . . . . 647

     A.   FACTUAL BACKGROUND . . . . . . . . . . . . 647

     B.   THE PRESENCE OF POLICE OFFICERS IN THE COURTROOM DURING
          THE TRIAL, INCLUDING THOSE WEARING THE SAME UNIFORM AS
          THE DECEASED OFFICER, PREVENTED PETITIONER FROM HAVING A
          FAIR HEARING BEFORE AN IMPARTIAL JURY. . . . . . . 650

     C.   THE PRESENCE OF THE OFFICERS CANNOT BE JUSTIFIED ON THE
          GROUND OF ANY LEGITIMATE SECURITY NEEDS. . . . . . 651

     D.   THE OFFICERS' PRESENCE CAUSED PREJUDICE SPECIFIC TO THE
          CIRCUMSTANCES OF THIS CASE. . . . . . . . . . 652

XXXVI.    THE COURT COMMITTED ADDITIONAL EVIDENTIARY ERRORS WHICH,
          VIEWED INDIVIDUALLY OR CUMULATIVELY, REQUIRE
          REVERSAL OF THE GUILT PHASE CONVICTIONS. . . . . . 653

     A.   THE TESTIMONY OF TECHNICIAN DAVID BLACKBURN CONCERNING
          TESTS PERFORMED PURPORTEDLY SHOWING THAT HOWARD BELL WAS
          UNDER THE INFLUENCE OF PCP WAS INADMISSIBLE HEARSAY,
          VIOLATIVE OF CONSTITUTIONAL RIGHTS, IRRELEVANT AND
          WITHOUT FOUNDATION. . . . . . . . . . . . . 654

          1.    HEARSAY AND CONFRONTATION CLAUSE VIOLATION . . . 655

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

        (a)   Evidence Code Section 1237 Not Applicable . 655

        (b)   Admission Of The Hearsay Testimony Amounted
            To A Confrontation Clause Violation . . . . 658

    2.   RELEVANCY AND FOUNDATION . . . . . . . . . . 659

    3.   CONCLUSION . . . . . . . . . . . . . . . . . 661

B.   TYRONE THOMAS' TESTIMONY THAT HE TOLD SERGEANT WOLFLEY
    THAT PETITIONER MIGHT HAVE A GUN WAS INADMISSIBLE
    HEARSAY AND VIOLATIVE OF PETITIONER'S CONSTITUTIONAL
    RIGHTS . . . . . . . . . . . . . . . . . . . . . . . 662

C.   THE TESTIMONY OF CRIMINALIST NORMAN WALLIS ABOUT THE
    CONTENTS OF A REPORT PREPARED BY CRIMINALIST GREGONIS WAS
    HEARSAY AND NOT ADMISSIBLE UNDER THE BUSINESS RECORDS
    EXCEPTION AND VIOLATIVE OF PETITIONER'S CONSTITUTIONAL
    RIGHTS . . . . . . . . . . . . . . . . . . . . . . . 664

D.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . 667

XXXVII.   THE PROSECUTOR COMMITTED MISCONDUCT BOTH IN JURY
    SELECTION AND IN CLOSING ARGUMENT BY STATING HIS PERSONAL
    BELIEF REGARDING GUILT AND THE CREDIBILITY OF A
    WITNESS. . . . . . . . . . . . . . . . . . . . . . . 668

XXXVIII.   CUMULATIVE ERROR DENIED PETITIONER HIS DUE
    PROCESS RIGHT TO A FAIR GUILT PHASE TRIAL . . . . . . 668

GUILT PHASE AND PENALTY PHASE JOINT CLAIMS . . . . . . . . . . 671

XXXIX.   PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR
    TRIAL AND HIS EIGHTH AMENDMENT PROTECTION AGAINST CRUEL
    AND UNUSUAL PUNISHMENT WHEN THE COURT ADMITTED TESTIMONY
    AND PHOTOGRAPHS OF A KNIFE FOUND AT THE SHELL STATION, IN
    THE ABSENCE OF ANY EVIDENCE SHOWING THE KNIFE BELONGED TO
    PETITIONER . . . . . . . . . . . . . . . . . . . . . 671

A.   FACTS RELATING TO EVIDENCE OF A KNIFE FOUND AT THE
    SHELL STATION . . . . . . . . . . . . . . . . . . . 672

B.   EVIDENCE OF THE KNIFE WAS IRRELEVANT IN THE ABSENCE
    OF ANY TESTIMONY TO SHOW THE KNIFE BELONGED TO
    PETITIONER . . . . . . . . . . . . . . . . . . . . . 675

C.   THE TRIAL COURT ALSO ERRED IN FAILING TO MEANINGFULLY
    EXERCISE ITS STATUTORY FUNCTION OF WEIGHING THE
    PROBATIVE VALUE OF THE EVIDENCE AGAINST ITS POTENTIALLY
    PREJUDICIAL EFFECT, PURSUANT TO EVIDENCE CODE
    SECTION 352. . . . . . . . . . . . . . . . . . . . . 679

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

D.   THE PROSECUTOR IMPROPERLY CROSS-EXAMINED PETITIONER
     ABOUT THE KNIFE. . . . . . . . . . . . . . . . . 681

E.   THE ERRONEOUS ADMISSION OF THE KNIFE VIOLATED THE
     EIGHTH AMENDMENT REQUIRING A NEW PENALTY PHASE. . . . 685

F.   DEFENSE COUNSEL WAS INEFFECTIVE IN NEGLECTING TO
     MOVE TO EXCLUDE THE KNIFE EVIDENCE PRIOR TO THE
     PROSECUTOR MAKING ANY REFERENCE TO IT BEFORE
     THE JURY  . . . . . . . . . . . . . . . . . . . 686

G.   PETITIONER WAS PREJUDICED BY EVIDENCE OF THE
     KNIFE IN BOTH THE GUILT AND PENALTY PHASES  . . . . . 689

XL.  PETITIONER WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH,
     EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION
     BECAUSE OF THE IMPROPER INJECTION OF RACIAL ISSUES DURING THE
     GUILT AND PENALTY PHASES OF TRIAL.   THE PROSECUTOR
     COMPOUNDEDTHE ERROR BY GUILT PHASE  . . . . . . . . . . 691

A.   THE PROSECUTOR'S OPENING ARGUMENT DURING GUILT
     PHASE OF TRIAL . . . . . . . . . . . . . . . . . 692

B.   THE PROSECUTOR COMPOUNDED THE PREJUDICE BY
     DESCRIBING PETITIONER AS A "MAD DOG" DURING
     GUILT PHASE ARGUMENT  . . . . . . . . . . . . . . 696

C.   DEFENSE COUNSEL'S OBJECTION TO THE PROSECUTOR'S
     STATEMENTS WOULD HAVE BEEN FUTILE.  IF DEFENSE
     COUNSEL WAIVED THE OBJECTIONS, THEN PETITIONER WAS
     DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF
     COUNSEL . . . . . . . . . . . . . . . . . . . . 697

D.   RACIAL ISSUES DURING PENALTY PHASE OF TRIAL . . . . . 699

E.   CONCLUSION . . . . . . . . . . . . . . . . . . . 702


PENALTY PHASE CLAIMS  . . . . . . . . . . . . . . . . . 702

XLI. THE COURT COMMITTED REVERSIBLE ERROR IN THE PENALTY PHASE BY
     REFUSING TO APPOINT NEW COUNSEL IN LIGHT OF AN IRRECONCILABLE
     ATTORNEY-CLIENT CONFLICT THAT RESULTED IN AN UNRELIABLE DEATH
     VERDICT.  IT FURTHER ABUSED ITS DISCRETION IN FAILING TO
     CONDUCT AN ADEQUATE MARSDEN HEARING AND REFUSING TO GRANT
     A BRIEF CONTINUANCE TO PERMIT PETITIONER TO DEMONSTRATE
     THAT COUNSEL'S INEFFECTIVE REPRESENTATION IN THE GUILT
     PHASE CONSTITUTED A SEPARATE GROUND TO APPOINT NEW
     COUNSEL FOR THE PENALTY PHASE. . . . . . . . . . . . 702

A.   INTRODUCTION  . . . . . . . . . . . . . . . . . . 703

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

B.   FACTUAL BACKGROUND . . . . . . . . . . . . . . 704

    1.   DECEMBER 28, 1987 HEARING . . . . . . . . 704

    2.   DECEMBER 29, 1987 HEARING   . . . . . . . 707

    3.   DECEMBER 30, 1987 . . . . . . . . . . . . 709

    4.   JANUARY 4, 1988 HEARING . . . . . . . . . 710

        a.   Allegations Made In Attorney Ames' Motion . 710

        b.   Hearing On Counsel's Ineffectiveness In The
            Guilt Phase . . . . . . . . . . . . . . . 716

        c.   Hearing On The Attorney-Client Breakdown . 720

        d.   Court's Ruling . . . . . . . . . . . . . 721

    5.   JANUARY 19, 1988 HEARING . . . . . . . . . 722

C.   THE COURT ERRED IN NOT APPOINTING NEW COUNSEL TO
    REPRESENT PETITIONER IN THE PENALTY PHASE IN LIGHT
    OF AN IRRECONCILABLE ATTORNEY-CLIENT CONFLICT THAT
    PROHIBITED COUNSEL FROM EFFECTIVELY REPRESENTING HIS
    CLIENT.  COUNSEL'S INEFFECTIVE REPRESENTATION OF
    PETITIONER IN THE PENALTY PHASE RESULTED IN AN
    UNRELIABLE DEATH VERDICT . . . . . . . . . . . . 724

    1.   THE CONFLICT: BREAKDOWN OF THE ATTORNEY-
        CLIENT RELATIONSHIP AND EVAPORATION OF COUNSEL'S
        COMMITMENT TO HIS CLIENT . . . . . . . . . . 724

    2.   THE ATTORNEY-CLIENT CONFLICT RESULTED IN AN
        UNRELIABLE DEATH VERDICT. . . . . . . . . . 729

D.   THE COURT ABUSED ITS DISCRETION IN REFUSING TO GRANT A
    ONE WEEK CONTINUANCE TO PERMIT A SHOWING OF TRIAL
    COUNSEL'S INEFFECTIVENESS IN THE GUILT PHASE AS A
    SECOND GROUND FOR RELIEVING HIM AS COUNSEL IN THE PENALTY
    PHASE.  THE COURT'S INSISTENCE ON PRESSING FORWARD WITH
    THE PENALTY PHASE:  (1) INITIALLY DEPRIVED PETITIONER OF
    HIS RIGHT TO A MARSDEN HEARING AND (2) BY REFUSING TO
    GRANT A ONE WEEK CONTINUANCE, DEPRIVED PETITIONER OF THE
    OPPORTUNITY TO SHOW THAT COUNSEL'S INEFFECTIVENESS IN THE
    GUILT PHASE WAS A SEPARATE GROUND TO RELIEVE HIM AS
    COUNSEL IN THE PENALTY PHASE. . . . . . . . . . 734

    1.   MARSDEN ERROR . . . . . . . . . . . . . 734

    2.   DENIAL OF CONTINUANCE MOTION . . . . . . . . 738

E.   THE COURT'S ERRORS WERE PREJUDICIAL AND REQUIRE A NEW
     PENALTY PHASE TRIAL. . . . . . . . . . . . . . . . . 747

XLII.   THE PROSECUTOR'S FAILURE TO GIVE PETITIONER NOTICE OF THE
        EVIDENCE TO BE PRESENTED DURING THE PENALTY PHASE TRIAL
        UNTIL THE DAY THE GUILT VERDICT WAS RETURNED DENIED
        PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHTS. . . . . 748

XLIII.  THE TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION
        TO NOT ADMIT EVIDENCE OF OR DISMISS THE 7-11 ROBBERY
        AS AN AGGRAVATING CIRCUMSTANCE BECAUSE IT WAS NOT
        PROVEN BEYOND A REASONABLE DOUBT THAT PETITIONER
        COMMITTED THE ROBBERY . . . . . . . . . . . . . . . 752

   A.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . 753

   B.   LACK OF SUFFICIENT PROOF THAT PETITIONER COMMITTED THE
        ROBBERY . . . . . . . . . . . . . . . . . . . . . . 756

XLIV.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS BY
        COUNSEL'S FAILURE TO INVESTIGATE ANDS PRESENT FULLY
        EVIDENCE OF PETITIONER'S BACKGROUND, PHYSICAL AND
        MENTAL CONDITION, AND FAMILY AND SOCIAL HISTORY, WHICH
        DEMONSTRATE THE EXISTENCE OF MENTAL DEFENSES IN THE GUILT
        PHASE AND SIGNIFICANT MITIGATING EVIDENCE IN THE PENALTY
        PHASE . . . . . . . . . . . . . . . . . . . . . . . 762

XLV. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT OF
     THE PENALTY TRIAL DENIED PETITIONER HIS RIGHTS UNDER
     THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . 763

   A.   GENERAL PRINCIPLES GOVERNING PROSECUTORIAL
        MISCONDUCT . . . . . . . . . . . . . . . . . . . . 764

   B.   ARGUMENT NOT TO REPLY ON SYMPATHY TO DECIDE AGAINST
        IMPOSING THE DEATH PENALTY . . . . . . . . . . . . 765

   C.   ARGUING FACTS NOT IN EVIDENCE . . . . . . . . . . . 768

   D.   APPEALS TO PASSION AND PREJUDICE . . . . . . . . . 770

   E.   REFERENCES TO CRIMINAL ELEMENTS IN SOCIETY . . . . 771

   F.   EXPRESSION OF PERSONAL OPINION . . . . . . . . . . 772

   G.   CONCLUSION . . . . . . . . . . . . . . . . . . . . 772

XLVI.   CALJIC 8.84.1 AND THE PROSECUTOR'S MISLEADING PENALTY
        ARGUMENT PERMITTED DOUBLE COUNTING UNDER SUBPARAGRAPHS
        (A), (B), AND (C) OF THE CONVICTIONS RETURNED, THEREBY
        INCREASING THE LIKELIHOOD THE JURY WOULD RETURN A DEATH
        VERDICT; THE DOUBLE-COUNTING VIOLATED PETITIONER'S RIGHT
        TO A RELIABLE PENALTY DETERMINATION UNDER THE EIGHTH

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

AND FOURTEENTH AMENDMENTS . . . . . . . . . . . 775

A.   CALJIC NO. 8.84.1 AND THE PROSECUTOR'S ARGUMENT . . . 776
B.   THE INSTRUCTION AND MISLEADING ARGUMENT VIOLATED
     PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO A
     RELIABLE DETERMINATION THAT DEATH IS THE APPROPRIATE
     PUNISHMENT. . . . . . . . . . . . . . . . . . . 779

XLVII.   THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS UNDER THE
         FEDERAL CONSTITUTION WHEN IT FAILED TO DELETE THE WORD
         "EXTREME" FROM SUBDIVISION (D) OF CALJIC NO. 8.84.1.   781

XLVIII.  THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND DENIED
         PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHTS BY FAILING
         TO DELETE FROM CALJIC NO.8.84.1 THOSE SENTENCING FACTORS
         NOT RELEVANT TO THIS CASE AND BY FAILING
         TO DESIGNATE WHETHER THE EXISTENCE OF A FACTOR IS
         TO BE CONSIDERED AGGRAVATING OR MITIGATING. . . . . . 788

A.   CALJIC NO. 8.84.1 INJECTED AMBIGUITY INTO THE JURORS'
     DELIBERATIVE PROCESS. . . . . . . . . . . . . . . 789

B.   THE FAILURE TO DELETE IRRELEVANT FACTORS VIOLATED
     PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS . . . . . 794

C.   CONCLUSION . . . . . . . . . . . . . . . . . . 803

XLIX.    PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED
         WHEN THE COURT REFUSED TO INSTRUCT THE JURORS THAT
         DEATH COULD BE IMPOSED ONLY IF THE THEY WERE CONVINCED
         BEYOND A REASONABLE DOUBT: (1) OF THE EXISTENCE OF ANY
         AGGRAVATING FACTOR USED; (2) THAT AGGRAVATING
         CIRCUMSTANCES SUBSTANTIALLY OUTWEIGHED THOSE IN
         MITIGATION; AND (3) THAT DEATH WAS THE APPROPRIATE
         PENALTY. . . . . . . . . . . . . . . . . . . 804

A.   INTRODUCTION . . . . . . . . . . . . . . . . . 805

B.   THE DUE PROCESS CLAUSE REQUIRES THAT A CONVICTION
     BE BASED ON A FINDING BEYOND A REASONABLE DOUBT. . . 807

C.   EQUAL PROTECTION INTERESTS ARE ALSO VIOLATED BY
     CALIFORNIA'S CAPITAL PUNISHMENT PROCEDURE. . . . . . 812

D.   THE FAILURE OF THE COURT TO INSTRUCT ON THE
     APPLICABILITY OF THE BEYOND A REASONABLE DOUBT
     STANDARD TO THE PENALTY FINDINGS ALSO VIOLATED THE EIGHTH
     AMENDMENT. . . . . . . . . . . . . . . . . . . 813

E.   CONCLUSION . . . . . . . . . . . . . . . . . . 815

L.    THE JUDGMENT OF DEATH MUST BE REVERSED BECAUSE THE
      JURORS WERE NOT INSTRUCTED THAT THEY HAD TO AGREE
      UNANIMOUSLY ON THE SAME AGGRAVATING FACTORS. . . . . . . 816

LI.   THE TRIAL COURT ERRONEOUSLY REJECTED PETITIONER'S
      LINGERING DOUBT INSTRUCTION, THEREBY PRECLUDING
      PETITIONER'S COUNSEL FROM ARGUING THE ISSUE TO
      THE JURY DURING THE PENALTY PHASE OF THE TRIAL. . . . . . 824

LII.  PETITIONER WAS DENIED HIS RIGHTS UNDER THE EIGHTH AND
      FOURTEENTH AMENDMENTS TO HAVE THE JURY CONSIDER ALL
      MITIGATING EVIDENCE WHEN THE TRIAL COURT REFUSED TO
      INSTRUCT JURORS THEY COULD CONSIDER THEIR
      OBSERVATION OF HIM DURING TRIAL. . . . . . . . . . . . . 829

LIII.     THE DEATH JUDGMENT VIOLATES DUE PROCESS, EQUAL
          PROTECTION AND THE EIGHTH AMENDMENT BECAUSE THE
          RECORD CONTAINS NOWRITTEN STATEMENT BY THE JURY OF
          THE EVIDENCE RELIED ON AND THE REASON FOR IMPOSING THE
          DEATH SENTENCE  . . . . . . . . . . . . . . . . . . . 831

     A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . 832

     B.   DUE PROCESS IS FLEXIBLE AND CALLS FOR SUCH PROCEDURAL
          PROTECTIONS AS THE PARTICULAR SITUATION DEMANDS. . . 832

     C.   THE LACK OF WRITTEN REASONS ALSO VIOLATES THE
          EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT EQUAL
          PROTECTION . . . . . . . . . . . . . . . . . . . . . 835

     D.   CONCLUSION   . . . . . . . . . . . . . . . . . . . . 836

LIV. PETITIONER'S DEATH SENTENCE IS DISPROPORTIONATE TO HIS
     INDIVIDUAL CULPABILITY AND MORAL GUILT AND ITS
     IMPOSITION WOULD VIOLATE THE EIGHTH AMENDMENT
     PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT . . . . . 837

     A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . 838

     B.   PETITIONER'S DEATH SENTENCE WAS DISPROPORTIONATE TO
          HIS PERSONAL CULPABILITY AND MORAL GUILT IN VIEW OF
          THE CIRCUMSTANCES OF THE CRIME AND ITS COMPARISON
          WITH OTHER CAPITAL CASES . . . . . . . . . . . . . . 838

          1.   CIRCUMSTANCES OF KILLING . . . . . . . . . . . 839

          2.   THE INDIVIDUAL DISPROPORTIONALITY OF PETITIONER'S
               SENTENCE IS DEMONSTRATED BY COMPARING PETITIONER
               WITH DEFENDANTS IN OTHER CAPITAL CASES WHO ARE FAR
               MORE HEINOUS AND WHO COMMITTED "ABOMINABLE"
               MURDERS  . . . . . . . . . . . . . . . . . . . 840

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

3.   THE DEATH PENALTY IS DISPROPORTIONATE BECAUSE THE
EXTENT OF PETITIONER'S PERSONAL CULPABILITY FOR THE
OFFENSE WAS NEVER ADEQUATELY PROVED; UNCERTAINTY
REGARDING A DEFENDANT'S BLAMEWORTHINESS CANNOT
CONSTITUTIONALLY BE RESOLVED IN FAVOR OF A DEATH
SENTENCE. . . . . . . . . . . . . . . . . . . 844

C.   CONCLUSION . . . . . . . . . . . . . . . . . . . 846

LV.   THE COURT ERRED IN DENYING PETITIONER'S
MOTION FOR NEW PENALTY TRIAL . . . . . . . . . . . . 846

A.   INTRODUCTION . . . . . . . . . . . . . . . 847

B.   A NEW TRIAL WAS REQUIRED WHERE, DUE TO THE
IRRECONCILABLE ATTORNEY-CLIENT CONFLICT, PETITIONER
WAS DEPRIVED OF HIS RIGHT TO TESTIFY. . . . . . . 848

C.   A NEW TRIAL WAS REQUIRED DUE TO THE COURT'S ERRONEOUS
RULING DENYING SUBSTITUTION OF COUNSEL PRIOR TO THE
PENALTY PHASE. . . . . . . . . . . . . . . . . . 850

D.   CONCLUSION . . . . . . . . . . . . . . . . 851

LVI.   CUMULATIVE ERROR DENIED PETITIONER HIS DUE PROCESS RIGHT
TO A FAIR TRIAL AND HIS EIGHTH AMENDMENT RIGHT TO
A RELIABLE PENALTY DETERMINATION . . . . . . . . . . 852

POST-TRIAL ISSUES . . . . . . . . . . . . . . . . . . 853

LVII.   THE COURT ERRED IN REFUSING PETITIONER'S REQUEST TO
REPRESENT HIMSELF IN POST-TRIAL PROCEEDINGS. . . . . 853

A.   FACTUAL BACKGROUND . . . . . . . . . . . 853

B.   THE TRIAL COURT ERRONEOUSLY DENIED PETITIONER'S
RIGHT TO SELF-REPRESENTATION. . . . . . . . . . . 857

C.   CONCLUSION . . . . . . . . . . . . . . . . 866

LVIII.   THE PROCEDURE UTILIZED TO RESOLVE PETITIONER'S
MOTION TO DISQUALIFY THE TRIAL JUDGE AFTER ENTRY
OF THE PENALTY PHASE VERDICT WAS FLAWED AND
REQUIRES REVERSAL OF THE DEATH JUDGMENT. . . . . . 867

PRAYER FOR RELIEF . . . . . . . . . . . . . . . 872

VERIFICATION . . . . . . . . . . . . . . . . 874

VERIFICATION . . . . . . . . . . . . . . . . 875

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

xxvi

1   Petitioner, Dennis Mayfield, by and through his counsel,

2   hereby petitions this Court for a writ of habeas corpus.  As set

3   forth herein, Petitioner is being held under convictions and

4   sentences in violation of the United states Constitution and laws

5   of the United States.

6   I.

7   ## INTRODUCTION

8   On March 3, 1986, petitioner Dennis Mayfield, a Black man, was

9   assaulted by a White police officer, resulting in the officer's

10   death.  The officer, Sergeant Wolfley, was a veteran of the Rialto

11   Police Department.  In subsequent years, the City of Rialto

12   launched an investigation of its own police department, finding

13   that the department had a history of racism against Blacks.  The

14   investigation documented racist acts commonly practiced and

15   condoned by department heads: namely, at roll call, supervisors

16   would hang a Black doll and play Ku Klux Klan tapes; cartoons

17   ridiculing Blacks were often found on bulletin boards and pictures

18   with racial slurs were hung on the squad room wall; and police

19   officers would routinely disseminate material espousing the beliefs

20   of the Ku Klux Klan.

21   Sergeant Wolfley, known as "Scarface" in the Black community

22   of Rialto, had a reputation of being "one of the meanest and

23   roughest police officers who routinely harassed and beat members of

24   the Black community."  The racist practices of Sergeant Wolfley

25   became so alarming that the NAACP and a United States Department of

26   Justice official met with the Rialto Chief of Police to address the

27   problem.  Neither the pervasive racism of the Rialto Police

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

Department nor the racist practices of Sergeant Wolfley was presented as evidence at Petitioner's trial.  Petitioner's trial testimony that Sergeant Wolfley assaulted him with racial slurs and threats to his life remained without necessary corroboration.

## II.

### JURISDICTIONAL ALLEGATIONS[1]

1.   Place of detention: California State Prison at San Quentin, San Quentin, California.

2.   Conviction on which Petition is based:

a.   Nature of offenses involved: first-degree murder with special circumstance; attempted murder; kidnapping for extortion; grand theft; assaulting a peace officer with a deadly weapon.

b.   California Penal Code sections: Amended Information of April 10, 1987: (1) Count 1, Penal Code § 187; (2) Count 2, §§ 664 and 187(a); (3) Count 3, §§ 664 and 187(a); (4) Count 4, § 209(a); (5) Count 5, § 487(3); (6) Count 6, §245(b); (7) Count 7, § 245(b); (8) Count 8, § 211.

c.   Name and location of sentencing court: Superior Court of San Bernardino County, California.

d.   Case number: SCR-44261

e.   Date of conviction: December 18-22, 1987.

---

[1]   Local Rule 26.8.5(b) states: "Petitions shall be filed on a form supplied by the Clerk of the Court, and shall be filled in by printing or typewriting.  In the alternative, the petition may be in a legible typewritten or written form which contains all of the information required by that form." The initial allegations are set forth in a manner equivalent to this Court's form.

f.   Date of sentence: May 4, 1988.

g.   Sentence on each count: (1) Count 1, death; (2) Count 2, fourteen years and stayed an additional one year enhancement; (3) Count 3, three years and three months to run consecutive to the sentence imposed as to Count 2; the court stayed a three year enhancement; (4) Count 4, sentence of life imprisonment without the possibility of parole and stayed enhancements totaling six years; (5) Count 5, eight months to run consecutive to the sentence imposed as to Count 2; (6) Count 6, four years plus a two-year enhancement; the court stayed the sentence as well as an additional one-year enhancement and indicated it would run that sentence concurrent to the sentence imposed as to Count 2; and, (7) Count 7, two-year sentence and stayed a one-year sentence enhancement.

h.   Pleas: Not guilty.

I.   Kind of trial: jury.

j.   Did you testify at trial?: Yes.

3.   Automatic appeal:

a.   Name of Court: Supreme Court of the State of California, Crim. No. S005620.

b.   Affirmed.

c.   Date of result: January 2, 1997; as modified on denial of rehearing on March 19, 1997.

d.   Citation or number of opinion:  People v. Mayfield, 15 Cal.4th 231A, 60 Cal.Rptr.2d 1 (1997).

e.   In summary, the grounds raised in Petitioner's automatic appeal included, but were not limited to:

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

3

1        (1)   Petitioner's statements to police should have been

2  suppressed because (1) the evidence of the post-arrest statements

3  allegedly made to Deputy Stein was inherently improbably; and (2)

4  the statements, if made, and all statements made by Petitioner

5  during negotiations were obtained in violation of Petitioner's

6  <u>Miranda</u> rights.  (Claim 1)

7        (2)   The court committed prejudicial error by admitting

8  hearsay testimony about statements Petitioner allegedly made to his

9  father. (Claim 2)

10       (3)   The prosecutor's discriminatory exercise of

11  peremptory challenges violated Petitioner's constitutional rights.

12  (Claim 3)

13       (4)   The first-degree murder conviction must be reversed

14  because proof of premeditation-deliberation was legally

15  insufficient evidence supporting the jury's verdict. (Claim 4)

16       (5)   Petitioner was denied his due process right to be

17  present at trial, his right to confront and cross-examine

18  witnesses, his right to a fair trial, and his right to the

19  effective assistance of counsel when evidence was taken, in his

20  absence, during the jury's visit to the crime scene.  (Claim 5)

21       (6)   The lack of any satisfactory explanation for defense

22  counsel's widespread and highly prejudicial errors in the guilt

23  phase constitutes ineffective assistance of counsel requiring

24  reversal.  (Claim 6)

25       (7)   The hearsay statements of Bill Haverstick and Yvonne

26  Hester made during negotiations with Petitioner were erroneously

27

28

admitted as adoptive admissions, spontaneous declarations or state
of mind evidence.  (Claim 7)

(8)  Petitioner was denied his due process right to a
fair trial and his Sixth Amendment right to cross-examine witnesses
when the trial court admitted into evidence a videotape of the
crime scene in which the prosecutor appeared.  (Claim 8)

(9)  The admission of the preliminary hearing testimony
of deceased witness William Haverstick violated Petitioner's
constitutional rights.  Moreover, the court committed additional
evidentiary errors in admitting certain parts of the prior
testimony.  (Claim 9)

(10) The trial court committed reversible error by
admitting the expert opinion of Dr. Root that the shooting could
not have occurred as testified by Petitioner where Dr. Root's
testimony was not a proper subject for expert opinion and there was
an insufficient foundation for the opinion.  (Claim 10)

(11) The prosecutor's cross-examination of Petitioner
amounted to prosecutorial misconduct and the court erred in denying
Petitioner's motion for mistrial.  (Claim 11)

(12) The court committed additional evidentiary errors
which, viewed individually or cumulatively, require reversal of the
guilt phase convictions.  (Claim 12)

(13) The prosecutor committed misconduct both in jury
selection and in closing argument by stating his personal belief
regarding guilt and the credibility of a witness.  (Claim 13)

/ /

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1      (14) The court's modification of CALJIC 2.70 and 2.71

2 erroneously negated the cautionary requirement of these

3 instructions resulting in reversible error.  (Claim 14)

4      (15) CALJIC 9.57 was misleading and unconstitutional in

5 that it failed to adequately instruct the jury that Petitioner

6 could be found guilty of the lesser included offense of

7 manslaughter if the jury found that he used unreasonable force in

8 response to the officer's use of excessive or unreasonable force.

9 (Claim 15)

10     (16) The trial court's refusal to instruct with CALJIC

11 5.01 denied Petitioner his rights to have the jury consider his

12 defense.  (Claim 16)

13     (17) The trial court's refusal to instruct with CALJIC

14 5.51 and to supplement CALJIC 5.00 with CALJIC 8.46 denied

15 Petitioner his constitutional rights.  (Claim 17)

16     (18) The trial court erred in reading CALJIC 8.73 because

17 the instruction misstates the law in regard to the provocation

18 which may be sufficient to reduce the degree of murder from first

19 to second.  (Claim 18)

20     (19) The kidnaping for extortion conviction must be

21 reversed because the court erroneously denied the offense and the

22 evidence was non-existent and/or insufficient and/or insufficient

23 to support the conviction.  (Claim 19)

24     (20) The attempted murder convictions in counts two and

25 three must be reversed because the evidence was non-existent and/or

26 insufficient to prove that Petitioner had the specific intent to

27

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

6

1    kill Officer Cirilo (Count Two) or William Haverstick (Count
2    Three).  (Claim 20)

3              (21) The trial court committed reversible error in
4    excluding prospective jurors Luna and Villasenor without
5    determining their willingness to perform their duties in accordance
6    with their instructions and their oath in violation of Petitioner's
7    constitutional rights.  (Claim 21)

8              (22) The non-random selection of the jury constituted a
9    material departure from statutory procedures and violated
10   Petitioner's constitutional rights.  (Claim 22)

11             (23) The denial of Petitioner's motion to sever Counts
12   One, Two Five, Seven, and Eight from Counts Three, Four, and Nine
13   denied Petitioner his constitutional rights.  (Claim 23)

14             (24) Cumulative error denied Petitioner his due process
15   right to a fair trial.  (Claim 24)

16             (25) Petitioner was denied his constitutional rights when
17   the court admitted testimony and photographs of a knife found at
18   the Shell Station, in the absence of any evidence showing the knife
19   belonged to Petitioner.  (Claim 25)

20             (26) Petitioner was denied his constitutional rights
21   because of the improper injection of racial issues during the guilt
22   and penalty phases of trial.  The prosecutor compounded the error
23   by guilt phase argument appealing to the jury's passion and
24   prejudice.  (Claim 26)

25             (27) The special circumstance finding must be reversed
26   because the evidence shows that Officer Wolfley was not lawfully
27   engaged in the performance of his duties at the time of his death
28

1  and the trial court erroneously instructed the jury on the meaning
2  of "in the performance of his duties."   (Claim 27)

3      (28) The court committed reversible error in the penalty
4  phase by refusing the appoint new counsel in light of an
5  irreconcilable attorney-client conflict that resulted in an
6  unreliable death verdict.  It further abused its discretion in
7  failing to conduct an adequate Marsden hearing and refusing to
8  grant a brief continuance to permit Petitioner to demonstrate that
9  counsel's ineffective representation in the guilt phase constituted
10 a separate ground to appoint new counsel for the penalty phase.
11 (Claim 28)

12     (29) The court erred in denying the Petitioner's motion
13 for new penalty trial.  (Claim 29)

14     (30) Prosecutorial misconduct during closing argument of
15 the penalty phase of Petitioner's trial violated his constitutional
16 rights.  (Claim 30)

17     (31) The trial court erred in denying Petitioner's motion
18 to not admit evidence of or dismiss the 7-11 robbery as an
19 aggravating circumstance because it was not proved beyond a
20 reasonable doubt that Petitioner committed the robbery.  (Claim 31)

21     (32) Petitioner's death sentence is disproportionate to
22 his individual culpability and moral guilt and its imposition would
23 violate the constitution.  (Claim 32)

24     (33) CALJIC 8.84.1 and the prosecutor's misleading
25 penalty argument permitted double counting under subparagraphs (1),
26 (b), and (C) of the convictions returned in the present proceeding,
27 thereby increasing the likelihood the jury would return a death
28

verdict; the double counting violated Petitioner's constitutional rights.  (Claim 33)

(34)  The prosecutor's failure to give Petitioner notice of the evidence to be presented during the penalty phase trial until the day the guilt verdict was returned violated Petitioner's constitutional rights.  (Claim 34)

(35)  The trial court violated Petitioner's rights under the Eighth Amendment when it failed to delete the word "extreme" from subdivision (D) of CALJIC 8.84.1.  (Claim 35)

(36)  The trial court committed reversible error and denied Petitioner his constitutional rights by failing to delete from CALJIC 8.84.1 those sentencing factors not relevant to this case and by failing to designate whether the existence of a factor is to be considered aggravating or mitigating.  (Claim 36)

(37)  Petitioner's constitutional rights were violated when the court refused to instruct the jurors that death could be imposed only if the jury was convinced beyond a reasonable doubt: (1) of the existence of any aggravating factor used; (2) that aggravating circumstances substantially outweighed those in mitigation; and (3) that death was the appropriate penalty.  (Claim 37)

(38)  The death judgment violated Petitioner's constitutional rights because the record contains no written statement by the jury of the evidence relied on and the reason for imposing the death sentence.  (Claim 38)

/ /

/ /

(39) The judgment of death must be reversed because the jurors were not instructed that they had to agree unanimously on the same aggravating factors.  (Claim 39)

(40) The trial court erroneously rejected Petitioner's lingering doubt instruction, thereby precluding defense counsel from arguing the issue to the jury during the penalty phase of the trial.  (Claim 40)

(41) Petitioner was denied his constitutional rights to have the jury consider all mitigating evidence when the trial court refused to instruct jurors they could consider their observation of him during trial.  (Claim 41)

(42) Cumulative error denied Petitioner his due process right to a fair trial and his Eighth Amendment right to a reliable penalty determination.  (Claim 42)

(43) The court erred in refusing Petitioner's request to represent himself in post-trial proceedings.  (Claim 43)

(44) The procedure utilized to resolve the Petitioner's motion to disqualify the trial judge after entry of the penalty phase verdict was flawed and requires reversal of the death judgment.  (Claim 44)

f.   The facts supporting these grounds are included in the claims below.

4.   Petition for Writ of Habeas Corpus:

a.   Name of Court: Supreme Court of the State of California, Crim. No. S039866.

b.   Result: Petition denied on its merits.

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

c.   Date of result: October 23, 1996.   Justice Mosk believed and order to show cause should issue.

d.   Citation or number of opinion: unknown at this time.

e.   In summary, the grounds included, but were not limited to:

(1)   The admission of false and/or perjured testimony that was substantially material or probative on the issues of guilt or innocence and punishment violated Petitioner's constitutional rights.   (Claim A)

(2)   Petitioner was denied his constitutional right to the effective assistance of counsel by counsel's failure to present evidence that the Rialto Police Department, and particularly the deceased officer, had a history of racial bias and/or harassment towards Blacks.   (Claim B)

(3)   Petitioner is entitled to a petition for writ of habeas corpus because his counsel has presented newly discovered evidence that would probably produce an acquittal of Petitioner; that undermines the entire structure of the case upon which the prosecution was brought; and that would probably have resulted in convictions on reduced charges, the finding of no special circumstance and/or the absence of the death penalty.   (Claim C)

(4)   Petitioner's convictions and death sentence were unlawfully and unconstitutionally imposed in that the prosecution failed to meet its constitutional obligations to provide exculpatory information; to wit, evidence of the deceased officer's use of excessive force, propensity for violence, and engagement in racial acts against Blacks.   (Claim D)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1          (5)   Petitioner was denied his constitutional right

2  to the effective assistance of counsel by his counsel's failure to

3  present expert testimony demonstrating that Deputy Stein's

4  testimony about Petitioner's alleged confession was false.

5  (Claim E)

6          (6)   Petitioner was denied his constitutional right

7  to the effective assistance of counsel by his counsel's failure to

8  investigate and present fully evidence of Petitioner's background,

9  physical and mental condition, and family and social history, which

10  demonstrate the existence of mental defenses in the guilt phase and

11  significant mitigating evidence in the penalty phase.   (Claim F)

12          (7)   Petitioner was denied his constitutional right

13  to the effective assistance of counsel by his counsel's (1)

14  elicitation of damaging evidence against Petitioner during the

15  guilt phase of the trial, (2) failure to present significant

16  exculpatory evidence to the guilt phase jury, (3) failure to object

17  to inadmissible evidence and improper argument by the prosecution;

18  (4) negligent bolstering of the prosecution's contention that

19  Tyrone Thomas told Sergeant Wolfley that Petitioner was armed with

20  a gun and was going to kill Thomas, (5) failure to adequately

21  prepare Petitioner for his testimony at trial, and (6) failure to

22  make timely objections.   (Claim G)

23          (8)   Petitioner was denied his constitutional right

24  to the effective assistance of counsel by his counsel's failure to

25  have Sergeant Wolfley's clothing tested for the presence of

26  gunpowder and failure to present favorable evidence.   (Claim H)

27  / /

28

1     (9) The jury's deliberations on the question of

2 guilt or innocence were fatally contaminated by (1) jurors sleeping

3 during the presentation of evidence, and by (2) the jury's exposure

4 to a highly prejudicial sign, the effect of which was to eliminate

5 some jurors' reasonable doubts as to Petitioner's culpability.

6 (State Hab. I)

7     (10) Petitioner's constitutional rights were

8 violated by the jurors' viewing of Petitioner in restraints.

9 (Claim J)

10     (11) Petitioner's constitutional rights were

11 violated by the presence of police in the courtroom on a regular

12 basis during the trial, including officers wearing the same uniform

13 as the deceased officer.  (Claim Kelly)

14     (12) Petitioner's constitutional rights were

15 violated by the prosecution's failure to provide exculpatory

16 information regarding a marital argument between Sergeant Wolfley

17 and his wife occurring immediately before Sergeant Wolfley's

18 interaction with Petitioner on March 3, 1986, and by trial

19 counsel's failure to adequately investigate and present this

20 evidence.  (Claim L)

21   f. The facts supporting these grounds are included in

22 the claims below.

23   g. No evidentiary hearing was held.

24

25  5. Petition for Writ of Certiorari:

26   a. Name of court: United States Supreme Court, case

27 number 96-9288.

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

b.   Result: Petition denied.

c.   Date of denial: October 6, 1997.

d.   Citation or number of opinion: <u>Mayfield v.</u>
<u>California</u>, ___ U.S. ___, 118 S.Ct. 116, 139 L.Ed.2d 68.

e.   In summary, the questions presented included:

(1) Whether a death judgment which rests on the inherently incredible testimony of a police officer who claimed to have memorized a criminal defendant's lengthy "confession" word-for-word violates the defendant's Fourteenth Amendment due process right to a fair trial and his Eighth Amendment right to a reliable death verdict.

(2) Whether a criminal defendant's Sixth Amendment right to conflict-free counsel and his Eighth Amendment right to present mitigating evidence and to a reliable death judgment are violated when his attorney is allowed to continue representing the defendant at the penalty phase of a capital trial after the attorney expressly informs the trial court that a conflict exists between counsel, his staff, and the defendant and cautions that he will be "grossly incompetent" in the penalty phase.

7.   Petitioner presently has no appeal or other proceedings pending in any other court as to the judgments under attack.

8.   The following attorneys have represented Petitioner:

a.   At the trial: B. Gene Bristoll, Esq., and Donald Ames, Esq.

b.   On appeal and initial state habeas level: Jay L. Lichtman, Esq., and Robert Kelly. Thyfault, Esq.

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

III.

## PROCEDURAL HISTORY

1.   Petitioner was charged on April 10, 1987 as alleged above in Section II.

2.   _The Trial_: Petitioner was represented by court appointed counsel B. Gene Bristoll, Esq., and for purposes of Petitioner's motion to relieve counsel, by Donald Ames, Esq.

2.   _Appeal and Affirmance_: On September 14, 1992, Petitioner filed his opening brief in his automatic appeal with the California Supreme Court.  On January 2, 1997, the court affirmed Petitioner's conviction and sentences in _People v. Mayfield_, 15 Cal.4th 231A, 60 Cal.Rptr.2d 1 (1997).  A petition for rehearing was filed on January 16, 1997.

4.   _Petition for Writ of Certiorari to the United States Supreme Court_: On October 6, 1997, Petitioner's Petition for Writ of Certiorari was denied by the United States Supreme Court.

5.   _State Petition for Writ of Habeas Corpus_: On May 16, 1994, Petitioner filed his Petitioner for Writ of Habeas Corpus with the California Supreme Court.  Numerous confidential applications for authorization for funds for a habeas corpus investigation were also filed.  Funding in excess of the statutory limit was denied.  The petition was denied on October 23, 1996. Justice Mosk was of the opinion that an order to show cause should issue.

/ /

/ /

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

IV.

OVERVIEW OF TRIAL PROCEDURES

A judgment of death was entered against Petitioner Dennis Mayfield in the Superior Court of San Bernardino County before the Honorable Ben T. Kayashima.   Petitioner was found guilty of one count of murder with the special circumstance that the victim of the murder was a peace officer who was killed while engaged in the performance of his duties within the meaning of Penal Code Section 190.2 subdivision (a)(7).   The killing resulted from a struggle between the officer, who had pointed his gun at Petitioner, and the Petitioner, who was unarmed and had attempted to retreat from the officer.   The death sentence was entered pursuant to Penal Code Sections 190 et. seq.

A.   THE AMENDED INFORMATION

1.   By an Amended Information filed in the Superior Court,[2] Petitioner was charged with one count of murder, two counts of attempted murder, one count of kidnapping for extortion, one count of grand theft of personal property, two counts of assault with a deadly weapon upon a peace officer, and one count of robbery.   As to the murder count, it was alleged that Petitioner committed the murder of a peace officer who was engaged in the performance of his duties, and as to most counts, as specified below, it was further

_____

[2]   The date on the Amended Information in the record is April 10, 1987.   (CT 788-796)   That filing shows handwritten changes on the Information.   These changes were made as a result of a court hearing held on June 5, 1987, wherein the court severed Count 6 (robbery of 7-11 store) from the Amended Information.   (RT 21-37)   The Information read to the jury was the Amended Information with the changes as indicated in the record.   (RT 453-460)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

16

alleged that the offense committed was a serious felony within the meaning of Penal Code Section 1192.7 subdivisions (c)(8) and (9) and that in the commission of the offense, Petitioner was personally armed with and personally used a revolver within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively.[3]

2.   As to Count 1, it was alleged that on or about March 3, 1986, Petitioner wilfully, and with malice aforethought, murdered Gary Wayne Wolfley in violation of Penal Code Section 187 subdivision (a).   It was further alleged that the victim of the murder was a police officer who was intentionally killed by Petitioner while engaged in the performance of his duties and that Petitioner knew, or reasonably should have known, that such victim was a peace officer so engaged in performance of his duties within the meaning of Penal Code Section 190.2 subdivision (a)(7).   It was further alleged that the murder was a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(1).   Finally, it was alleged that in the commission of the above offense, Petitioner was personally armed with and personally used a revolver within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8).

---

[3]   Abbreviations used in this Brief are as follows: "CT" refers to Clerk's Transcript; "RT" refers to Reporter's Transcript; and "Supp. RT" refers to a Supplemental Reporter's Transcript and "Confidential CT" refers to a Confidential Clerk's Transcript, with the appropriate date specified when discussed in the Brief.

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

3.  As to Count 2, it was alleged that on or about March 3, 1986, Petitioner, wilfully and with malice aforethought, attempted to murder Joseph Cirilo in violation of Penal Code Sections 664 and 187 subdivision (a).  It was further alleged that the above offense was a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(9).  Finally, it was alleged that in the commission of the above offense, Petitioner was personally armed with and personally used a revolver, within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8).

4.  As to Count 3, it was alleged that on or about March 3, 1986, Petitioner wilfully, and with malice aforethought, attempted to murder William Haverstick in violation of Penal Code Sections 664 and 187 subdivision (a).  It was further alleged that the above offense was a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(9).  It was further alleged that in the commission of the above offense, Petitioner was personally armed with and personally used a revolver within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8). Finally, it was alleged that in the commission of the above offense, Petitioner, with the intent to inflict such injury, personally inflicted great bodily injury upon William Haverstick, not an accomplice to the above offense, within the meaning of Penal Code Section 12022.7, also causing the above offense to be a

serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8).

5. As to Count 4, it was alleged that on or about March 3, 1986, Petitioner wilfully kidnaped William Haverstick with the intent to detain him for purposes of extortion in violation of Penal Code Section 209 subdivision (a). It was further alleged that the above offense was a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(20). It was further alleged that in the commission of the above offense, Petitioner was personally armed with and personally used a revolver within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8). Finally, it was alleged that in the commission of the above offense, Petitioner, with the intent to inflict such injury, personally inflicted great bodily injury upon William Haverstick, within the meaning of Penal Code Section 12022.7, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8).

6. As to Count 5, it was alleged that on or about March 3, 1986, Petitioner wilfully committed grand theft of personal property by taking a firearm from the personal property of Gary Wayne Wolfley in violation of Penal Code Section 487 subdivision (3).

7. As to Count 6, it was alleged that Petitioner wilfully committed an assault with a deadly weapon, to wit, a revolver, and by means likely to produce great bodily injury upon Joseph Cirilo,

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

19

at such time that Petitioner knew, or should have known, that Mr. Cirilo was a peace officer engaged in the performance of his duties, in violation of Penal Code Section 245 subdivision (b). It was further alleged that in the commission of the above offense, Petitioner was personally armed with and personally used a revolver within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8).

    8.  As to Count 7, it was alleged that on or about March 3, 1986, Petitioner wilfully committed an assault with a deadly weapon, to wit, a revolver, by means likely to produce great bodily injury upon Ruschel Paul Pierson at such time that Petitioner knew, or should have known, that Mr. Pierson was a peace officer engaged in the performance of his duties, in violation of Penal Code Section 245 subdivision (b).  It was further alleged that in the commission of the above offense, Petitioner was personally armed with and personally used a revolver within the meaning of Penal Code Sections 12022 subdivision (a) and 12022.5, respectively, also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(8).

    9.  Finally, as to Count 8, it was alleged that on or about March 3, 1986, Petitioner robbed William Haverstick in violation of Penal Code Section 211 and that such robbery was a serious felony within the meaning of Penal Code Section 1192.7 subdivision (c)(19).  It was further alleged that in the commission of the above offense, Petitioner, with the intent to inflict such injury,

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

personally inflicted great bodily injury upon William Haverstick

within the meaning of Penal Code Section 12022.7, also causing the

above offense to be a serious felony within the meaning of Penal

Code Section 1192.7 subdivision (c)(8). Finally, it was alleged

that in the commission of the above offense, the Petitioner was

armed with a revolver within the meaning of Penal Code Section

12022 subdivision (c) and that the Petitioner personally used the

revolver within the meaning of Penal Code Section 12022.5.

B.   **PRE-TRIAL PROCEDURES**

    10.   On January 28, 1987, after several continuances of the
trial date, the Honorable Ben T. Kayashima was appointed the judge
for this case for all purposes.   (CT 783)

    11.   After several more continuances, on June 5, 1987, the
court ruled on pretrial motions previously filed.   First, the court
denied Petitioner's motion to dismiss pursuant to Penal Code
Section 995.   (CT 816; RT 21-25)   Second, the court granted a
severance as to Count 6 of the Information which charged a robbery
of a 7-11 store on March 2, 1986; the court denied the severance
motion as to all other counts of the Information.   (CT 800; RT 25-
37)

    12.   On June 26, 1987, Petitioner was arraigned on the Amended
Information and entered not guilty pleas to all counts and denied
all allegations.   (RT 56-57)   The Amended Information reflected the
omission of Count 6 due to the court's granting of the severance
motion, and the omission of allegations referring to Petitioner
being an habitual criminal resulting from the prosecution's
decision to strike such enhancements from the Information.   (RT 57-

58)   Moreover, the court deferred ruling on Petitioner's motion for an order compelling the prosecution to comply with the notice requirements of Penal Code Section 190.3 as to the aggravating factors it intended to introduce in the penalty phase.  (CT 884; RT 58)   Finally, in response to Petitioner's <u>Pitchess</u> motion for the personnel records of the deceased police officer, the court received the records and indicated it would make an in camera review of them to determine which, if any, records would be released to the defense.  (CT 862; RT 73-74)

13.   On June 29, 1987, the court indicated that it had completed its in camera review of the personnel records and it concluded that there was nothing of relevance contained in those records.   The records were ordered sealed and not released to the defense.  (RT 78-79)

C.   <u>JURY SELECTION</u>

14.   On July 6, 1987, jury selection began.  (RT 92)   On July 14, 1987, the court commenced individual voir dire as to the prospective jurors attitudes towards the death penalty.  (RT 505) On August 25, 1987, the court commenced general voir dire of the remaining prospective jurors.  (RT 2392)

15.   On or about September 1, 1987, after the prosecutor had exercised two of his first eleven peremptory challenges to excuse two Black jurors (RT 3038, 3172), Petitioner made a motion for mistrial, claiming <u>Wheeler</u> error on grounds that the prosecutor had systematically and purposefully excluded Blacks from the jury.  (RT 3175)   The court responded that it had "ordered transcripts" and would take the matter under submission until the transcripts could

1  be read.   After Petitioner accepted the jury, the prosecutor

2  exercised his thirteenth peremptory challenge to exclude a third

3  Black juror.   At the request of defense counsel, the court recessed

4  for the day to take up the Wheeler motion the next morning without

5  conducting further voir dire.   (RT 3182-3184)   At the hearing on

6  the motion, the court stated it was going to "require" the

7  prosecutor to indicate his explanation for excusing each of the

8  three Black jurors.   (RT 3194)   The court found that the jurors

9  were excused for specific bias and not on the basis of group bias

10  (RT 3206)

11  D.   PETITIONER'S MOTION TO EXCLUDE STATEMENTS

12       16.   Prior to trial, Petitioner filed a motion to exclude two

13  sets of statements he purportedly made on March 3, 1986.

14  Specifically, Petitioner moved to exclude: (1) statements he

15  allegedly made to Deputy Michael Stein while standing outside the

16  officer's patrol unit after surrendering to police and while being

17  transported in Deputy Stein's patrol car to the Rialto Police

18  station; and (2) all statements he made during telephone

19  conversations while inside the Haverstick residence.   (RT 3346-

20  3375)   Following a hearing, the court denied Petitioner's motion.

21  (RT 3756-3777)

22  E.   THE GUILT PHASE OF THE TRIAL

23       17.   The presentation of evidence and argument in the guilt

24  phase commenced on or about September 14, 1987.   (RT 3790)   On

25  September 16, 1987, Petitioner moved for a continuance of the trial

26  due to new discovery recently provided by the prosecution.   After a

27  hearing on the motion (RT 3862-3894) and interviews conducted by

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

23

1  the court of the jurors regarding the length of trial (RT 3896-

2  3905), the court, on September 21, 1987, granted a one-week

3  continuance of the trial.  (RT 3913)  Trial resumed with the taking

4  of evidence on September 28, 1987.  (RT 4011)

5      1.   THE STATE'S CASE-IN-CHIEF

6      18.   On the evening of October 14, 1987, during the

7  prosecution's case-in-chief, the court, counsel for both parties,

8  police investigators, and the jury visited the crime scene,

9  including the area around the Shell station, the Sunstone

10  Apartments on Eucalyptus, the Haverstick residence at 481 Acacia,

11  and the open field leading up to the residence.  (RT 5538-5572)

12  Prior to the visit, Petitioner and his counsel informed the court

13  that Petitioner did not wish to be present at the jury visit of the

14  crime scene.  (RT 5508-5509)  During the visit, jurors were not

15  only shown the crime scene; evidence was presented, juror's

16  questions were answered by the court, and, at the court's request,

17  counsel entered into stipulations about evidence.  Over objection,

18  the court permitted the firing of Sergeant Wolfley's weapon while

19  the jury was positioned at various locations around the crime

20  scene.  (RT 5332, 5519, 5533, 5556-5559, 5563, 5568)

21      19.   On October 26, 1987, during the prosecution's case-in-

22  chief, the court took up two motions:  First, the motion to exclude

23  the testimony of deceased witness William Haverstick given at the

24  preliminary hearing; and second, the exclusion of part of the

25  hostage negotiation tape involving a conversation between William

26  Haverstick and Yvonne Hester.

27  / /

28
P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

20. Commencing with the first motion, Petitioner moved the court to exclude the preliminary hearing testimony of William Haverstick, on grounds that the Petitioner did not have a meaningful opportunity to cross-examine Mr. Haverstick at the preliminary hearing. (CT 1126-1128)  At the initial hearing on the motion, the court ruled that the testimony was admissible except for those parts where a proper objection was raised at the preliminary hearing.  The court ordered Petitioner to file specific objections to those parts of the testimony he sought to exclude on evidentiary grounds. (RT 5061-5062)  After Petitioner filed specific evidentiary objections to parts of the preliminary hearing testimony (CT 1136), to which the prosecution filed its response (CT 1155), the court held two hearings on the objections.  At the first hearing, the court made tentative rulings (RT 5625-5629) and at the second hearing, the court made its final rulings, both adopting and rejecting various tentative rulings. (RT 5696-5707)

21. The court next considered the motion to exclude the Hester-Haverstick conversation on the negotiation tape. (RT 5709-5713)  The court held an evidentiary hearing on the motion, the next day, October 27, 1987. (RT 5849-5859)  The court ruled the tape admissible and it was played to the jury. (RT 5858-5859, 5870-5871)  At the conclusion of the prosecution's case-in-chief, on October 29, 1987, the defense made a motion to exclude evidence of a kitchen knife found at the crime scene on the ground that the knife had not been connected to the crime. (RT 6079)  Initially, the court determined that the knife had some relevance to the case simply because it was found at the scene, and overruled counsel's

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

25

1   objection.  (RT 6079-6086)  The next day, however, the court

2   reversed its ruling, concluding that there was no evidence

3   connecting Petitioner to the knife, thus making the knife

4   irrelevant under Evidence Code Sections 210, 350 and 352.  (RT

5   6151-6154)  The court then excluded from evidence the knife and

6   certain photographs of the knife.  (RT 6161-6164)  However, the

7   court would not exclude photographs in which the knife and Sergeant

8   Wolfley's handy-talkie were shown together.  (RT 6162)  Moreover,

9   prior to the beginning of the defense case-in-chief, defense

10  counsel moved for an order directing the prosecutor to not cross-

11  examine Petitioner about the knife since it had not been admitted

12  into evidence.  The court denied the motion.  (RT 6167-6168)  On

13  cross-examination, the prosecutor asked Petitioner whether he tried

14  to conceal the knife from Sergeant Wolfley and dropped the knife

15  after the officer yelled "freeze."  (RT 6694)

16       22.  Also at the close of the prosecution's case-in-chief, the

17  court considered whether the Petitioner could be impeached with

18  prior convictions if he testified in the defense case.  The court

19  granted a defense motion to prohibit his impeachment with a prior

20  robbery conviction.  (RT 6091-6092, 6095-6099)  In making its

21  ruling, the court relied solely on the fact that Petitioner was

22  charged with robbery in this proceeding.  (RT 6092-6099)

23  Immediately thereafter, defense counsel made a motion pursuant to

24  Penal Code Section 1118.1 to dismiss the robbery count on the

25  ground that there was no evidence to show Petitioner had taken Mr.

26  Haverstick's keys by force or violence.  (RT 6100-6101)  The court

27  informed the parties that if the robbery count was dismissed, the

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1 court would allow impeachment with the prior robbery.  Given the

2 court's ruling, the prosecutor joined in defense counsel's motion.

3 Defense counsel renewed his motion and the court dismissed the

4 robbery count on its own motion and later permitted impeachment of

5 Petitioner with the prior robbery conviction.  (RT 6103)

6     2.   **THE DEFENSE CASE**

7     23.  As part of the defense case in the guilt phase,

8 Petitioner testified.  During the cross-examination of Petitioner,

9 on November 23, 1987, the prosecutor sought to impeach Petitioner

10 with a video-tape; the videotape, made on November 16, 1987,

11 depicted the prosecutor pointing out various areas around the crime

12 scene.  Over objection, the court ruled that the prosecutor would

13 be permitted to show an edited version of the videotape.  (RT 6573-

14 6575, 6619)

15     24.  Later, on November 25, 1987, during the fifth day of the

16 prosecutor's cross-examination of Petitioner, the defense made a

17 motion for mistrial.  Petitioner claimed that the prosecutor's

18 cross-examination of Petitioner constituted misconduct, was

19 abusive, and unfairly prejudiced the jury against him.  The motion

20 was denied.  (RT 6842-6845)

21     3.   **THE STATE'S REBUTTAL**

22     25.  During the prosecution's rebuttal, on November 30, 1987,

23 the prosecution made an offer of proof as to statements

24 Petitioner's father, Roy Mayfield, Sr., allegedly made to Detective

25 Amicone after visiting with Petitioner at the Rialto Police

26 station.  Mr. Mayfield's statements concerned statements Petitioner

27 allegedly made to him during a private conversation between the two

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1    men at the police station after Petitioner was taken into custody

2    and had invoked his <u>Miranda</u> rights. Petitioner objected to this

3    testimony and to the admissibility of a secret tape recording of

4    the conversation. (RT 7053-7066, 7185-7199, 7200-7233, 7700-7703)

5    After a hearing, the court ruled that Detective Amicone could

6    testify as to the statements made to him by Mr. Mayfield, Sr., but

7    the secret tape recording could not be played to the jury because

8    the prosecutor's last minute revelation of the tape to the defense

9    constituted improper rebuttal evidence. (RT 7584)

10         26. Also during rebuttal, on December 10, 1987, the

11    prosecution sought to recall pathologist Irving Root to testify

12    that, in his opinion, the fatal shot could not have been fired as

13    testified to by Petitioner. (RT 7627) In response to defense

14    objection, the court held a hearing on whether such would be proper

15    expert testimony given by Dr. Root. (RT 7631-7635, 7639-7668) The

16    court ruled that Dr. Root would be permitted to testify, but that

17    the questioning would be limited to the anatomical ranges of the

18    gun being fired under circumstances presented by Petitioner's

19    testimony. (RT 7666-7667)

20         **4. THE VERDICT**

21         27. The cause was submitted to the jury on Friday, December

22    18, 1987. (RT 8409-8423) On December 23, 1987, the jury returned

23    its verdicts. Petitioner was found guilty of all counts charged

24    with the exception of count 3 where he was found guilty of the

25    attempted murder of William Haverstick in the second degree. All

26    allegations, including the special circumstance allegation, were

27    found true. (CT 1450-1463, 1478-1497; RT 8452-8459)

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

F.   THE PENALTY PHASE OF THE TRIAL

    1.   PETITIONER'S MOTION TO RELIEVE COUNSEL AND HEARING
         REGARDING THE SCOPE OF THE STATE'S EVIDENCE

    28.   On December 28, 1987, at the commencement of the penalty phase, Petitioner requested new counsel to represent him in further proceedings.   Hearings were held on this matter on December 28, December 29, and December 30, 1987 while the court was disposing of pretrial matters relating to the penalty phase.   Petitioner moved for substitution of counsel on two grounds: (1) trial counsel had not provided effective representation in the guilt phase; and (2) there was a breakdown in the attorney-client relationship.   Defense counsel, Gene Bristoll, joined Petitioner in urging the court to appoint new counsel on the latter ground.   On December 30, 1987, the court appointed attorney Donald Ames to represent Petitioner in his motion to relieve his present counsel and continued the matter to January 4, 1988.   (RT 8465-8480, 8482-8531, 8537-8550, 8587-8590, 8599-8607)   On January 4, 1988, the court convened an in camera hearing in which it considered written allegations and testimony.   (Confidential CT 101-120; RT 8659-8663, 8665-8692, 8700-8719, 8720-8732)   The court denied the motion to relieve counsel.   (8736-8737, 8759-8764)

    29.   Also on December 28, 1987, during the pendency of the motion to relieve counsel, the court took up issues relating to what evidence the prosecution would be permitted to introduce in the penalty phase.   Petitioner had objected to the introduction of certain prior convictions on the ground of improper notice under Penal Code Section 190.3.   (CT 884, 902, 1053, 1144)   The court

1  ruled that the notice was timely and that the prosecution would be

2  permitted to introduce evidence relating to two prior convictions:

3  a grand theft conviction and a robbery conviction.  The court

4  further ruled that the prosecution could introduce the

5  circumstances underlying each of the convictions.  Finally, the

6  court overruled the defense objection to introduction of evidence

7  relating to the robbery of a 7-11 store, which had been originally

8  charged in the Information but severed by the court prior to the

9  commencement of the guilt phase.  (RT 8482-8504)  In lieu of having

10  evidence presented on the two prior convictions, the defense

11  entered into a stipulation with the prosecution regarding the two

12  prior convictions which were read to the jury.  The stipulation

13  made reference to the Black race of the Petitioner's accomplices in

14  each of the two prior crimes.  (RT 8520-8521, 8524, and 8531-8532)

15  The court later ruled that the prosecution could introduce a third

16  conviction for accessory to robbery.  (RT 8559-8562)

17      30.  After a two-week continuance, on January 19, 1988,

18  defense counsel Gene Bristoll again urged the court to appoint new

19  counsel for the penalty phase due to an irreconcilable attorney-

20  client conflict.  The court again denied the motion and the penalty

21  phase proceeded with Mr. Bristoll representing Petitioner.  (RT

22  8787-8790)

23      2.   **THE STATE'S PENALTY PHASE CASE**

24      31.  The prosecution presented evidence relating to the 7-11

25  robbery at the penalty phase through the testimony of Mark Fister.

26  The direct testimony was taken on December 28, 1987.  (RT 8526-

27  8531)  The cross-examination of witness Fister resumed on January

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

30

1  19, 1988 (RT 8791-8841)  The Petitioner then moved to dismiss

2  evidence of the 7-11 robbery on the grounds of insufficiency of

3  evidence; the court denied the motion.  (RT 8844-8846)

4      3.   PETITIONER'S CASE IN MITIGATION

5      32.   The defense presented its evidence in the penalty phase

6  on January 19, 1988 and January 20, 1988.  (RT 8850-8930)

7  Petitioner's evidence is outlined below in the Statement of Facts.

8      4.   THE PENALTY PHASE VERDICT

9      33.   The cause was submitted to the jury on Thursday, January

10  21, 1988.  The jury returned a death verdict on January 27, 1988.

11  (CT 1617-1619; RT 9044-9050)

12      5.   POST-TRIAL MOTIONS

13  34.  On February 24, 1988, the court granted a four-week

14  continuance for preparation of post-trial motions.  (RT 9056)  On

15  March 23, 1988, Petitioner orally moved to proceed in pro per and

16  represent himself for further proceedings.  (RT 9067)  On the same

17  day, Petitioner filed a motion to challenge the trial judge from

18  proceeding further on his case due to the judge's partiality and

19  prejudice.  (CT 1669-1670; RT 9067-9068)  Due to the

20  disqualification motion, the court continued its ruling on the

21  Faretta motion pending the resolution of the former motion.  Also

22  on March 23, 1988 the trial judge, Ben T. Kayashima, filed a

23  declaration opposing the motion to disqualify himself.  (CT 1672-

24  1673)  The disqualification motion came on for hearing before Judge

25  Rouse on April 1, 1988.  The motion was denied.  (Supp. RT 11-13)

26  / /

27  / /

28

35.   On April 15, 1988 the trial judge held a hearing on the Faretta motion.   The motion was denied.   (CT 1680-1684; RT 9084, 9094, 9101-9113)

36.   On May 4, 1988, the court took up several additional motions.   It denied a motion for a new penalty trial, a motion to strike the special circumstance, and a motion to reduce the sentence made pursuant to Penal Code Section 190.4(e).   (CT 1645-1659; RT 9117-9123)

37.   Finally, on May 4, 1988, the court sentenced Petitioner as follows:   The court sentenced the Petitioner to death as to count 1 and issued a Commitment Judgment Of Death.   (CT 1699-1707; RT 9130-9132)   As to count 2, the court imposed a sentence of fourteen years and stayed an additional one year enhancement pursuant to Penal Code Section 12022 subdivision (a).   As to count 3, the court imposed a sentence of three years and three months to run consecutive to the sentence imposed as to count 2; the court stayed a three year enhancement pursuant to Penal Code Sections 12022 subdivision (a) and 12022.5.   As to count 4, the court imposed a sentence of life imprisonment without the possibility of parole and stayed enhancements totaling six years pursuant to Penal Code Sections 12022 subdivision (a), 12022.5 and 12022.7.   As to count 5, the court imposed an eight month sentence to run consecutive to the sentence imposed as to count 2.   As to count 6, the court imposed a sentence of four years plus a two year enhancement pursuant to Penal Code Section 12022.5; the court stayed the sentence as well as an additional one year enhancement pursuant to Penal Code Section 12022 subdivision (a) and indicated

1   it would run that sentence concurrent to the sentence imposed as to

2   count 2.  Finally, as to count 7, the court imposed a two-year

3   sentence and stayed a one year enhancement pursuant to Penal Code

4   Section 12022 subdivision (a).

V.

## STATEMENT OF FACTS

A.   INTRODUCTION

8   1.  The shooting of Rialto Police Sergeant Gary Wolfley

9   occurred at about 1:30 a.m. on March 3, 1986 at the rear of a Shell

10  service station in Rialto, California.  Sergeant Wolfley had been

11  summoned by a phone call from the service station's clerk, Carlos

12  Price.  Mr. Price made the call at the insistence of Tyrone Thomas;

13  Mr. Thomas, visibly intoxicated and paranoid, claimed that someone

14  was chasing and trying to rob him.

15  2.  Prior to Sergeant Wolfley's arrival at the station,

16  Petitioner, Dennis Mayfield, and Howard Bell drove up to the

17  station.  They purchased a can of beer, cigarettes and gas.  Mr.

18  Price mentioned that he had just called the police; neither

19  Petitioner nor Mr. Bell showed any concern.

20  3.  Sergeant Wolfley arrived at the station accompanied by his

21  wife, Fontana police officer Candette Wolfley.  After detaining Mr.

22  Thomas and Mr. Bell for questioning, Sergeant Wolfley saw

23  Petitioner talking on a public phone at the other end of the

24  station.  Sergeant Wolfley then withdrew his gun, charged towards

25  Petitioner and assumed a full combat stance pointing his gun at

26  Petitioner.  Petitioner was unarmed and began retreating with arms

27  raised in the air.

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

4.   Sergeant Wolfley and Petitioner proceeded to the rear of the service station out of view of witnesses.   Two or more shots rang out.   One shot, fired from the officer's own gun, hit him in the jaw and killed him.   Petitioner, in possession of the officer's gun, ran out of the station.

5.   Petitioner was chased by the police as he was attempting to reach his father's residence.   He fired shots in the direction of a police car, striking the windshield.   As the officers pursued and later fired at Petitioner, in an effort to escape the police gun fire, Petitioner dove through the living room window of the nearby residence of William Haverstick.   When Mr. Haverstick emerged from his bedroom startling Petitioner, Petitioner discharged a shot which struck Mr. Haverstick in the leg.   Shortly thereafter, the police surrounded the residence looking for an opportunity to arrest or kill Petitioner.

6.   For the next five hours, Petitioner, his family members and the police engaged in negotiations by telephone.   Petitioner, who sought a car to take Mr. Haverstick to the hospital and surrender, threatened to kill Mr. Haverstick and himself if his demand was not met.   Petitioner eventually agreed to surrender after being assured by his father, Roy Mayfield, Sr., that the police would not kill him.

7.   Petitioner was placed in the custody of Deputy Sheriff Michael Stein.   Deputy Stein claimed that while Petitioner was standing outside the police unit, Petitioner made a series of incriminating statements, totaling about 110 words.   Deputy Stein claimed that he committed the statements to memory and, after

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

34

conversing with other officers, recorded the statements, word for word, in a steno pad from two to fifteen minutes later.  No other officer at the scene recalled Petitioner making such statements, and Deputy Stein told no other officer, including his superiors present at the scene, about the statements.  The prosecution relied on one such statement, namely, that Petitioner shot Sergeant Wolfley because he did not want to return to jail, as its prime proof of the premeditation element of first degree murder.

8.  Petitioner was eventually driven to the Rialto Police Station and placed in an interview room.  When Detective Amicone attempted to interview him, Petitioner invoked his <u>Miranda</u> rights. Detective Amicone then permitted Petitioner's father, Roy Mayfield, to enter the interview room to see if he could find out what had occurred at the service station.  After emerging from the room, Mr. Mayfield declined to speak with the police.  However, Detective Amicone claimed that, as he was escorting Mr. Mayfield out of the police station, Mr. Mayfield stated that as Sergeant Wolfley tried to regain possession of his gun, the fatal shot was fired.

9.  Petitioner testified that at the rear of the service station, he stopped backpedaling and faced Sergeant Wolfley.  After shouting racial slurs and verbal threats at Petitioner, Officer Wolfley pointed the gun at Petitioner's head.  Observing the gun barrel begin to turn, Petitioner grabbed the officer's hands and began struggling for possession of the gun.  After one shot was discharged into the ground, the second, and fatal shot, was accidentally discharged during the struggle.  Petitioner harbored no intent to kill the officer; he only sought to protect his own

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   life.   Petitioner also denied making any of the incriminating

2   statements to Deputy Stein.

3   B.   PRETRIAL HEARING REGARDING ADMISSIBILITY OF PETITIONER'S

4        STATEMENTS

5        10.   Immediately prior to commencement of trial, the court

6   took up Petitioner's motion to exclude statements he purportedly

7   made to the police.   Specifically, Petitioner moved to exclude: (1)

8   statements allegedly made to Deputy Sheriff Michael Stein while

9   standing outside the patrol unit after his surrender to the police

10  and other statements allegedly made while he was being transported

11  in Deputy Stein's vehicle to the Rialto Police Station; and (2) all

12  statements made by Petitioner over the phone while conversing with

13  the police when he was inside the Haverstick residence prior to his

14  surrender.   The court held an evidentiary hearing regarding

15  Petitioner's motion (RT 3346-75).

16       1.   TESTIMONY OF DEPUTY STEIN

17       11.   On March 3, 1986, Deputy Michael Stein was a watch

18  commander for the Sheriff's Fontana Police Station.   After he heard

19  Deputy Hensley over the radio state that she had shot the suspect,

20  Deputy Stein ordered the officers to set up a perimeter around the

21  Acacia Street residence of William Haverstick.   Arriving over the

22  next several hours were the Sheriff's Negotiation Team and SWAT

23  Team, the Highway Patrol and other officers.   A hostage negotiation

24  team command post was set up near the residence and negotiations

25  were started with Petitioner by phone.   Once the perimeter was

26  established around the Acacia Street residence, no one was

27  permitted to enter or exit the residence without the permission of

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  law enforcement.  The perimeter remained around the residence from

2  approximately 2:00 a.m. until 6:40 a.m. when Petitioner exited the

3  residence and surrendered.  The purpose of the negotiation team was

4  to convince Petitioner to surrender and release Mr. Haverstick, a

5  hostage held inside the residence, and also to take Petitioner into

6  custody.  (RT 3379-86, 3401-14)

7      Petitioner exited the house with hands raised in the air and,

8  as instructed by the police, took a prone position on the front

9  lawn.  Petitioner was then placed in handcuffs.  There was no doubt

10 in Deputy Stein's mind that, prior to Petitioner surrendering, he

11 would not have been permitted to leave the residence, and force

12 would have been used by the police if necessary to prevent such an

13 exit.  After Petitioner was handcuffed, Deputy Stein pulled his

14 police vehicle within approximately fifteen feet from Petitioner.

15 Petitioner was escorted to Deputy Stein's vehicle and placed in the

16 rear seat.  Deputy Stein acknowledged that Petitioner was in

17 custody from the point he was handcuffed and continuing thereafter,

18 and further acknowledged that Petitioner was a suspect.  After

19 Petitioner was seated, Deputy Stein closed the vehicle door.

20 Deputy Stein had been told to drive Petitioner to the Rialto Police

21 Station for interrogation.  (RT 3386-88, 3414-17)

22     12.  Approximately three minutes later, Deputy Stein was asked

23 by Deputy Emerson to exchange the handcuffs that were currently on

24 Petitioner.  Deputy Stein then removed Petitioner from the police

25 unit.  Deputy Emerson's handcuffs were taken off Petitioner and

26 Deputy Stein's handcuffs were placed on Petitioner.  Deputy Stein

27 asked Petitioner to re-seat himself in the rear of the police unit.

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   Petitioner then asked to speak with his father, explaining that the

2   police had promised that he would be able to do so if he

3   surrendered.  Up until this point Petitioner had made no statements

4   to Deputy Stein.  Deputy Stein asked Lieutenant Stodelle whether

5   Petitioner's request could be honored.  Lieutenant Stodelle asked

6   Deputy Stein to wait a minute.  (RT 3388-90, 3417-21)  At that time

7   Lieutenant Stodelle was standing approximately twenty feet from

8   Deputy Stein, conversing with Lieutenant Colfer, Petitioner's

9   father, Roy Mayfield, and other officers.  (RT 3456-57)

10      13.  Deputy Stein asked Petitioner to have a seat in the

11  patrol unit.  Petitioner responded: "I'm not going to get to talk

12  to my father?"  Deputy Stein again asked Petitioner to have a seat

13  in the patrol car.  Petitioner asked Deputy Stein if he could stand

14  outside the unit, explaining that he would cause no problems or do

15  anything stupid.  He said he was just scared and not a bad guy and

16  Deputy Stein could asked the hostage (Bill) how well Petitioner

17  treated him.  Petitioner explained that after he dove through the

18  window, he was startled and shot the hostage; but he tried to help

19  the hostage after this occurred.  (RT 3391, 3421-22)  Petitioner

20  then asked:  "How's the officer I shot?"  Deputy Stein responded

21  that he had heard that the officer had been taken to a hospital.

22  (RT 3392, 3422-23)

23      14.  Petitioner and Deputy Stein remained standing outside the

24  patrol unit.  Deputy Stein had his attention directed towards

25  Lieutenant Stodelle, awaiting a response to Petitioner's request.

26  According to Deputy Stein, Petitioner then made the following

27  verbatim statements which Deputy Stein committed to memory: "I had

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

38

to do it.  I didn't want to go back to jail.  I've been there too
many times.  When I took off and he caught me, all I thought about
was getting his gun and shooting him so he couldn't arrest me.  I
took his gun and I shot him.  Then I got scared, so I started
running.  Some other cops started chasing me.  So I shot them so
they would stop chasing me.  When I got over here, somebody shouted
'police, freeze'.  And I didn't want to get hurt.  So I ran and
dove through that window.  When I got inside, Bill startled me and
I shot him."  (RT 3393, 3424, 3452-61)

15.  Approximately thirty seconds after Petitioner concluded
his statements, Lieutenant Stodelle yelled to Deputy Stein that
Petitioner would not be permitted to speak with his father.  Deputy
Stein then instructed Petitioner to be seated in the rear of the
unit.  (RT 3425, 3462)  Deputy Stein went to speak with three other
deputies and it was decided that Deputy Stein would transport
Petitioner to the Rialto Police Station.  (RT 3429-30)

16.  Deputy Stein obtained his steno pad from the police unit
and walked to the rear of the unit.  He then recorded in his steno
pad Petitioner's exact statements from memory.  From the time
Petitioner made statements to the time Deputy Stein made
notations in his pad, approximately two to three minutes had
transpired.[4]  At the time Deputy Stein recorded his notations in
the pad, Lieutenant Colfer and Deputy Hankerson were also present
at the rear of the patrol unit having a conversation.  At one point

---

[4]     However, it is noteworthy that at the preliminary hearing,
Deputy Stein testified that he recorded his notations approximately
ten to fifteen minutes after Petitioner made his statements.  (RT
3425-30)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

in his testimony, Deputy Stein testified that he told Deputy
Hankerson that Petitioner had made the statements; however, at a
later point in the testimony Deputy Stein testified that he told
neither Lieutenant Colfer nor Deputy Hankerson of Petitioner's
confession.  (RT 3431, 3463-65)  When Deputy Stein was recording
the notes, he was approximately three to five feet from the back of
the patrol unit.  (RT 3470)

    17.  After writing his notes, Deputy Stein drove Petitioner to
a nearby taco stand and met Deputy Hankerson. En route, Deputy
Stein testified that Petitioner stated to him that he did not want
to be taken to the Rialto Police Station because he feared
reprisals for having shot one of their officers and requested that
he be taken to the San Bernardino County Jail.  (RT 3394-95, 3466)
Deputy Stein recorded these statements in his pad at the time that
he arrived at the Rialto Station prior to his exiting the patrol
unit.  (RT 3466)  Deputy Stein remained at the Rialto Police
Station from approximately 7:00 a.m until 10:45 a.m. at which time
he drove Petitioner to the San Bernardino County Jail.  (RT 3396-
97)

    18.  While at the Rialto Station, Deputy Stein did not provide
his notes of Petitioner's statements to officers there.  He did not
recall whether he told officers at the station who were about to
interrogate Petitioner that Petitioner had made prior statements to
him.  (RT 3432)  Deputy Stein saw Detective Amicone taking
Petitioner out of the holding cell, but did not recall whether he
told Detective Amicone of Petitioner's statements.  (RT 3447-48)
Deputy Stein thought that at the Rialto Station he told Lieutenant

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

Colfer or Captain Brody of Petitioner's statements.  (RT 3467)
Finally, Deputy Stein did not recall whether he told any officers
at the San Bernardino County Jail of Petitioner's statements, and,
if he did, he did not recall who he may have told.  (RT 3435-38)

19.  Using his notes, Deputy Stein later dictated a police
report between 2:00 and 4:00 p.m. on March 3, 1986 at the Fontana
Sheriffs Station.  The report was typed on March 4, 1986 from the
dictating cassette tape.  Deputy Stein realized that Petitioner's
statements constituted a confession and were significant to the
police investigation.  After reviewing the typed police report,
Deputy Stein destroyed all of his notes and the cassette tape.
Deputy Stein does not usually destroy all investigative notes and
has made efforts to preserve notes in other cases.  (RT 3431-32,
3433-34, 3438-39, 3445-46)

2.  **TESTIMONY OF LIEUTENANT COLFER**

20.  San Bernardino County Sheriff Lieutenant Colfer observed
the Petitioner being placed in Deputy Stein's patrol unit.
Lieutenant Colfer did not walk over to the unit or talk to the
Petitioner or officers surrounding the unit.  Specifically, he did
not talk with Deputy Stein.  Furthermore, Lieutenant Colfer was not
told of the purported conversation between Petitioner and Deputy
Stein.  (RT 3509-12)

3.  **TESTIMONY OF SERGEANT HANKERSON**

21.  San Bernardino County Sheriff Sergeant Donald Hankerson
was Deputy Stein's supervisor and personally in charge of
Petitioner's security after he surrendered.  (RT 3571)  Sergeant
Hankerson assisted Deputy Stein in escorting the Petitioner over to

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

Deputy Stein's patrol unit.  (RT 3557)  Sergeant Hankerson recalled the Petitioner stood outside the car for a brief time before being placed in the rear of the vehicle.  Sergeant Hankerson remained standing outside the vehicle for the entire time until Deputy Stein drove off on his way to the Rialto Police Station.  (RT 3559-60)

22.  While Sergeant Hankerson stood shoulder-to-shoulder with Petitioner, he recalled a brief conversation between Petitioner and Deputy Stein.  The only question Sergeant Hankerson recalled Petitioner asking was whether the police officer was dead. Sergeant Hankerson did not observe Deputy Stein interviewing Petitioner at the scene.  (RT 3564-65)  The only time Sergeant Hankerson left the immediate vicinity of Petitioner and Deputy Stein was when he walked to the rear of the vehicle to have a conversation with Sergeant Kidwell.  During that conversation, Sergeant Hankerson stood approximately two to three feet from Deputy Stein and participated in a conversation with Sergeant Kidwell that lasted a couple of seconds, certainly less than five seconds.  (RT 3567-69)   Moreover, Sergeant Hankerson recalled a brief one minute conversation with Petitioner and his father as Petitioner stood outside the vehicle.  During that conversation, the father said that he wanted to see Petitioner's condition before he was taken to the police department.  Petitioner did not say anything during that exchange.  (RT 3564, 3567)

23.  Sergeant Hankerson remained at the door of the vehicle for security purposes during the time between Petitioner's surrender and Deputy Stein driving off on his way to the Rialto Police Station.  At no time did Sergeant Hankerson observe anyone,

1  including Deputy Stein, having a lengthy conversation with

2  Petitioner.  (RT 3561, 3563, 3571)  Also, Sergeant Hankerson did

3  not recall Deputy Stein walking away from the police vehicle nor

4  did he recall Deputy Stein conversing with any other officers.  (RT

5  3573-74)  With the exception of the brief several second

6  conversation with Sergeant Kidwell, Sergeant Hankerson remained in

7  the area of the vehicle in the company of Deputy Stein.  (RT 3570)

8      24.  Finally, Sergeant Hankerson did not interview Petitioner

9  nor advise him of his <u>Miranda</u> rights.  Petitioner did ask Sergeant

10  Hankerson whether the police officer was dead, to which Sergeant

11  Hankerson responded that he did not know.  (RT 3563, 3559-60)

12      4.  **TESTIMONY OF DEPUTY EMERSON**

13      25.  San Bernardino County Deputy Robert Emerson handcuffed

14  Petitioner and placed him in the patrol unit.  Petitioner was then

15  taken out of the vehicle and his handcuffs were exchanged over a

16  period of approximately 1 to 1-1/2 minutes.  After the cuffs were

17  exchanged, Petitioner was returned to the police unit.  Deputy

18  Emerson recalled no conversation between Deputy Stein and

19  Petitioner from the time Deputy Emerson placed Petitioner in the

20  rear of the vehicle to the time Deputy Emerson left the vehicle

21  immediately after the exchange of handcuffs.  Deputy Emerson did

22  not recall Deputy Stein telling him that Deputy Stein had a

23  conversation with Petitioner when the handcuffs were exchanged.

24  (RT 3500-07)

25      5.  **TESTIMONY OF DETECTIVE AMICONE**

26      26.  Deputy Stein and Sergeant Hankerson brought Petitioner to

27  the Rialto Police Station and placed him in a holding cell.  Rialto

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

43

1  Detective Paul Amicone was the investigating officer in the case
2  and was responsible for interviewing the Petitioner at the police
3  station.  (RT 3577-79)  While in the hallway of the station, Deputy
4  Stein told Detective Amicone that the Petitioner had given him a
5  statement in the field and that Petitioner was cooperative and
6  willing to speak with the detective.  Deputy Stein explained that
7  Petitioner had admitted shooting the officer because he didn't want
8  to return to jail or prison.  However, Detective Amicone did not
9  record his conversation with Deputy Stein in any notes or written
10  reports, despite the fact that he was about to interrogate
11  Petitioner.  (RT 3579-80, 3585-86)

12      27.  Petitioner was taken to the police interview room and
13  advised by Detective Amicone of his <u>Miranda</u> rights.  While in the
14  room, Detective Amicone did not inform Petitioner that he knew of
15  the statement Petitioner purportedly gave to Deputy Stein.
16  Petitioner did not waive his rights, but requested an attorney.  In
17  response to such a request, Detective Amicone conducted no further
18  interrogation.  (RT 3581, 3584)

19      6.  <u>TESTIMONY OF LIEUTENANT STODELLE</u>

20      28.  San Bernardino County Sheriff Lieutenant Michael Stodelle
21  was part of the negotiation team on March 3, 1986.  During phone
22  conversations with Petitioner, Lieutenant Stodelle attempted to
23  convince Petitioner to exit the house.  The police told Petitioner
24  that he would be given an opportunity to speak with his father
25  after he exited the house and before he left the scene.  (RT 3516,
26  3520-21, 3522, 3534-35)  Lieutenant Stodelle did not advise
27  Petitioner of his constitutional rights while speaking to him on
28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

44

the phone.   (RT 3528)   There was no doubt that while Petitioner was in the house, he was a suspect and would not be permitted to leave. (RT 3527)

29.   Lieutenant Stodelle conducted negotiations with Petitioner by phone.   During the negotiations there was discussion regarding the shooting of Sergeant Wolfley.   Petitioner stated that he took the gun from Sergeant Wolfley because the officer had stuck the gun in his face.   (RT 3591-92)   Petitioner further explained that he had been rushed by the officer and that the officer's placing the gun in his face was "not cool."   Petitioner further said:   "If he ain't gonna use it, he shouldn't pull it out."   (RT 3597-98)   Furthermore, Petitioner told Lieutenant Stodelle that Officer Wolfley gave him "proper action" "to take it (gun) from him."   (RT 3599)   Petitioner also asked Lieutenant Stodelle about the condition of Sergeant Wolfley; Lieutenant Stodelle responded that the condition was satisfactory.   (RT 3599, 3600-01)   During the negotiations, Lieutenant Stodelle was first given the impression that the hostage had not been shot, but was later informed that the hostage was seriously injured.   Petitioner also stated that he had weapons and that if his demands were not met, other people would be eliminated; specifically, he would kill the hostage and himself.   (RT 3594-95)   Lieutenant Stodelle continued to assure Petitioner that he was checking on Petitioner's request for a vehicle.   (RT 3591)

30.   After Petitioner was seated in the patrol unit, Lieutenant Stodelle spoke with several officers about whether Petitioner would be permitted to speak with his father.   After a

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  decision was made, Lieutenant Stodelle walked over to the unit and

2  told Petitioner that his request would be denied.   Lieutenant

3  Stodelle also so informed Petitioner's father.   (RT 3524-26)

4      7.   TESTIMONY OF OFFICER WHEELER

5      31.   Rialto Officer Dennis Wheeler had been informed by the

6  dispatcher that Sergeant Wolfley had been killed and that the

7  suspect was in a residence with a hostage, and that he had

8  identified himself as Fred Sanford.   During a phone conversation

9  originating about 3:18 a.m. with Petitioner, Officer Wheeler

10  identified himself as a police officer and was aware that he was

11  speaking with the suspect killer.   Officer Wheeler attempted to

12  obtain information from the Petitioner regarding the circumstances

13  of the shooting.   Petitioner stated that the incident was

14  "ridiculous" and that he couldn't understand why the officer

15  bothered him.   (RT 3619-26, 3632)   Petitioner told Officer Wheeler

16  that he would hurt the hostage if his demands were not met.   He

17  said that if the police did not give him a car he would blow the

18  hostage's head off.   (RT 3643-45)

19      32.   At no time did Officer Wheeler advise Petitioner of his

20  right to speak with an attorney or to have an attorney present.

21  Nor did he advise Petitioner that he should not speak about the

22  shooting to the police.   At one point, Petitioner stated that he

23  did not want to speak anymore to Officer Wheeler, but Officer

24  Wheeler attempted to convince Petitioner to speak with him further.

25  (RT 3626-27)   Moreover, Officer Wheeler did not tell Petitioner

26  that the police would not use anything Petitioner said against him.

27  (RT 3634)   Officer Wheeler made a tape of the conversation with

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1 Petitioner for purposes of using it in any negotiations and to

2 gather evidence to be used in court.   (RT 3635)   Officer Wheeler

3 then went to the hostage scene and briefed the SWAT Team as to his

4 conversations with Petitioner.   (RT 3638-40)

5    8.   TESTIMONY OF DISPATCHER DAVIS

6    33.   San Bernardino Sheriff dispatcher Cynthia Davis also

7 conversed with Petitioner.   Petitioner phoned the Rialto Station

8 and identified himself as Mr. Mayfield.   Petitioner and his cousin

9 (who was also on the line) requested to speak to a sergeant.   As

10 Ms. Davis was attempting to locate a sergeant, Petitioner stated

11 that he was leaving the house to proceed to the hospital to take

12 the hostage, Bill, there for treatment.   Petitioner explained that

13 he wanted to have his cousin pick him up at the house and take him

14 and Bill to the hospital.   Petitioner also stated that he had fired

15 five shots and one shot had struck the officer and two others were

16 pointed in the direction of the police.   (RT 3676-99, 3701-03,

17 3718-19)

18    9.   TRIAL COURT'S RULING

19    34.   At the conclusion of the hearing, the court denied the

20 motion.   Responding to Petitioner's contention that the statements

21 allegedly made to Deputy Stein should be excluded due to the

22 incredibility and inaccuracy of Deputy Stein's testimony, the court

23 stated that counsel could elicit such during his cross-examination

24 of Deputy Stein at trial.   Moreover, with respect to all statements

25 whose exclusion was sought, the court found no Miranda violation.

26 (RT 3756-77)

27 / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

C.   **GUILT PHASE TRIAL**

    1.   **PROSECUTION'S CASE-IN-CHIEF**

        a.   **Shooting Incident At Shell Station**

           (1)   **Perspective Of Clerk Carlos Price**

    35.   Between 12:30 and 1:00 a.m. on March 3, 1986 Tyrone Thomas walked into a Shell service station located on the corner of Eucalyptus and Foothill Streets in the City of Rialto, California. (RT 4134)  Mr. Thomas, a Black male, seemed scared and under the influence of narcotics.  (RT 4159-60)  Carlos Price, on duty at the station, was confronted by Mr. Thomas.  Mr. Thomas asked Mr. Price to call Andre Ray, a clerk who worked another shift at the station. Mr. Price did so, but received no answer on the telephone.  Mr. Thomas then asked Mr. Price to call the police. Mr. Thomas claimed that someone had robbed him and was chasing him.  Mr. Price then dialed emergency 911 and told the police that someone was at the store trying to rob someone.  (RT 4160-62, 4135-37)

    36.   Mr. Thomas then hid behind a soda machine in the corner of the store.  Darnell, a customer entered the store.  Mr. Price asked Darnell to give Mr. Thomas a ride home but Darnell could not do so.  (RT 4140, 4163-64)  Mr. Thomas remained in the store, acting strangely, repeatedly asking Mr. Price to lock the door and to look around outside.  (RT 4165)

    37.   Petitioner Dennis Mayfield and Howard Bell drove up to the service station in Mr. Bell's mother's car.  After parking at the gas pump, they entered the store.  Petitioner paid for a can of beer, cigarettes and gas for the car.  Mr. Price told them that he had called the police so that if they had anything on them (i.e. an

opened can of beer) they should get rid of it.  (RT 4141-42)
Neither Petitioner nor Mr. Bell were concerned when advised that
the police had been called.

38.  Petitioner and Mr. Bell arrived at the station between
1:00 a.m. and 1:30 a.m. that morning, approximately twenty to
thirty minutes after Mr. Thomas first entered the station.  (RT
4164, 4247-50)  When Petitioner and Mr. Bell entered the store they
noticed Mr. Thomas hiding in the corner.  Mr. Thomas appeared
scared, paranoid and intoxicated.  As Petitioner and Mr. Bell
walked in, Mr. Thomas said "he didn't do it."  Neither Petitioner
nor Mr. Bell responded to the statement.  (RT 4246-47)  Mr. Bell
had been to the Shell Station on many previous occasions and
purchased gas, cigarettes and beer at those times.  He also knew
Mr. Price and Mr. Ray, the two clerks who worked various shifts at
the station.  (RT 4242-43)

### (2)   Perspective Of Tyrone Thomas

39. At approximately 10:30 p.m. on March 2, 1986, Tyrone
Thomas drove to the Meadowbrook Apartments in San Bernardino to
purchase cocaine.  As he was leaving the apartments, he was
confronted by an individual who requested money that Thomas had
owed him for a prior drug purchase.  The individual threatened
Thomas with a gun.  (RT 3826-31, 4045-63)

40.  Thomas fled from the Meadowbrook Apartments and ran to a
service station near a Zodys store where he flagged down a Black
police officer in a vehicle.  Other officers were summoned to the
scene.  Mr. Thomas asked the officer to drive him home to Rialto.
The Black officer handcuffed Mr. Thomas and placed him in the rear

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   of his vehicle.   Mr. Thomas laid down on the vehicle's seat,

2   thinking that people were watching him and that possibly the police

3   might be after him.   As the officer drove towards Rialto, he asked

4   Mr. Thomas about his activities that evening.   Mr. Thomas told him

5   about purchasing drugs at the Meadowbrook apartments and that he

6   had used cocaine earlier that evening.   The officer dropped him off

7   at a K-Mart shopping center.   Mr. Thomas then ran across the street

8   into the Shell station where he confronted Mr. Price.   (RT 3831-34,

9   4064-79)

10      41.   After Mr. Thomas requested that Mr. Price call the

11  police, Mr. Thomas hid beyond the ice machine in the corner of the

12  store.   He observed three or four customers come into the store and

13  leave.   Finally Petitioner and Mr. Bell entered the store.

14  Petitioner appeared to look like a friend of Mr. Thomas.   When Mr.

15  Thomas saw Mr. Bell he recognized him and thought that Mr. Bell had

16  "come for him".   Mr. Thomas was scared for his life and very

17  paranoid.   Mr. Thomas watched Petitioner for several seconds

18  transacting business with Mr. Price at the candy counter.   Mr.

19  Thomas then approached the Petitioner and Mr. Bell and blurted out

20  "don't do it."   Thomas claimed that he felt Petitioner and Bell

21  were about to kill him.   Neither Petitioner nor Mr. Bell made any

22  threats to Mr. Thomas or anyone else inside the store or at the

23  station.   (RT 4080-86, 3836-43, 4115-16)

24      42.   Mr. Thomas dashed out of the store.   He was immediately

25  confronted by Sergeant Wolfley who had exited his vehicle.

26  Sergeant Wolfley grabbed Mr. Thomas by the arm and placed him

27  across the hood of the police vehicle.   As Thomas was face down on

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1 the hood, he told Wolfley that one of the guys in the store had a

2 gun and was after him.  (RT 4087-90, 4013, 3844-45)

3            (3)  <u>Perspective Of Howard Bell</u>

4      43. At approximately 8:00 to 9:00 p.m. on March 2, 1986,

5 Howard Bell left home driving his mother's car and arrived at the

6 Meridian Apartments in San Bernardino.  While at the apartments

7 that evening, Mr. Bell saw Petitioner a couple of times coming and

8 going from that vicinity.  Petitioner was wearing a jacket and a

9 black beanie and riding a ten-speed bicycle.  Mr. Bell and

10 Petitioner engaged in brief conversation.  Mr. Bell offered to

11 drive Petitioner to the local Shell station so he could purchase

12 cigarettes in exchange for Petitioner paying for Mr. Bell's

13 gasoline.  Petitioner rode his bicycle to his father's home which

14 was several blocks away and arranged to meet Mr. Bell at that

15 location.  Mr. Bell then picked up Petitioner and they drove a few

16 short blocks to the Shell station and parked at one of the gas

17 pumps.  (RT 4182-93)

18      44.  Petitioner and Mr. Bell left the store seconds after

19 Sergeant Wolfley had confronted Mr. Thomas on the hood of the

20 police vehicle.  The police vehicle was parked behind Mr. Bell's

21 car towards the east end of the station.  Petitioner had already

22 paid Mr. Price about $2.00 for the gas.  Mr. Bell walked to his

23 vehicle and began pumping gas.  Simultaneously, Petitioner departed

24 the store and walked towards the west end of the service station in

25 the area of the public telephones.

26      45.  As Sergeant Wolfley was standing by his vehicle with Mr.

27 Thomas, he asked Mr. Bell to come over to speak with him.  Sergeant

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

51

Wolfley was using an angry and harsh tone of voice, but when Mr.

Bell complied and approached, Sergeant Wolfley's voice became more

polite.  Sergeant Wolfley asked Mr. Bell who he was with and Mr.

Bell turned in the direction of the telephones.  Sergeant Wolfley

then turned towards Petitioner who was located at the phones.

Sergeant Wolfley took possession of his gun in his right hand, and

pointed the gun in Petitioner's direction as he began running

towards Petitioner.  Petitioner was unarmed and had not made any

threatening gestures towards Sergeant Wolfley.  (RT 4197-98, 4250-

64)

### (4)  Perspective Of Candette Wolfley

46.  At slightly after midnight on March 3, 1986 Candette

Wolfley left her shift at the Fontana Police Department and met her

husband Sergeant Wolfley at the Rialto Police Department.  Mrs.

Wolfley was dressed in street clothes.  Sergeant Wolfley was the

watch commander in charge of the graveyard shift for the Rialto

Police Department.  Mrs. Wolfley had ridden along with her husband

a number of times prior to this evening.  Sergeant Wolfley's duties

that evening were to assist other officers on his shift.  He was

dressed in full uniform and drove a marked patrol unit.  (RT 4336-

43)

47.  As the Wolfleys were traveling approximately 1/2 miles

from the Shell station, they heard a radio broadcast.  They

proceeded to the Shell station for purposes of backing up another

police unit.  However, the Wolfley unit was the first to arrive.

They pulled into the service station in the southeast area of the

station and parked behind Mr. Bell's mother's car which was

1 positioned at one of the gas pumps furthest to the north of the

2 station.  (RT 4344-48)  Sergeant Wolfley's confrontation with Mr.

3 Thomas lasted approximately 1-1/2 minutes.  During this time Mr.

4 Thomas was rambling and walking around as Sergeant Wolfley

5 attempted to pat him down outside of the police unit.  Mrs. Wolfley

6 remained seated inside the vehicle.  As Petitioner and Mr. Bell

7 exited the store, Mr. Thomas claimed that they were going to kill

8 him.  (RT 4351, 4355-56)

9    48.  After Sergeant Wolfley had concluded his brief

10 conversation with Mr. Bell, both Mr. Bell and Mr. Thomas were

11 ordered to stand with their hands on the police unit.  At that time

12 Mrs. Wolfley had exited the vehicle and remained standing outside

13 the passenger door.  Sergeant Wolfley yelled to Petitioner to stop

14 and that he wanted to talk to him.  (RT 4356-67, 4425-33)  As

15 Sergeant Wolfley approached Petitioner with his gun drawn,

16 Petitioner quickened his pace and began backpedalling in the

17 direction of the northwest end of the station.  When Sergeant

18 Wolfley reached the southwest corner of the building he was in a

19 full combat stance with gun in right hand outstretched and pointed

20 in the direction of Petitioner.  Sergeant Wolfley and Petitioner

21 approached within approximately five feet of each other.  Sergeant

22 Wolfley yelled "freeze."  No response was heard from Petitioner.

23 Petitioner slowed to a stop and Sergeant Wolfley, practically in

24 Petitioner's face, pointed his gun at Petitioner.  Both men

25 proceeded into the darkness along the northwest side of the service

26 station building and disappeared around the corner.  (RT 4198-99,

27 4200-4218, 4281, 4357-60, 4433-46)

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

53

### (5)   Events At The Rear Of The Station

49.   Over the next several minutes, the Petitioner and Sergeant Wolfley were at the rear of the Shell station out of direct view of any witnesses.   Different witnesses present varying recollections of these moments.   For example, Mr. Price testified that within approximately five minutes from the time Sergeant Wolfley left his view and retreated to the rear of the station, Mr. Price heard two or three gun shots from that location.   (RT 4149-50)   Mr. Bell testified that within approximately thirty seconds to one minute after Sergeant Wolfley left his view, Mr. Bell heard one gunshot ring out from behind the station.   (RT 4218-19)   Mr. Thomas testified that he heard two gunshots from behind the station with a two to three second pause between each shot.   (RT 4117-18) Mrs. Wolfley testified that after Sergeant Wolfley left her vision, she heard him issuing commands in loud verbal tones at the rear of the station.   (RT 94-95)   She also testified that from the time Sergeant Wolfley ordered Petitioner to freeze to the time that she heard shots was approximately four to seven seconds and approximately two seconds later she saw Petitioner running eastbound from the rear of the service station.   (RT 4362-63)

50.   Other witnesses not present at the Shell station also testified concerning events occurring between Sergeant Wolfley and Petitioner at the rear of the station.   William Judevine, who resided at 402 Eucalyptus Avenue, was present in his apartment near the rear of the Shell station.   He was approximately twenty-five feet away from Petitioner and Sergeant Wolfley.   He heard a struggle, including feet shuffling and grunts.   He heard voices

that sounded "fearful."  The scuffling lasted approximately six to
seven seconds.  He then heard one gunshot and five seconds later
heard a second gunshot.  The shots came from the rear of the Shell
station.  (RT 4671-83)  Also, Joseph Deepers, a roommate of Mr.
Judevine, heard two shots coming from the rear of the Shell station
that evening.  (RT 5041-43)

51.  Curtis Corbin resided at 428 Eucalyptus Street.  He came
forward with a statement regarding the events in question only
after he had been arrested for narcotics charges.  He testified
that on the morning of March 3, 1986 he was looking out of his
bedroom window and saw a police unit parked in front of the Shell
station.  He could only observe individuals from the waist up since
the lower portions of their bodies were obstructed by a wall.  The
officer approached Petitioner at approximately a distance of
twenty-five feet.  As the officer came within approximately six
feet of Petitioner, Petitioner began backing away from the officer
proceeding in a northeasterly direction on the northwest side
corner of the Shell station.  At that point, Petitioner appeared to
be fumbling with his hands in his pockets as if looking for
something; however, it was not possible for Mr. Corbin to see those
hands due to the wall obstructing his view.  The officer and
Petitioner came within two to three feet apart as they approached
the east side of the station.  Mr. Corbin's attention was
distracted momentarily by his daughter who was present in the room.
As he looked back towards the vicinity of the Shell station moments
later, he saw two, possibly three shots, or two shots with an echo

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

flashing in the night.  He did not see a gun.  (RT 4785-4801, 4840-53)

52.  While the events at the rear of the Shell station were occurring, Mrs. Wolfley remained by the police unit in the front of the station.  At the time Sergeant Wolfley ordered Petitioner to halt, Mrs. Wolfley called for backup on the radio.  When she heard gunshots from the rear of the station she made a second radio call for immediate police assistance.  She observed Petitioner run out of the station in a fast jog.  She radioed that the suspect was headed northbound up Eucalyptus Avenue.  Mrs. Wolfley then took the shotgun from the police vehicle and ran north up the east side of the station.  She observed Sergeant Wolfley lying on the ground with his head facing southeast; he was lying on his left cheek and on his stomach with the back of his hands faced down.  Mrs. Wolfley approached Sergeant Wolfley, yelled to him and attempted to feel for a pulse.  Since she was not able to find his portable radio on his belt, she ran back to the police unit and radioed that an officer was down and an ambulance was needed.  She told the store clerk to lock Mr. Thomas and Mr. Bell in the store.  She returned to her husband and observed a large amount of blood on the ground.  She rolled him on his back and attempted to stop the bleeding which was emanating from his face.  (RT 4361-62, 4364-68)

53.  That night Sergeant Wolfley was wearing a sam brown belt.  The belt had holders for handcuffs, a baton, a knife, an HT radio, and speed loaders to speed load his revolver.  He was only carrying his gun, a buck knife on his belt and handcuffs.  He was not carrying any back up weapon.  (RT 4467-76)

54.   Mrs. Wolfley attempted to administer to her husband as he was lying on the ground.   After rolling him on his back she attempted to stop the bleeding from his face.   Officer Sorenson arrived shortly thereafter and helped administer aid.   Mrs. Wolfley tried to unbutton Sergeant Wolfley's bulletproof vest to permit breathing.   Other officers arrived and started administering CPR on Sergeant Wolfley.   Shortly thereafter the paramedics arrived and administered aid and took Sergeant Wolfley away in an ambulance. Mrs. Wolfley flagged down a San Bernardino police officer and told the officers not to let Mr. Bell or Mr. Thomas out of their custody since they were aware of the identity of the person who shot Sergeant Wolfley.   Other officers then came to the crime scene and secured it.   (RT 4368-70)

### b.   Police Response And Chase Of Petitioner

55.   After the shooting, Officer Joseph Cirilo received the emergency radio call from Mrs. Wolfley.   Officer Cirilo was approximately 1/2 mile from the Shell station and arrived there in about one minute.   Officer Cirilo thought Sergeant Wolfley was proceeding north up Eucalyptus Avenue on foot following a suspect. Consequently Officer Cirilo proceeded to drive northbound up Eucalyptus in the southbound lane of traffic.   He was illuminating the area with a spotlight and headlights.   When he reached the Sun-stone Apartments located in the middle of the Eucalyptus block, Officer Cirilo attempted to reach Sergeant Wolfley by his walkie talkie.   As Officer Cirilo was maintaining the spotlight on the road, he was also reaching for a shotgun located inside the vehicle; his car door was partly opened as the car proceeded

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  northbound.   Suddenly, Officer Cirilo heard a loud bang that

2  sounded like a shot, and the front windshield of his vehicle was

3  shattered.   He immediately put his car in reverse for approximately

4  ten to fifteen feet.

5       56.   Officer Cirilo looked up and saw Petitioner north of the

6  Sun-stone Apartments entrance on the westside of Eucalyptus Avenue.

7  Petitioner appeared to be running, holding a chrome steel revolver

8  in his right hand.   Officer Cirilo drove northbound.   Petitioner

9  fired a shot while pointing the gun in Officer Cirilo's direction.

10  At that time no red lights on top of the vehicle were on.   There

11  were no street lights that illuminated the area.   Officer Cirilo

12  had not identified himself as an officer to Petitioner nor had any

13  other officer yelled "police" within hearing distance of

14  Petitioner.   Other than the shots, there was no communication

15  between Officer Cirilo and Petitioner at that time.   The officers

16  subsequently located a bullet next to the frame on the floor of the

17  back seat of the police car near the left rear door.   (RT 4496-99,

18  4500-15, 4517-21, 4558-59, 4578-96)

19       57.   Had officer Cirilo seen Petitioner running, he would have

20  attempted to apprehend him, and if Petitioner had refused to drop

21  his weapon, Officer Cirilo would have shot Petitioner.   Officer

22  Cirilo made no efforts to call Petitioner on the PA system in his

23  vehicle and identify himself as a police officer.   Although Officer

24  Cirilo was responding to a Code 3 emergency which requires that the

25  red lights on the police vehicle be turned on, they were not turned

26  on on this occasion.   (RT 4596-99, 4600-02)

27  / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

58.  Rialto Police Officer Paul Pierson also proceeded up Eucalyptus with Officer Cirilo.  Officer Pierson had no lights on inside his vehicle nor were his headlights turned on.  The shots fired by Petitioner were done at a distance of approximately 35 to 40 yards.  (RT 4739-49, 4767, 4768-69)  After the shots were fired, Petitioner was seen hunched over catching his breath near the Sunstone Apartments.  The gun was located in his pants pocket as he rose and walked away slowly from the area.  (RT 4693-99, 4703-06)

59.  San Bernardino Deputy Sheriff Jay Blankenship responded to the police 999 call for emergency at approximately 1:45 a.m. on March 3, 1986.  He took up a position in the area of the Rainbow Bar which was adjacent to an open field in the vicinity where the Petitioner had last been seen by the officers.  He spotted an unidentified person moving briskly in the field.  (RT 5065-73, 5080-98)  Deputy Blankenship gave chase.  (RT 5073-75, 5099, 5100-05)

60.  As Petitioner was running through the field being chased by Deputy Blankenship, he proceeded in the direction of San Bernardino Deputy Sheriff Joanne Hensley.  She spotted Petitioner crouched on a dirt driveway near Acacia Boulevard.  She did not notice any gun in his possession.  Deputy Hensley ordered Petitioner "halt police".  Petitioner, who was in a crouched position, raised up slightly and stopped.  He started to turn slightly to the left and Deputy Hensley fired at him with her rifle.  However, the rifle misfired and only a loud click could be heard.  Petitioner began running towards the nearest house.  Deputy Hensley fired a second round at Petitioner as he simultaneously

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  dove head first through a large plate glass window in the

2  residence.  Several seconds later, a third shot was heard coming

3  from inside the residence.  (RT 4936-46, 4959-73)

4      61.  Officer Peter Sorenson joined Mrs. Wolfley at the rear of

5  the station.  He attempted to administer CPR to Sergeant Wolfley

6  who was lying on his back.  The blood was shooting two to three

7  feet up in the air from Sergeant Wolfley's face.  (RT 4713-24)

8  Rialto Officer Mark Coulombe attempted mouth-to-mouth resuscitation

9  of Sergeant Wolfley.  In order to do so, he had to wipe the blood

10  away from Sergeant Wolfley's face.  (RT 5241-42)  Sergeant Gary

11  Young of the Fontana Police Department arrived.  He noticed that

12  Officer Coulombe was extremely upset; Officer Coulombe had blood

13  all over his face, hands and uniform and seemed not to be in charge

14  of the situation.  Sergeant Young noticed that there was a sam

15  brown belt laying off to the right side of Sergeant Wolfley.  Also

16  in the vicinity of the belt was a flashlight, a set of keys and a

17  HT radio unit.  Sergeant Wolfley's service revolver was not seen in

18  that area.  (RT 5255-61, 5270-71)

19      62.  The paramedics arrived at the scene at approximately 1:43

20  a.m.  They took over from the officers administering CPR.  Sergeant

21  Wolfley was observed to have suffered a gunshot wound to the left

22  cheek approximately a little larger than a quarter, circular in

23  size.  The sergeant was bleeding profusely from that area.

24  Sergeant Wolfley was taken by ambulance to the San Bernardino

25  Community Hospital and attended to by the paramedics who attempted

26  to stop the bleeding and maintain his breathing.  Sergeant Wolfley

27  died shortly thereafter.  In addition to the gunshot wound,

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  Sergeant Wolfley had a small abrasion on his left temple and a gray

2  pencil-like mark on his forehead.  (RT 5015-23)

3          c.   **Events At The Haverstick Residence**

4      63.  Petitioner dove through the living room window of the

5  residence located at 481 Acacia Avenue in Rialto.  William

6  Haverstick and Terry Fifelski were present in the house.  (RT 5987-

7  88, 5189-90)  Mr. Haverstick, asleep in his bedroom, was awakened

8  by the crash of the glass.  He initially thought that his roommate,

9  Mr. Fifelski had broken the glass coffee table located in the

10  living room.  He yelled out to his roommate to see what happened.

11  Mr. Haverstick, who stood 6'4" tall opened the bedroom door and saw

12  Petitioner standing there facing him.  Petitioner, who had a gun in

13  his hand, immediately shot Mr. Haverstick in the right thigh.  No

14  words were exchanged.  The house was dark except for a light which

15  was left on in the living room and the adjoining hallway and a

16  small night light which was on in Mr. Haverstick's bedroom.  Mr.

17  Haverstick then collapsed and fell backwards into his bedroom,

18  forcing the bedroom door shut.  Petitioner then began pushing

19  against the bedroom door in order to force his way into the

20  bedroom.  (RT 5988-90, 6007-18)

21      64.  Mr. Fifelski entered the living room.  Mr. Haverstick

22  yelled out that he had been shot, that there was a burglar in the

23  house, and that Mr. Fifelski should leave the house immediately.

24  Mr. Fifelski ran out of the house through the front door.  Although

25  Mr. Fifelski was without his glasses and the darkness of the night

26  prohibited a clear view of the doorway, he claims to have seen

27  Petitioner standing in the doorway approximately twenty feet from

28

him aiming a gun at him and telling him "don't say nothing."  Mr.
Fifelski then called to Mr. Haverstick from outside the house.  Mr.
Haverstick told him to get the police.  (RT 5990-91, 5211-17)
Petitioner entered the bedroom.  He began looking through the desk
for a gun.  Petitioner spent approximately the next 4 to 5 hours
with Mr. Haverstick.  During most of this time, Petitioner was on
the telephone with family members and with the police negotiation
team.  (RT 5992-93)

65.  During this time, Mr. Haverstick was in grave pain and in
fear of his life.  However, he acknowledged that Petitioner
attempted to help him and was basically nice to him.  Petitioner
made a tourniquet and tried to stop Mr. Haverstick's bleeding.
Petitioner also assisted Mr. Haverstick into his mother's walker so
he could be in a more comfortable sitting position.  (RT 5993,
5997, 6002, 6003, 6021)  As daylight approached, Petitioner helped
Mr. Haverstick into his bed to ease his pain.  (RT 6026, 6031)

66. During this ordeal, Petitioner did not threaten Mr.
Haverstick with the gun.  At one point he kicked Mr. Haverstick in
his leg to illicit a scream; this was for the purpose of proving to
the police that Mr. Haverstick was still alive.  (RT 5995-97, 6031)
Petitioner told the police Mr. Haverstick was his hostage and that
he wanted the police to bring a car to the house.  Petitioner
appeared to be in great fear of the police and very agitated.  (RT
5995, 6022, 6028, 6046)

67.  During one of the phone conversations, Petitioner said
that a cop had been harassing him at the Shell station and that
after the officer had pulled his gun Petitioner took the gun away

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

62

1  from the officer.  At another point in the phone conversations,

2  Petitioner said that if the officer had died he would let Mr.

3  Haverstick die and use the last bullet on himself.  (RT 5993-94)

4  Other than uttering this statement, Petitioner did not threaten to

5  kill Mr. Haverstick.  (RT 6025)

6      68.  Petitioner did not take any property or ask Mr.

7  Haverstick for any money.  Some car keys were removed from the

8  house; Mr. Haverstick did not give Petitioner permission to take

9  the keys.  (RT 6020, 6047-52)  A pack of Benson Hedges cigarettes

10  and a package of sunflower seeds, both of which were found in the

11  house, did not belong to Mr. Haverstick.  (RT 5999, 6000-01)

12      69.  Officer Cirilo received a radio call that Deputy Hensley

13  had shot at the suspect at a residence located at 481 Acacia

14  Avenue.  Officer Cirilo set up a perimeter around the house with

15  other officers.  He heard a voice from the house saying that the

16  police should back off and that he was going to kill a hostage

17  inside the house.  Officer Cirilo proceeded to the Rialto Police

18  Station and made phone contact with Petitioner who had telephoned

19  the station.  Petitioner said that he had a hostage in the house,

20  and that if the police tried to shoot him, he would kill the

21  hostage.  (RT 4531-38, 4535-43)

22      70.  San Bernardino Sheriff Lieutenant Michael Stodelle set up

23  a hostage negotiation position near the Acacia Street residence.

24  Negotiations with Petitioner proceeded over the next several hours.

25  During this time, Petitioner conversed with his cousin, Yvonne

26  Hester, his father Roy Mayfield, other relatives and the police

27

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  negotiation team.  The negotiations were tape recorded except for
2  one part which was erased.  (RT 5643-70)

3      71.  At approximately 4:30 a.m. the San Bernardino County
4  Sheriffs Swat Team took control of the area surrounding the
5  residence.  Approximately fifteen to twenty Swat Team members and
6  other police were positioned at various locations around the
7  residence.  Five snipers, who had scoped rifles, were ordered to
8  shoot to kill Petitioner if he exited the residence or placed
9  himself visible in a window.  At one point the Swat Team ordered
10  Petitioner to surrender over a bullhorn.  The purpose in asking
11  Petitioner to do so was to cause him to exit the residence in order
12  to kill him.  The shoot-to-kill orders were finally rescinded at
13  around sunrise when Lieutenant Stodelle informed the Swat Team that
14  Petitioner's father, Roy Mayfield, was arriving at the scene for
15  purposes of facilitating Petitioner's surrender.  (RT 5675-88)

16          d.    Petitioner's Surrender And Interaction With
17                Deputy Stein

18      72.  With the arrival of Petitioner's father, Roy Mayfield,
19  Petitioner surrendered at approximately 6:40 a.m.   As instructed
20  by the police, he threw the weapon out of the house.  He then
21  exited the house and laid down on the ground near the front door,
22  with hands on top of his head.  He was handcuffed by Swat Team
23  members and taken to a police patrol car.  (RT 5794-95)

24      73.  Petitioner was handcuffed by Deputy Emerson and taken to
25  Deputy Stein's patrol car.  Deputy Emerson placed Petitioner in the
26  rear of the car and left the vicinity of the car.  Deputy Stein was
27  standing outside the car.  (RT 5812-16)

28

74. Deputy Stein asked Petitioner to step outside the car in order to exchange handcuffs. Deputy Stein took Deputy Emerson's handcuffs off Petitioner and replaced those handcuffs with his own. While outside the vehicle, Petitioner asked to speak to his father. At this point, then-Sergeant, now-Lieutenant Stodelle, Lieutenant Colfer, and Petitioner's father were standing approximately 17 feet away from Deputy Stein. Petitioner explained that he had been promised that if he surrendered he would be allowed to speak to his father. Deputy Stein then relayed Petitioner's request to Sergeant Stodelle. (RT 5800-02, 5817-18) Deputy Stein attempted to listen to the conversation regarding the request occurring between Sergeant Stodelle, Lieutenant Colfer and Petitioner's father. (RT 5804, 5818)

75. According to Deputy Stein, Petitioner asked if he could stand outside the patrol unit. Petitioner said: "I'm not going to cause any problems. I'm just scared. I'm really not a bad guy. You can ask Bill, the guy I shot. He can tell you I tried to help him. It's just that when I entered the house, he startled me, so I shot him." Petitioner then asked Deputy Stein how the officer that he shot was doing. Deputy Stein looked at Petitioner and informed him that the officer had been taken to the hospital. (RT 5805-06)

76. Deputy Stein, often reading from his police report, then testified that Petitioner blurted out the following statements: That he had to do it, he didn't want to go back to jail, "I've been there too many times before. When I took off and he caught me all I could think about was getting his gun and shooting him. So I got

his gun and I shot him."   Moments later, Deputy Stein offered a

second version of Petitioner's quote as follows:   "When I took off

and he caught me, all I thought about was getting his gun and

shooting him so he couldn't arrest me.   I took his gun and I shot

him."   Deputy Stein testified that Petitioner further stated that:

"Then I got scared and I started running."   Other cops started

chasing Petitioner so he shot at them so they would stop chasing

him.   When he got to Acacia he heard someone say "police, freeze."

Because he didn't want to get hurt, he dove through the window.

Bill startled him and so he shot him.   (RT 5806-08)

77.   The statements given by Petitioner lasted approximately 3
to 10 minutes and were continuous.   (RT 5832-33)   Prior to giving
the statements, Deputy Stein had not told Petitioner that he wanted
to speak with Petitioner.   Petitioner made the statements
spontaneously.   Deputy Stein had never met Petitioner on any
previous occasions.   (RT 5831-32)

78.   Deputy Stein did not record the statements given by
Petitioner at the time the statements were made.   Rather, Deputy
Stein recorded them in a steno pad while standing at the rear of
the vehicle approximately 5 to 10 minutes or longer after the
statements concluded.   Deputy Stein had obtained the steno pad from
his vehicle.   At the time he recorded the statements, Sergeant
Hankerson and Sergeant Stodelle were standing at the rear of the
vehicle approximately a car width away from Deputy Stein.   At this
point Deputy Stein was also watching the Petitioner who was seated
in the vehicle.   Deputy Stein did not ask Petitioner if he had made
the statements.   At the scene, Deputy Stein did not tell any other

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   officer that the statements had been made with the possible

2   exception of Sergeant Hankerson.   (RT 5818-28)

3        79.   During the afternoon of March 3, 1986, Deputy Stein

4   dictated a police report from the notes he recorded in the steno

5   pad.   He then destroyed the notes and erased the tape used to type

6   the report.   (RT 5821-25)   Although Deputy Stein had a superior

7   officer, he did not tell that officer about the report or the

8   statements made by Petitioner.   (RT 5843-44)

9        80.   Prior to Petitioner making the statements, Deputy Stein

10  had not advised him of his constitutional rights.   The court then

11  instructed the jury that it had found that the statements had been

12  made freely and voluntarily and without coercion, but that it was

13  up to the jury to decide if Petitioner actually made the statements

14  and what precisely was said.   (RT 5830-32)

15       81.   Petitioner was placed in the police vehicle and driven by

16  Deputy  Stein to the Rialto Police Station.   On the way to the

17  station, according to Deputy Stein, Petitioner said he wanted to go

18  to the San Bernardino County Jail.   He explained that because he

19  had shot one of the Rialto police officers, he feared that other

20  Rialto officers would hurt him at the police station.   Petitioner

21  was taken to the Rialto station and put in a holding cell.   At the

22  station he received medical attention to a scratch on his chest and

23  on his left calf.   Later that day he was taken to the San

24  Bernardino County Jail.   (RT 5808-11)   While at the Rialto Police

25  Station, Deputy Stein advised investigating officer Amicone of the

26  statements made by the Petitioner at the scene.   (RT 6063)

27  / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

e.   <u>Crime Scene Investigation</u>

82.   Daniel Gregonis, a San Bernardino County Sheriff criminalist, began collecting evidence at the Shell station at 8:19 a.m. on the morning of March 3, 1986.   On the northwest corner of the parking area at the rear of the Shell station, the following items were recovered:   A Marlborough cigarette package; a cigarette wrapper; an HT radio set; and a man's watch cap.   (RT 5347-48, 5362-66)

83.   Also recovered from the northwest corner of the store near the end of the sidewalk was a butcher knife.   Trial Exhibit 23.   The knife was subsequently tested for blood with negative results.   However, San Bernardino Police Officer Robert Shultis, who arrived at the crime scene at 1:45 a.m. to secure the area for law enforcement, did not see the knife.   (RT 4909, 4918, 4931-32)

84.   From the cement pad north of the store, one metal fragment, possibly a bullet, was recovered.   There was no testing done of the item.   Also recovered from the cement pad was suspected blood; however, it was not tested to determine if it was blood and whose blood it might be.   In addition, a possible bone fragment was found on the pavement north of the store.   Finally, a set of keys was collected from the area north of the store, but the owner of the keys was never identified.   (RT 5369-74)

85.   Deputy Gregonis also observed blood droplets on the path behind the Shell station.   They appeared to indicate movement in a westerly direction.   The droplets could have come from a person who had a severed carotid artery, such as Sergeant Wolfley.   (RT 5392-99, 5400)   However, it could not be determined whether the blood

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

droplets came from one or more sources.  Deputy Gregonis
acknowledged that his opinion that the droplets appeared to travel
in a westerly direction could be modified based on certain factors:
the fact that the body was moved during the administration of CPR;
the fact that blood was spit out during the administration of CPR;
and the slope of the land where the blood was seen.  (RT 5406-10)

86.  Sergeant Wolfley's gun (Trial Exhibit 64) was thrown out
of the Acacia residence by Petitioner when he surrendered.  It was
determined that fragments taken from Sergeant Wolfley's body had
been fired by this gun.  It was also determined that four
cartridges found on the porch of the Acacia residence had been
fired by this gun.  (RT 5747-51, 5755-57)  When the gun was
examined by the police one live round of ammunition was found in
it.  The live round was situated in the cylinder of the gun so that
it would have taken two pulls of the trigger to have fired the
round.  (RT 5453-54, 5493-94)  The results of a gun residue test
were inconclusive as to whether Sergeant Wolfley had the gun in his
hands when it was fired.  (RT 5764-70)  It was also determined that
the cartridge taken from Officer Cirilo's police vehicle was
probably fired from Sergeant's Wolfley's gun.  (RT 5753-55)

87.  Hairs were taken from the watch cap found at the rear of
the Shell station.  Based on tests done on the hairs, the Sheriffs
criminalist concluded that the hairs probably did not belong to
Petitioner.  (RT 5760, 5775-76)

f.  **Autopsy And Scientific Evidence**

88.  The autopsy of Sergeant Wolfley was performed by Dr.
Irving Root, a pathologist for San Bernardino County, at 3:25 p.m.

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

on March 3, 1986, approximately 14 hours after the shooting.
Sergeant Wolfley was a white male, 6'3 ½" tall, 216 pounds, with a
muscular physique. (RT 5120-22, 5146-47) The deceased had the
following injuries: (1) a gunshot wound to the left side of the
face; (2) scrapes and abrasions interspersed with tearing or
lacerations on the left side of the front face; and (3) small
scrapes and abrasions on the knees. (RT 5126) There were no other
bullet wounds and no knife wounds on the body. (RT 5148-49)

89. The gunshot wound inflicted on the left side of the face
was almost one inch in vertical size and slightly more than an inch
horizontally. The path of the bullet was front to back, very
slightly from left to right. When the bullet entered the face it
caused scraping or abrasions on the skin of the jaw. The bullet
fragments that were found were consistent with a .357 caliber
bullet. Moreover, it was not possible for Dr. Root to determine
what position the deceased was in when the gun was fired. It was
possible that, if Sergeant Wolfley had his head tilted downward,
the gun could have been fired upward inflicting the wound; or, if
Sergeant Wolfley was standing face to face with his assailant with
the officer's head turned slightly at an angle, he could have
received the wound. Finally, Dr. Root concluded that Sergeant
Wolfley was probably positioned "somewhat upright" and fell to the
ground causing abrasions on his face (pitching forward like a "sack
of potatoes" after being stricken with the bullet). (RT 5127-28,
5148-56) However, it was also possible that after Sergeant Wolfley
was hit with the bullet, his body was thrown backwards and he

1 landed on the left side of his face causing the abrasions at that

2 spot.  (RT 5158-60)

3       90.   Dr. Root offered the opinion that the bullet wound was

4 inflicted by a distant range firing.  That is, the gun was fired

5 from a distance exceeding 27 to 36 inches from Sergeant Wolfley. He

6 explained that when a hand gun is fired, the gunshot residue will

7 travel approximately 27 to 36 inches.  If the gun is fired from a

8 distance of between 5 and 10 inches, the residue particles begin to

9 separate out and "stippling" or "tattooing" appears on the skin;

10 stippling or tattooing are small abrasions that cut into the skin

11 and are not removed even when the skin is washed during the

12 autopsy, assuming the wound was not a contact wound where the gun

13 was shot when next to the skin.  Therefore, since no gunshot

14 residue nor any stippling was seen surrounding Sergeant Wolfley's

15 wound, Dr. Root concluded that the gun was fired at a distance

16 exceeding 27 to 36 inches from the wound.  (RT 5128-34)

17       91.   However, Dr. Root acknowledged that the 27 to 36 inch

18 range was an approximation.  One would really need to test fire the

19 actual weapon used under the same conditions, using the same bullet

20 and the same gunpowder to make an accurate determination as to the

21 range the residue would travel.  (RT 5162-64)  Sometimes, gunpowder

22 particles can strike a person's skin but not have sufficient force

23 to penetrate it.  Moreover, Dr. Root recognized the possibility

24 that residue could have been washed away from Sergeant Wolfley's

25 face by blood spurting from the wound or could have been wiped off

26 his moustache.  Dr. Root agreed that he could not conclude that

27 gunshot residue was never on Sergeant Wolfley's face; he could only

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

state that it was not there at the time of the autopsy.  Finally, it was also possible that residue adhered to Sergeant Wolfley's clothing, or that when the clothing was moved, the residue was dislodged.  Dr. Root did not examine the clothing for residue.  (RT 5161-67)

92.  Daniel Gregonis, San Bernardino County Sheriff Criminalist, also testified that because of no apparent stippling on Sergeant Wolfley the distance of the shot was greater than 18 inches.  But he also acknowledged that this was an approximate distance.  The distance residue travels depends on the weapon, the cartridge, type of powder, the age of the powder, the weather conditions and the type of bullet used.  (RT 5346-47, 5385-88)  Mr. Gregonis also testified that during the autopsy of Sergeant Wolfley Dr. Root's examination for stippling was done visually at a distance of approximately two feet from the body.  No microscope or magnifying glass was used by Dr. Root to make this analysis.  (RT 5404-05)

93.  Norman Wallis, a San Bernardino County Sheriff Criminalist, conducted tests to determine the distance gunshot residue particles would travel when fired from the gun used to kill Sergeant Wolfley.  Trial Exhibit 64.  Mr. Wallis set up cardboard targets situated at varying distances.  He then fired the gun from each of those distances, noting the amount of gun residue lodged on the cardboard exhibits.  He offered the opinion that gun powder would travel approximately 30 to 36 inches when fired from that particular gun.  The test was conducted in June 1987, more than a year after the shooting in question.  (RT 5882-86, 5977-78)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

94. However, Mr. Wallis recognized a number of variables that could affect his opinion: First, the ammunition used by Mr. Wallis was from his own laboratory stock and was not matched by date with the ammunition used in Sergeant Wolfley's gun at the time of the shooting. Second, the distance gun powder particles travel can be affected by the age, moisture and amount of the powder in the cartridge; weather conditions such as wind or rain; the amount of oil in the gun permitting more or less residue to escape the barrel; or the condition of the cartridge, i.e. whether it is a loose or tight seal around the bullet. Third, the cardboard used in the experiment permits powder particles to affix to it more easily than a human face, particularly one with beard stubble. Fourth, the condition of the barrel of the gun may also affect the distance the residue travels. This particular gun had been tested for finger prints prior to the experiment and was, consequently, in a filthy condition covered by fingerprint film. Though Mr. Wallis was attempting to duplicate the firing that occurred on March 3, 1986, he, in fact, had no idea of the condition of the barrel on that date. Fifth, during the experiment, Mr. Wallis test-fired the gun face to face with the target. However, if a gun is fired at an angle, or if a glancing wound is inflicted, such could affect the amount of particles that affix to a target. In addition, a moustache, eyebrow, or beard stubble could impede the amount of particles imbedded on a human face. Finally, if a gun was shot upwards you would expect to see more particles below the bullet hole. The less the target was exposed to the gun, the fewer number of particles would affix to the target. (RT 5887-99, 5900-49)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

73

95.   The autopsy also revealed scrapes found on Sergeant Wolfley's knees.   They could have resulted from the officer crawling or from falling to his knees during the struggle.   (RT 5149-50)   The knee wounds also appeared to be similar to rug burns which can occur when one falls on pavement.   (RT 5134-35)   The scrapes were also consistent with Sergeant Wolfley falling on his face forward on the asphalt behind the Shell station.   (RT 5137-38)

96.   Nothing was found in Sergeant Wolfley's blood indicating that he was impeded emotionally or physically; there was no drug or narcotic found that would have prevented him from having quick reflexes.   (RT 5145-46)   The cause of death was gunshot wound to the face.   (RT 5144)

### g.   Jury Visit To Crime Scene

97.   During the prosecution's case-in-chief, the jury was taken on a field trip to the various crime scene areas.   The Petitioner was not present.   While on the tour bus, the Deputy District Attorney pointed out certain locations testified to by witnesses in court.   The jury was then taken to the area around the Shell station, the Sunstone Apartments on Eucalyptus, and the Haverstick residence at 481 Acacia Street.

98.   During the tour, a juror asked the court whether the lighting at the rear of the Shell station seen that night was the same as the lighting existing on March 3, 1986.   The court defined the issue for the jury in terms of whether the flashes of the gun could have been seen from the nearby apartments.   The court also informed the jury of its recollection as to the evidence relating

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

74

1  to the position of Sergeant Wolfley's body at the rear of the

2  station.  (RT 5538-45)

3      99.  While in the area near the Haverstick residence, the

4  Deputy District Attorney pointed out to the jury where Deputy

5  Hensley had been located.  The prosecutor also showed the jury

6  where Deputy Blankenship chased Petitioner through an open field

7  (RT 5545-46).  The jury then moved to the 481 Acacia Street

8  residence.  At that location the court instructed the jury to look

9  at the two bullet holes around the window through which Petitioner

10  dove.  The viewing of the Acacia residence was done in the evening

11  after it had become dark.  A juror asked questions about Deputy

12  Hensley's weapon and the court provided some information about the

13  weapon.  (RT 5547-52)

14      100.  After viewing the grounds around the Sunstone Apartments

15  on Eucalyptus Avenue, the jury was taken up to an apartment.  While

16  each juror looked out the window of the apartment, one of the

17  deputies, following the court's instructions, fired three shots at

18  the rear of the Shell station.  The shots were fired with Sergeant

19  Wolfley's gun using the same ammunition that was in the gun on the

20  night of the shooting.  (RT 55-58)  The jury was then taken to the

21  rear of the Sunstone Apartments.  They observed a police unit

22  parked in front of the apartments with the spotlight shining on

23  Eucalyptus Avenue in a similar manner as testified to by Officer

24  Cirilo.  The jury then viewed the rear of the Shell station.  At

25  that time, following the court's instructions, a sergeant, facing

26  in a southwesterly direction, fired three shots for the jury to

27  view.  The jury was next taken to the apartment where Messrs.

28

1  Judevine, Deeper and Davis resided at 402 North Eucalyptus Avenue.

2  While the jury was looking out the kitchen window, a deputy fired

3  two shots in the vicinity of the Shell station for the jury to

4  view.  Next, the jury was taken to the front of the Shell station

5  and stood at a patrol unit located where Sergeant Wolfley had

6  parked his vehicle.  A total of three shots were fired by a deputy

7  at the rear of the Shell station for the jury to hear.  (RT 5558-

8  68)

9      101.  While the jury was at the Shell station, the court took

10  testimony from the station's owner.  The owner stated that the

11  lighting on March 3, 1986 was the same as the lighting that

12  evening.  He also stated that in March of 1986 a customer was

13  required to obtain a key in order to open up the restroom at the

14  station.  In addition, the police obtained a video film that was

15  running on the night of March 3, 1986 from inside the store of the

16  station.  Finally, while the jury was at the station, two

17  additional shots were fired north of the driveway located at the

18  Sunstone Apartments.  (RT 5569-72)

19      2.  DEFENSE CASE

20          a.  Howard Bell And Tyrone Thomas

21      102.  Howard Bell had a conversation with Tyrone Thomas on

22  March 3, 1986 in the district attorney's office.  At that time,

23  Thomas admitted to Bell that he knew that Bell and Petitioner were

24  not the persons who were after him on that evening, and that Thomas

25  had not seen either Bell or Petitioner earlier that evening.

26  Thomas further stated to Bell that he, Thomas, had told the deputy

27  district attorney and Detective Amicone of these facts.  It

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  appeared to Bell that the prosecutor had forced Thomas to come to

2  court to testify to the contrary.  Moreover, Bell did not see

3  Petitioner in possession of a knife or any other weapon on the

4  night of the incident.  (RT 6174-79)

5          **b.**   **Interaction Between Petitioner And Deputy**

6              **Stein**

7      103.  Lieutenant (then-Sergeant) Hankerson was the San

8  Bernardino County Sheriff sergeant watch commander on March 3,

9  1986.  His duties that morning were to provide security and to

10  assure that Petitioner did not flee after he surrendered.

11      104.  When Petitioner exited the Acacia Street residence,

12  Lieutenant Hankerson helped Deputy Stein escort Petitioner over to

13  a patrol unit.  The Petitioner was placed in handcuffs by Deputy

14  Stein.  Lieutenant Hankerson stood outside the patrol unit from the

15  time of Petitioner's arrest to the time the car left the area on

16  its way to the Rialto Police Station.  (RT 6181-85)  During this

17  entire period, the only statement Lieutenant Hankerson heard

18  Petitioner make was a question to Deputy Stein asking how Officer

19  Wolfley was.  Moreover, Lieutenant Hankerson did not recall

20  observing Deputy Stein write any notes on a pad at the rear of the

21  patrol unit nor did he recall standing next to Deputy Stein at the

22  rear of the unit.  Also, Deputy Stein did not tell Lieutenant

23  Hankerson that Petitioner had made any statements regarding the

24  shooting.  Furthermore, Petitioner did not make any statements to

25  Lieutenant Hankerson other than the inquiry concerning the

26  condition of Sergeant Wolfley.  (RT 6184)  Finally, Lieutenant

27  Hankerson was present in Deputy Stein's vehicle as it was driven to

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  the Rialto Police Station.  During that ride, Petitioner did not

2  make any statements to Deputy Stein or Lieutenant Hankerson.  (RT

3  6196)

4          c.   Observations Of Roy Mayfield, Sr.

5      105.  During the early morning hours of March 3, 1986, Roy

6  Mayfield, Sr., Petitioner's father, was managing another Shell

7  service station when he got a call from a relative about

8  Petitioner.  Mr. Mayfield was informed that a police officer had

9  been shot and that his son might be involved in the shooting.  Mr.

10  Mayfield was not notified at his place of employment by any

11  officers and asked by them to come to the Acacia Street residence.

12  (RT 6210-12, 6198-99, 6200)

13      106.  Mr. Mayfield went to the Acacia residence to assist in

14  protecting his son's safety and insuring that he was not killed by

15  the police officers.  (RT 6209)  When he arrived at the residence,

16  he observed "a small army" of more than twenty police officers, all

17  of whom had guns, rifles and shot guns, located at various

18  positions surrounding the house.  The officers did not inform him

19  that they wanted his son to exit the house safely.  (RT 6201-02)

20  However, the police did allow him to speak on the telephone with

21  his son.  Mr. Mayfield asked Petitioner to surrender.  But, Mr.

22  Mayfield insisted that Petitioner not exit the house until an

23  officer situated on a nearby roof put his gun down.  That officer

24  seemed eager to shoot Petitioner, intently aiming his rifle in the

25  direction of the house.  (RT 6200, 6203-05, 6217-19)  Petitioner

26  complied with his father's request and threw the gun out of the

27

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

78

1  residence and surrendered according to instructions given to him by

2  the officers.  (RT 6205)

3      107.  The Petitioner was taken to Deputy Stein's patrol car.

4  Mr. Mayfield stood approximately 17 feet away from Petitioner

5  talking to two other officers.  From the time Petitioner

6  surrendered to the time he left in the patrol car, Mr. Mayfield

7  closely watched his son.  During that time he heard his son make

8  only one statement; namely, an inquiry as to how the stricken

9  officer was and whether he, Petitioner, could speak to his father.

10 Petitioner said no other words while standing by the vehicle.  Once

11 Petitioner was placed in the car, he did not exit the car again.

12 (RT 6205-09)  Mr. Mayfield had been convicted of attempted robbery

13 in 1965.  (RT 6209)

14          d.   Petitioner's Testimony

15               (1)   Direct Testimony

16      108.  As of March 3, 1986, the Petitioner had seen Howard Bell

17 a few times in the area of the Meridian Apartments.  On that date,

18 Petitioner was staying with his father, Roy Mayfield, who lived

19 several blocks from the apartments in the general vicinity of the

20 Shell station.  On the night of March 2, 1986, Petitioner was

21 speaking with a friend when Mr. Bell offered to drive him to a

22 store to get cigarettes.  Petitioner and Mr. Bell agreed to meet in

23 approximately fifteen minutes at the house of Petitioner's father

24 in order for Petitioner to return his bicycle to the house.  They

25 did so and drove to the Shell station in Mr. Bell's car.  (RT 6232-

26 34)

27

28

109.  At the Shell station, Petitioner entered the store and asked the cashier for cigarettes.  He paid for the cigarettes and put the remainder of $3.00 towards the purchase of gas for Mr. Bell's car.  Petitioner saw Mr. Thomas acting paranoid inside the store.  Petitioner had never seen Mr. Thomas before in his life.  Mr. Thomas approached Petitioner and Mr. Bell and said "why me".  Petitioner then asked Mr. Bell if Mr. Bell knew Mr. Thomas.  Mr. Bell responded in the negative.  There was another male with Mr. Thomas at the time Mr. Thomas approached them inside the store.  Mr. Thomas and this other individual then exited the store.  (RT 6234-37)  Petitioner received the package of ten Benson Hedges cigarettes from the cashier and waited for Mr. Bell.  The cashier stated that he had called the cops and that if Petitioner and Mr. Bell had anything to get rid of, they should do so.  (RT 6237)

110.  Petitioner then left the store and observed a police vehicle that had pulled up in the vicinity of the store.  He observed Mr. Thomas talking to an officer.  Petitioner walked over to the phone booths located at the west end of the Shell station.  He dialed a phone number, but received a busy signal; he hung up the telephone.  Petitioner turned around and began walking towards the bathrooms which were located on the western side of the store east of the phone booths.  He observed the male police officer pointing a gun at him as the officer stood between the front of the station and Mr. Bell's car.  The officer began moving towards Petitioner with his gun outstretched in his right hand pointing at Petitioner.  Petitioner had not spoken to the officer.  The officer shouted at Petitioner, "hey, mother fucka, hold it."  At that

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

point, Petitioner was still in the vicinity of the phones.
Petitioner did not understand what was happening nor why the gun
was pointed at him.  The officer continued proceeding in
Petitioner's direction at the west end of the service station
yelling "black mother fucka, freeze."  Petitioner did not attempt
to run away.  He began to back away from the officer.  The officer
appeared angry.  Petitioner asked the officer what was going on.
The officer continued to curse at the Petitioner as the Petitioner
back pedaled.  (RT 6238-44)

111.  After Petitioner and the officer had reached the
southwest corner of the service station, Petitioner stopped and put
his hands up as directed by the officer.  The officer approached
further and put the gun in Petitioner's face a few inches away.
Petitioner was scared, upset and angry.  The officer said he was
going to blow Petitioner's "mother fucking head off."  The
Petitioner had done nothing to the officer nor anyone in the
service station.  At that time the officer had a two-handed grip on
the gun and was pointing it at the right side of Petitioner's face
at eye level. (RT 6245-58)

112.  Petitioner stood with his hands in the air staring at
the barrel of the gun.  At that point he was approximately 31 to 33
inches from the officer.  Petitioner observed the cylinder of the
gun begin to turn.  Petitioner believed that the officer was about
to shoot him both because of the movement of the cylinder and
statements made by the officer to that effect.  With his right
hand, Petitioner pushed the officer's left hand so that the gun
would not be pointed at Petitioner.  At the same time, Petitioner

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  attempted to move his head out of the way of the line of fire.  The
2  gun then fired hitting nobody.  Petitioner responded by wrapping
3  his hands around the officer's hands which were still holding the
4  gun.

5      113.  Petitioner and the officer began "tussling" for the gun.
6  The officer kept saying "mother fucka, I'm going to kill your ass."
7  The hands of Petitioner and the officer began moving up and down in
8  various directions.  Suddenly, the gun discharged again.  The gun
9  then fell to the ground.  Petitioner had not taken the gun out of
10 the officer's hands.  Petitioner went for the gun, scooping it up
11 in one motion and began running.  He did not know where the officer
12 was at that time; he just wanted to gain possession of the gun and
13 take it to another location.  As he began running eastward out of
14 the Shell station, he glanced back and saw the officer laying on
15 the ground.  Petitioner was scared, angry and afraid for his life
16 and still did not know why the officer had pointed the gun in his
17 face.  (RT 6259-72)

18     114.  Prior to this incident, Petitioner and Mr. Bell had not
19 talked about shooting a police officer.  When the officer put the
20 gun in Petitioner's face, Petitioner had no intention to shoot the
21 officer.  Nor did he have any intention to shoot the officer when
22 he began to struggle with the officer for the gun or when he picked
23 up the gun.  Petitioner's only intention was to get the gun away
24 from the officer.  Petitioner was afraid for his own life.  When he
25 ran out of the Shell station towards Eucalyptus Street, his desire
26 was to run home approximately six blocks away so his father could
27 advise him as to what to do.  (RT 6274-76)

28
P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

82

115.   As Petitioner ran north up Eucalyptus Street, he observed a police car speeding up approaching him.   A spotlight from the car was directed on him.   Petitioner then fired a shot in the air.   He did not intend to shoot at the police car; rather he intended to fire a warning shot so the police officers would back off and he would be able to reach home safely.   (RT 6278) Petitioner then ran into the driveway of the Sunstone Apartments and hid behind a boulder located on the grassy area near the driveway.   Seeing police cars coming in his direction, he fired a second warning shot in the air.   (RT 6280)

116.   Petitioner then ran around the corner of Eucalyptus and Grove Streets and into the first backyard that he saw.   He went over a wall and returned to the area of the Sunstone Apartments and rested for a few seconds.   He began running again and ran to the southeast end of the Sunstone Apartments parking lot.   He could see at the rear of the Shell station a lot of police officers around the area of the slain officer.   From the area of those officers, he heard:  "If you see the mother fucka, kill him."   Petitioner was afraid and scared for his life.   He went to the southwest part of the parking lot of the Sunstone Apartments.   There was a wall located high off the ground.   He jumped up and pulled himself over the wall to the other side.   He decided to surrender.   He threw his gun out around the corner of the building and put his hands up; but, to his surprise, there were no police officers at that location.   He retrieved the gun, paused, and began to pray.   (RT 6281-88)

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

83

117.   Petitioner then proceeded southwest of the Sunstone Apartments to a used car lot.  He ran across the open field, staying low to avoid being shot.  He arrived at a dirt road and fell down.  He walked up the dirt road and heard a shotgun pump. Someone yelled out "stop"; Petitioner complied.  He heard another gun rack.  He turned and ran scared towards the nearest residence for safety.  He heard gunshots as he dove through the window of the residence to avoid being shot.  He had never been at that residence on any prior occasions.  (RT 6288-90)

118.   Petitioner picked himself off the floor and walked into a hallway.  Suddenly Mr. Haverstick burst through the bedroom door. As Petitioner turned in Mr. Haverstick's direction, the gun, which was in Petitioner's hand, went off.  Petitioner did not attempt to shoot Mr. Haverstick.  Mr. Haverstick quickly closed the bedroom door.  Petitioner attempted to open the door, but it was being held closed from the inside.  Petitioner then saw Mr. Fifelski and told him to get out of the house.  Mr. Fifelski did so and was grabbed outside by the police.  (RT 6291-92)

119.   Petitioner forced the bedroom door open.  He observed Mr. Haverstick leaning against the door with blood on his leg. Petitioner asked Mr. Haverstick if he was hurt; to which Mr. Haverstick responded affirmatively.  Petitioner decided to stop the bleeding by tying a sock around the wounded leg to act as a tourniquet.  Petitioner went to the kitchen to get Mr. Haverstick some water.  He also walked through various other rooms of the house to see whether the police could invade the house through areas other than the front door.  At the back porch, Petitioner

unloaded the cylinder of the gun because, in his mind, the gun had discharged much to easily.  He returned to the bedroom and gave Mr. Haverstick the water.  He also obtained medication from the nightstand and provided that to Mr. Haverstick.  Petitioner helped Mr. Haverstick into a chair; while doing so, he laid the gun on the floor within Mr. Haverstick's reach.  At a later time that morning he helped Mr. Haverstick into his bed, maneuvering him in such a way as to avoid any further pain to Mr. Haverstick's leg.  (RT 6292-99, 6302)

120.  Over the course of the next several hours, Petitioner spoke over the telephone to his mother, stepfather, cousin and police officers.  He did not kick Mr. Haverstick, but simply touched his foot in order to cause Mr. Haverstick to moan so the police officers outside could hear him.  This was to show the officers that Mr. Haverstick was still alive.  When Petitioner dove through the window, he did not intend to take any hostages inside. He told the police officers he had a hostage in order to do anything to keep them from entering the house.  Petitioner felt that the police officers outside the residence had an intent to kill him.  He did request a car in order to take Mr. Haverstick to the hospital and to surrender himself.  He figured that at the hospital he would be safe from being shot by the police.  At one point, Petitioner realized that there was one bullet left in the gun.  He did not tell Mr. Haverstick that he would shoot him; rather, he said that if the cops invaded the house he would shoot himself.  (RT 6300-01, 6302-07)

/ /

121.  After his father gave instructions about how to exit the house, Petitioner surrendered.  He was handcuffed and taken to the patrol unit.  After being seated in the unit, he was taken outside to exchange handcuffs.  He asked the officer whether he could talk to his father.  He did not make any further statements; specifically he did not make any of the statements attributed to him by Deputy Stein.  Moreover, when he was transported away from the scene in Deputy Stein's patrol unit, he did not make any further statements; he did not ask Deputy Stein to not be transported to the Rialto Police Station.  (RT 6310-12)

122.  In sum, Petitioner did not intend to or conspire to kill Sergeant Wolfley on March 3, 1986.  At the Shell station he simply asked Sergeant Wolfley why he was pointing the gun at him.  He did not call Sergeant Wolfley any names or threaten him in any way.  He simply wanted to know what was going on.  (RT 6312, 6308-09)

        (2)  Cross-Examination

123.  After the court previously denied a motion to exclude Petitioner's prior convictions, it was elicited that Petitioner had suffered a prior conviction for grand theft in 1978 or 1979 and a conviction for accessory to robbery in 1984.  Petitioner was now 28 years old.  (RT 6340)

124.  On the evening of March 2, 1986, Petitioner walked to the Meridian Apartments which were approximately three to four blocks from his father's house.  He went there to see if his friend Henry Martin was home.  Not finding his friend there, Petitioner walked home.  A few hours later he rode his ten speed bicycle to the corner of 5th Street and the Meridian Apartments. He was at

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

that location for approximately fifteen to twenty minutes. That location is known as a narcotics area. Petitioner was there passing time. Mr. Bell volunteered to take Petitioner to a store to buy cigarettes. An open 7-11 market was approximately one block away. However, since Mr. Bell needed gasoline for his car, he offered to drive Petitioner to the Shell station where Petitioner could purchase the cigarettes. Petitioner dropped his bike off at his father's house and was picked up by Mr. Bell in his car. While in the house, the Petitioner obtained the beanie which was later found behind the Shell station. Mr. Bell and Petitioner drove to the Shell station.   (RT 6340-56)

125.  When Tyrone Thomas exited the store, Petitioner observed him walk over to the police officer who had just pulled up in his vehicle. The officer was trying to hold Thomas as Thomas was moving around. Petitioner knew that Sergeant Wolfley was a police officer due to his uniform. Petitioner walked over to the phones and then to the bathrooms which were along the westside of the Shell station building; Petitioner figured that the bathrooms would be open without the need to obtain a key from the store clerk. (RT 6366-73)

126. As Petitioner was walking in an easterly direction from the phones towards the bathrooms, he observed Sergeant Wolfley draw his gun. At that point Petitioner was approximately parallel with the front of the station building. The officer told Petitioner to hold it; Petitioner knew that the officer wanted him for something. Petitioner then slowed down and began back pedaling as he proceeded north along the westside of the building. When Sergeant Wolfley

1   reached the southwest corner of the building, he put both hands on

2   his gun.  Along the westside of the building, the officer commanded

3   Petitioner to halt.  Petitioner asked the officer what was going

4   on.  The officer seemed angry.  When Petitioner reached the

5   northwest corner of the building he began proceeding eastward along

6   the rear of the building.  The officer yelled "freeze" and

7   Petitioner stopped.  Sergeant Wolfley ordered Petitioner to put his

8   hands up; Petitioner complied.  The officer's anger increased and

9   he called Petitioner a "black mother fucka nigger".  (RT 6373-87)

10      127.  Sergeant Wolfley rushed toward Petitioner.  He was

11  holding the gun with both hands.  The officer placed the barrel of

12  the gun a couple of inches from Petitioner's face.  Petitioner

13  observed the cylinder begin to turn immediately after the officer

14  said that he was going to blow Petitioner's head off.  Petitioner

15  quickly pushed the gun to the officer's right and the gun fired.

16  Petitioner grabbed the officer's hands and placed his own hands

17  around the gun.  Petitioner and Sergeant Wolfley began tussling.

18  Petitioner managed to direct the barrel of the gun pointed between

19  the officer and himself.  The gun began moving all around, as both

20  men applied pressure.  Finally, the gun was directed in an upward

21  and vertical position at which time it discharged a second shot.

22  At the time of discharge, both men had their hands around the gun.

23  As they were struggling for the gun, Sergeant Wolfley said that he

24  was going to kill Petitioner, that it was all over for him.  After

25  the gun discharged, Petitioner thought that he might have been

26  shot.  Sergeant Wolfley's hands then loosened from around the gun

27  and the gun fell approximately four feet to the ground.  The

28
P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

88

1  struggle for the gun began at the wedge edge of the concrete area

2  at the rear of the station and moved towards the easterly end of

3  the concrete.  Both shots were fired while Petitioner and the

4  officer were at the rear of the station.  (RT 6388-99, 6400-03)

5      128.  As the second shot was being discharged, both the

6  officer and Petitioner raised their bodies in an upward direction.

7  Petitioner then dove for the gun, scooping it up in one motion and

8  continuing forward in a running position.  (RT 6410-15)  After the

9  shooting, the only thought on Petitioner's mind was to get home; he

10  did not know if the danger was over.  He knew that sometimes police

11  officers carry two guns.  (RT 6445, 6449-53)  Petitioner is 6'3"

12  tall and weighed 185 pounds.  He is known as Dennis Mayfield and

13  Dennis Brewer.  (RT 6436-37)

14      129.  As Petitioner ran north up Eucalyptus Street, he turned

15  and fired in the air in the direction of the police car that was

16  following him.  He consciously, not accidentally, pulled the

17  trigger, intending to fire a warning shot in the air.  He saw a big

18  flash come from the police car immediately after the shot was

19  fired.  (RT 6422-24)  When Petitioner was on the grassy area of the

20  Sunstone Apartments on Eucalyptus, a spot light was directed on him

21  by a police car.  Petitioner fired a second warning shot.  The

22  police car then backed up down the street.  (RT 6454-57)

23      130.  As Petitioner was fleeing from the chasing officers, he

24  lifted himself to the top of a wall, rolled over barbed wire

25  protruding three inches from the top, and landed on the other side.

26  The wall was located near a dumpster. (RT 6488-89)  Petitioner

27  tossed the gun on the dirt part of a new construction area in order

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   to surrender to the police.  When he realized that no police

2   officers were in his vicinity, he retrieved the gun and began to

3   pray.  He ran across the open field because, in his prayers, he

4   asked God to lead the way and that is the direction he went.  As he

5   ran through the field, he saw police officers popping up with

6   weapons pointed in his direction.  He did not hear the officers say

7   anything.  (RT 6495-96, 6502-07)

8        131.  After Petitioner dove through Mr. Haverstick's window,

9   he walked to the hallway.  While Petitioner was facing the hallway,

10  Mr. Haverstick burst open the bedroom door.  Petitioner then turned

11  to the left and the gun discharged  The bedroom door opened inward

12  towards the bedroom.  (RT 6516-17).  Mr. Haverstick's testimony

13  that Petitioner raised the gun and shot him was incorrect.  Mr.

14  Haverstick fell into the bedroom and the door was closed.

15  Petitioner tried to open the door, but it would not move.

16  Petitioner knocked on the door at which point Mr. Haverstick asked

17  who Petitioner was.  Petitioner said he was the police to which Mr.

18  Haverstick said "bullshit".  Petitioner told Mr. Haverstick to open

19  the door.  Mr. Fifelski appeared and Petitioner was still holding

20  the gun in his hand.  Petitioner did not check to see if Mr.

21  Fifelski  was in possession of a gun; he simply told Mr. Fifelski

22  to leave the residence.  Petitioner then forced his way into the

23  bedroom.  Petitioner disagreed with Mr. Haverstick's testimony that

24  he searched the dresser drawers when he first entered the bedroom.

25  (RT 6520-39)

26       132.  During the hours Petitioner was in the house with Mr.

27  Haverstick, he was experiencing great pressure in keeping alive.

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

The police were shouting at him from outside on bullhorns; a police helicopter was hovering above shining its light down into the residence; police officers were walking on the roof of the residence; while he was on the phone speaking with his relatives and friends the officers continually broke in on the phone lines interrupting the conversations; and he could see police officers through the window walking outside the residence.  (RT 6565)

133.  Petitioner did not kick Mr. Haverstick in his wound or in his groin.  He simply nudged the wounded leg by nudging the foot, knowing he would cause some pain.  Petitioner had worked for six to eight weeks at the St. Louis Hospital in Pasadena in 1980 and 1981 helping senior citizens.  (RT 6544-45, 6561-62)  On two separate occasions Petitioner caused Mr. Haverstick to scream out; on one of such occasions, Petitioner was on the phone with the police officers.  (RT 6698)  Petitioner was using Mr. Haverstick as a hostage in order to negotiate with the police and gain an advantage for himself.  He wanted the police to bring a car to the residence so he and Mr. Haverstick could leave.  Petitioner did tell an officer that he would blow Mr. Haverstick's brains out.  He also told the officers that he was using Mr. Haverstick as protection and if the officers came into the residence, Mr. Haverstick would get shot first.  Further, he told the officers that if they did not follow his rules, they would pick up a corpse. Petitioner was saying whatever was needed in order to stall for time and preserve his own safety.  At one point he told the officers that he did not want to hurt anyone.  Petitioner never intended to shoot Mr. Haverstick nor would he have actually blown

1  Mr. Haverstick's head off.  (RT 6666-68, 6670-74, 6684, 6689, 6690,

2  6693, 6696)

3      134.  Petitioner made demands on the police (to remove the

4  helicopter, to obtain a car) in order to stall for time.  He knew

5  that the officers outside the residence wanted to kill him.  He

6  used the terminology "fuck" only when he was under stress.  (RT

7  6675-79)  Although the Petitioner did not have a knife that night

8  either at the Shell station nor in the Haverstick residence, he

9  told one of the officers over the phone that he would knife Mr.

10 Haverstick.  (RT 6694-95)

11     135.  Sergeant Wolfley could have approached the Petitioner in

12 a proper fashion and asked Petitioner appropriate questions.

13 Petitioner had never been approached with a gun in that manner

14 previously.  (RT 6691-92)

15     136.  Petitioner said many things that night to the officers

16 which he did not mean in order to stall for time and save his own

17 life.  He realized that his only alternative was for his father or

18 his family to come to the residence in order to secure his safety.

19 Although Mr. Haverstick needed medical attention, Petitioner knew

20 that if he let the officers take Mr. Haverstick out of the

21 residence, they would then kill Petitioner.  Petitioner did lie to

22 the officers regarding Mr. Haverstick's condition.  (RT 6706, 6714-

23 15, 6723-26)

24     137.  Over the course of several hours, Petitioner spoke on

25 the phone to various people:  he spoke to his mother several times;

26 he spoke to his cousin Yvonne Hester for a considerable time; and

27 he spoke with his stepmother Eileen Gains, his neighbor Joanne, his

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

92

1  father and the police.  (RT 6559-61)  Tape recordings were made by

2  the police of most of the conversations.  Petitioner told his

3  cousin Yvonne Hester that he had fired five shots that evening.

4  (RT 6730)  He further stated that he had shot one police officer;

5  however, he did not go into detail about the fact that the shooting

6  was an accident.  He lied to his cousin about precisely what had

7  happened because it was not for her to know all the details.  He

8  wanted his cousin to help and come to the scene in order to secure

9  his safety.  Petitioner's statement to her that he was trying to

10  leave the Shell station was a lie; Petitioner was really going

11  towards the restrooms.  (RT 6737, 6741-42)

12      138.  Over the phone, Petitioner told Detective Tesselaar that

13  Mr. Haverstick wanted to go to the hospital; however, Petitioner

14  did not think the police would really take him there.  Petitioner

15  thought that Detective Tesselaar might permit Yvonne Hester to come

16  to the residence and take Petitioner and Mr. Haverstick away from

17  the house.  As Petitioner spoke with various officers on the phone,

18  he was attempting to find some officer that would comply with his

19  demands.  Eventually Petitioner realized that only his family would

20  really help him.  (RT 6749-54)

21      139.  Petitioner told Lieutenant Stodelle over the phone that

22  he took the gun from Sergeant Wolfley.  However, Petitioner did not

23  go into detail with Lieutenant Stodelle and meant that he took the

24  gun from the ground.  (RT 6853-54)  Petitioner knew that if he

25  killed Mr. Haverstick he would lose any bargaining position with

26  the police.  He told Lieutenant Stodelle that he would take Mr.

27  Haverstick to the hospital if the police brought a car in front of

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1 the residence.  Petitioner intended to surrender at the hospital if

2 permitted to drive there.  (RT 6855-60)  Furthermore, Petitioner

3 told Lieutenant Stodelle that Mr. Haverstick had not been shot.

4 Although this was a lie, it was true that Petitioner never wanted

5 nor intended to shoot Mr. Haverstick.  (RT 6863-64)  Lieutenant

6 Stodelle told Petitioner that he would not let Yvonne Hester near

7 the house.  (RT 6882)

8     140.  Petitioner said during the taped conversations that he

9 had shot a cop in the sense that both he and Sergeant Wolfley had

10 possession of the gun when it discharged.  It was the other police

11 officers who formed their own opinion that Petitioner had

12 intentionally shot Sergeant Wolfley.  (RT 6893-94)  If Mr.

13 Haverstick had died, Petitioner would have killed himself rather

14 than have let the police kill him.  (RT 6898)  Petitioner had not

15 been honest with Yvonne Hester because he did not want to go into

16 all the details of the events.  (RT 6914)  Petitioner did not speak

17 with anyone in county jail about his case.  (RT 6914)

18     141.  After Petitioner had fired the shots at officer Cirilo's

19 vehicle, he approached the wall in the vicinity of the Sunstone

20 Apartments.  He was able to look over the wall towards the rear of

21 the Shell station.  This was not at the southeast end of the

22 carport area, but more towards the middle.  But when looking at a

23 videotape played for Petitioner (depicting conditions that were

24 different than those existing on March 3, 1986) Petitioner was

25 unable to pinpoint the spot where he was able to look over the

26 wall.  (RT 6781-84)

27 / /

28

1    142.   Petitioner bought sunflower seeds at the Sav-A-Mint

2    store on the morning of March 2, 1986 at which time he also bought

3    eggs, milk and potatoes.  He did not make his purchases at the

4    store located on the corner of Foothill and Meridian Streets

5    because prices were cheaper at the former store.  (RT 6823-25)

6    143.   While Petitioner was in the Haverstick residence, he

7    never had the gun cocked.  (RT 6829)

8           e.   Testimony Of Detective Hankerson

9    144.   Rialto Police Department Detective Valerie Hankerson

10   interviewed Mr. Corbin in March 1986.  Mr. Corbin stated that

11   during the early morning hours of March 3, 1986 he heard four to

12   five gunshots very near his apartment.  He stated that the gunshots

13   awakened him, not that he had gone to the window of his apartment

14   prior to hearing any shots.  Mr. Corbin further stated that he

15   first heard two gunshots and then other shots to the north of his

16   apartment.  The first two gunshots were approximately 5 to 10

17   seconds apart; a third shot was approximately one minute later

18   coming from a northerly direction from the apartment; and a fourth

19   shot was heard approximately ½ minute after the third shot.

20   Detective Hankerson showed Mr. Corbin a photograph of the

21   Petitioner.  Mr. Corbin stated that he could not recognize

22   Petitioner as the person who ran through the Sunstone  Apartments

23   on March 3, 1986.  Finally Mr. Corbin said that Petitioner had a

24   great big gun in his left hand pocket.  (RT 6915-29)

25   145.   Detective Hankerson also conducted an investigation of

26   the Haverstick residence.  She found two bullet holes on the window

27   sill on the northwest side of the house - this was the same window

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  through which Petitioner dove.  She observed sunflower seeds in the

2  bedroom ashtray which were taken by the Sheriff's lab into

3  evidence.  Furthermore, Detective Hankerson found four shell

4  casings on the back porch.  Later Mr. Fifelski alerted the police

5  to a fifth shell found in Mr. Haverstick's bedroom.  Finally,

6  Sergeant Wolfley's gun, which remained on the front lawn for

7  several hours, was covered with dirt and mud.  (RT 6931-40)

8        f.   **Shell Station Videotape**

9        146.  During the early morning hours of March 3, 1986 a

10 videotape was running in the Shell station store.  It showed that

11 when Petitioner entered the store, the clerk, Mr. Thomas and

12 another individual were present.  Petitioner and Mr. Bell exited

13 the store at 1:30 a.m.  Mr. Bell then re-entered the store at 1:43

14 a.m.  Finally, Officer Coulombe arrived inside the market at 1:51

15 a.m.  (RT 6968-77)

16        g.   **Wall Near Sunstone Apartments**

17       147.  Defense investigator Lonsford made an onsite

18 investigation of the wall located near the Sunstone Apartments.  He

19 found the wall to be different heights at different locations along

20 the wall.  At the western end of the wall, the height was slightly

21 over six feet.  Attached to the back of the south side of the wall

22 was a two-foot chain link fence resting on top of the wall plus

23 three strands of barbed wire measuring one to two feet in height.

24 So the six foot wall plus the four feet of fence and wire on top of

25 the wall resulted in a height of approximately ten feet (RT 6997-

26 99).

27 / /

28
   P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

148.   Mr. Lonsford is 5'8" in height.  From different locations along the wall, he could see the back of the Shell station.  From the western end of the wall, he was able to see the concrete area behind the station.  At the eastern end of the wall, he could not see the concrete area, but he could see part of another defense investigator who stood positioned in that area. His view disappeared at the eastern end of the wall, where it was blocked by bushes.  Finally, at the westside of the dumpster, the wall was no higher than 6'2".  (RT 7003-11)

3.   **REBUTTAL**

a.   **District Attorney's Videotape**

149.   Mr. Chrzanowski owned property near the Shell station. A chain link fence over six feet in height has existed on the edge of his property for the last five years.  (RT 6641-45)

150.   Over defense objection, a videotape, made by Detective Amicone and Deputy District Attorney Glazier during trial, was played for the jury.  The videotape depicted the south parking lot and carport around the Sunstone Apartments.  The deputy district attorney appeared at various times on the tape.  (RT 6756-65)  On the wall (which Petitioner testified he scaled) there was a chain link fence and barbed wire; however, that was not depicted in the video.  The wall was lower at the southwest corner than at the southeast corner.  The wall, fence and barbed wire surrounded the entire complex except for the westside.  At one point the wall measured over six feet and the chain link fence and barbed wire rose up another four feet.  (RT 6766-70)

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

b.   Events Following Shell Station Shooting

151.  Deputy Sorenson has used the phrase "mother fucker" at times when he was angry.  However, he did not hear any officer use the term at the location of Sergeant Wolfley's body at the rear of the Shell station on March 3, 1986.  But Officer Sorenson did not make any report or compile a list of persons present at that location at the time.  (RT 7031-33)

152.  When Petitioner ran through the open field, Deputy Blankenship was positioned in the field.  There were no other officers in his immediate presence; however, Deputy Blankenship had no knowledge whether other officers were positioned at other locations in the field.  (RT 7077-82)

153.  As Petitioner ran through the open field to a dirt road, Deputy Hensley did not hear any round racked in a shotgun.  After she fired at Petitioner, Deputy Stein and other officers came to the Acacia residence location.  Deputy Stein had ordered Deputy Hensley to be present at her location.  (RT 7087-90)

154.  Mr. Fifelski was told by Mr. Haverstick that there were robbers in the house and to exit the house.  Mr. Fifelski did not see Petitioner while he, Mr. Fifelski, was present in the house. (RT 7096)

155.  Officer Cirilo had not illuminated Petitioner with his spotlight prior to Petitioner shooting at the police unit.  When Petitioner was running north up Eucalyptus Street, Officer Cirilo illuminated him with the spotlight and Petitioner turned and fired in the direction of the police car.  (RT 7110-12)  In response to a question from a juror, Officer Cirilo testified that a shot was

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

fired and hit the windshield of his vehicle.  He then backed up quickly and proceeded forward with the spotlight illuminated on a figure running in a northward direction up Eucalyptus.  Officer Cirilo then saw Petitioner point a gun as he was looking back at the officer.  Officer Cirilo saw and heard a muzzle flash at which time he had the light illuminated on Petitioner.  As Petitioner ran, he extended his arm in a full length position looking back at Officer Cirilo and fired the gun.  (RT 7119-21)

156.  Officer Cirilo did not hear any other officer say "if you see the mother fucker kill him" while at the rear of the Shell station.  However, Officer Cirilo did not arrive back at the Shell station for a considerable period of time and had no knowledge of what was occurring there or how many officers were present at that location.  There were other officers present in the area of Eucalyptus at the time that Officer Cirilo was there.  These officers were also located around Eucalyptus south of Grove Street. (RT 7114-18)

c.  **Statement Made By Roy Mayfield, Sr. To Detective Amicone**

(1)  **Evidentiary Hearing On Admissibility Of Statement**

157.  During rebuttal, the prosecution made an offer of proof as to a statement allegedly made by Roy Mayfield, Sr., Petitioner's father, to Detective Amicone at the Rialto Police Station at the time Petitioner was in custody.  This statement pertained to the shooting of Sergeant Wolfley and was made immediately after Mr.

1   Mayfield had a discussion with Petitioner in the police
2   department's interview room.

3       158.   Detective Amicone testified that Petitioner was
4   permitted to speak with his father in an interview room at the
5   Rialto Police Station.   After Mr. Mayfield exited the room,
6   Detective Amicone asked him if he would tell the detective what the
7   Petitioner had said regarding the incidents at issue.   Mr. Mayfield
8   said that he would not.   As Detective Amicone was escorting Mr.
9   Mayfield out of the station, Detective Amicone testified that Mr.
10  Mayfield stated to him that: Sergeant Wolfley had confronted
11  Petitioner with a gun, Sergeant Wolfley had pressed Petitioner and
12  Petitioner had taken the gun from Sergeant Wolfley, and when
13  Sergeant Wolfley tried to take the gun back, the gun was fired.
14  However, Detective Amicone acknowledged that Mr. Mayfield, Sr. did
15  not specifically say that this information was obtained from his
16  son, the Petitioner.   (RT 7042-45)

17      159.   Mr. Mayfield, Sr. was then questioned by the court.   He
18  testified that when he exited the interview room, the police
19  officers pressed him as to what Petitioner had said about the
20  incidents.   Mr. Mayfield stated that he had instructed his son not
21  to speak with the officers. Mr. Mayfield then said to the officers
22  that from what he gathers, there had been a struggle over the gun
23  and the gun went off.   (RT 7047)

24      160.   Petitioner objected first to the admissibility of
25  Detective Amicone's testimony; and second to the admissibility of a
26  secret tape made of the conversation between Petitioner and his

27
28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

father, in the police interview room.   (RT 7053-66, 7185-99, 7200-33)

161.   Roy Mayfield testified that at the Rialto Police Station the officers told him that they would permit him to see his son if he could get his son to make a statement.   It seemed at that point that none of the officers knew what had happened at the Shell station.   As Mr. Mayfield stood outside the interview room, the officers said that they would allow him to speak with his son in private if Mr. Mayfield could find out what had happened.   Mr. Mayfield then walked into the room.   Petitioner was already seated in the room in handcuffs.   An officer then walked back into the room and removed a tape recorder, advising Mr. Mayfield and Petitioner that he was removing the recorder so that they would not think that their conversation was being recorded.   (RT 7389)   After the officer left the room, Mr. Mayfield and Petitioner conversed. During the conversation Mr. Mayfield often used hand signals and whispered; he did not want his son to give clear answers because he was not convinced that they were conversing in private. Consequently, Petitioner gave brief responses to Mr. Mayfield's inquiries.   (RT 7398-99, 7401-02)   During the conversation, Mr. Mayfield did not advise Petitioner that their conversation was being taped.   He also did not tell Petitioner that he was going to make the police aware of what had happened at the Shell station. Finally Mr. Mayfield understood that his talking to Petitioner was conditioned on his attempting to find out what had happened with Sergeant Wolfley.   (RT 7392-95)

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

162.  An officer then entered the interview room and told Mr. Mayfield that his time was up.  Mr. Mayfield exited the room.  An officer asked Mr. Mayfield if Petitioner would give a statement. Mr. Mayfield responded that he had advised his son not to say anything until he had spoken with an attorney.  Several officers surrounding Mr. Mayfield became irate and furious.  Mr. Mayfield then left the police station.  He did not tell Detective Amicone or any other officer that at the Shell station Sergeant Wolfley confronted Petitioner with a gun, that Petitioner took the gun and that the gun fired.  (RT 7402-05)

163.  Detective Amicone testified that he escorted Petitioner from a holding cell to the interview room.  He told Petitioner that he was going to interview him.  Petitioner told Detective Amicone that he did not wish to speak with him and that he wanted to speak with an attorney.  Approximately five to fifteen minutes later Roy Mayfield, Sr. was brought into the interview room.  Detective Amicone did not tell Mr. Mayfield nor Petitioner that their conversation would be recorded nor did he alert them to the presence of a hidden microphone in the interview room.  Finally, although Petitioner had asked for an attorney, Detective Amicone asked Mr. Mayfield, Sr. about the content of his conversation with Petitioner in order to obtain information to be used against Petitioner.  (RT 7410-17)  Detective Amicone had no knowledge that the conversation between Petitioner and his father had been recorded.  (RT 7418)

164.  Detective Amicone further testified that when he escorted Petitioner into the interview room, he brought a tape

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1    recorder to record Petitioner's statements.  When Petitioner

2    refused to speak with him, Detective Amicone removed the tape

3    recorder from the room.  Detective Amicone did not ask Mr.

4    Mayfield, Sr. to obtain information from Petitioner.  (RT 7419-21,

5    7430)

6        165.  Rialto Captain Greek was not aware that the conversation

7    between Petitioner and Mr. Mayfield was being tape recorded.  In

8    the hallway outside the interview room, Mr. Mayfield stated to

9    Captain Greek that he was aware of what bruises were on Petitioner

10   and that he did not expect to see any more bruises inflicted on his

11   son.  Furthermore, at the Rialto station, the interview room is set

12   up so that if an officer wants to record a secret conversation,

13   such an option is available to him.  (RT 7431-34)

14       166.  Rialto Officer Henriksen was present in the interview

15   room when the Petitioner asked to speak with a lawyer.  There were

16   no signs present in the room warning Petitioner that any

17   conversation would be recorded.  (RT 7437-41)  In Officer

18   Henriksen's recollection, Mr. Mayfield, Sr. told Detective Amicone

19   and him what Petitioner had told Mr. Mayfield in the interview room

20   (RT 7443)

21       167.  Rialto Officer Kidwell was Detective Amicone's

22   supervisor.  Officer Kidwell approved of the interview set up

23   between Mr. Mayfield and Petitioner in the interview room.  He had

24   also previously directed Detective Amicone to interview Petitioner

25   and other witnesses.  (RT 7476-77)  Officer Kidwell decided to

26   secretly tape the interview between Mr. Mayfield, Sr. and

27   Petitioner.  That was consistent with a Rialto Police policy to

28

secretly tape conversations in order to obtain investigative
information when a "major event" is at hand.  Another reason for
taping is to prevent security problems.  Furthermore, all
interviews that are monitored in the interview room are tape
recorded (RT 7465-67, 7478-79).  The Mayfield name was known in
Rialto for robbery and violent crimes.  (RT 7481)

168.  The court made the following rulings:  Detective Amicone
could testify as to the statements allegedly made to him by Mr.
Mayfield, Sr. under the admission exception and prior inconsistent
statement exception to the hearsay rule; and the secret tape of the
interview room conversation between Petitioner and Mr. Mayfield,
Sr. was not admissible because the prosecution's last minute
surprise revelation of the tape to the defense constituted improper
rebuttal.  (RT 7584)

### (2) <u>Trial Testimony Regarding Statement</u>

169.  Roy Mayfield testified that on March 3, 1986 he was
permitted to speak with his son in the interview room of the Rialto
Police Station.  When he exited the room, police officers asked him
if Petitioner was going to give a statement.  Mr. Mayfield
responded that Petitioner would not do so until he had spoken with
an attorney.  The officers inquired about Mr. Mayfield convincing
his son to make a statement.  Mr. Mayfield responded that during
the interview Petitioner did not really explain to him what had
happened at the Shell station.  He did not tell the officers that:
At the Shell station, Petitioner was confronted by an officer with
a gun, the officer pressed Petitioner and Petitioner took the gun

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1 and when the officer attempted to take the gun back, a shot was

2 fired. (RT 7607-09)

3    170.  Detective Amicone testified that when he exited the

4 interview room he was asked what Petitioner had told him.  Mr.

5 Mayfield responded that he would not so advise the officers without

6 an attorney present.  Mr. Mayfield turned to Captain Greek and said

7 that he knew of what injuries his son has suffered and he did not

8 expect to see any more injuries inflicted on him.  Detective

9 Amicone then escorted Mr. Mayfield, Sr. down several hallways

10 towards the exit of the Rialto Station.  At such time, Mr. Mayfield

11 stated to Detective Amicone:  that an officer had confronted him

12 with a gun, that he pressed him, took the gun and when the officer

13 tried to take the gun back, a shot was fired.  (RT 7611-13)

14    171.  Detective Henriksen testified that Mr. Mayfield, Sr.

15 stated:  that the officer pushed or pressed Petitioner, that

16 Petitioner took the gun, that the officer attempted to take the gun

17 back and that a shot was fired.  Detective Henriksen did not make a

18 report or supplemental report on this statement because Detective

19 Amicone said that he would include it in his report.  (RT 7700-03)

20        d.   **Dr. Root's Testimony**

21    172.  Over objection, the prosecutor read to Dr. Root selected

22 portions of Petitioner's testimony.  Dr. Root then gave his opinion

23 that if the gun was fired as described by Petitioner he would

24 expect to see stippling on Sergeant Wolfley's face.  (RT 1670-81)

25 Dr. Root testified that he could conceive of no situation where

26 Sergeant Wolfley had both hands on the gun and the gun discharged

27 without leaving any stippling on the officer's face.  (RT 7690-92)

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

173. Dr. Root acknowledged that he had not used a magnifying glass to examine Sergeant Wolfley for stippling. Further, the autopsy was performed 14 hours after the shooting and Dr. Root did not know what events which may have affected the presence of stippling on the body occurred in the field or in the morgue prior to his seeing the body. (RT 7677-90)

### 4. SURREBUTTAL

174. The defense initiated the conducting of an experiment to test the residue left on a human face after discharge of Sergeant Wolfley's gun at various distances from a target. The experiment was conducted under the direction of Dr. Parker Bell, a criminalist and an attorney specializing in firearms and homicide reconstruction. Also present at the experiment was the defense investigator, Richard Lonsford, Dr. Root and the Sheriff's criminalist, Mr. Wallis. The experiment was conducted on December 12 and 13, 1987; the weather was cold and windy. On December 12, the gun was discharged at a distance of 18 inches from the target and on December 13 the gun was discharged at a distance of 12 inches from the target. A total of ten rounds were fired and one round was taken apart for analysis. The firing of all ten rounds was video-taped. (RT 7831-46)

175. Dr. Parker Bell's expertise in the area of firearms and homicide reconstruction was gained through his experience with the sheriff's office as a criminalist; for four and one-half years in a police department as a criminalist; acting as the chief of a crime lab for another police department for three years; and as an attorney for ten years. (RT 7846-47) He was also familiar with

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   writings on gunshot residue and has testified as an expert in both

2   state and federal courts.   (RT 7847-49)

3      176.   There are three types of gunpowder:  disk flake powder,

4   ball powder and flattened ball powder.   The disk flake powder will

5   not travel as far as the other two types of gunpowder after the

6   cartridge is discharged from the gun.  Also, gunpowder can adhere

7   to the skin, hair and clothing of a person.   If the gunpowder is

8   projected with enough velocity, "tattooing" occurs.   Tattooing is

9   the penetration of gunpowder into the skin causing a visible area

10  of powder under the skin; "stippling", on the other hand, occurs

11  where gunpowder or a secondary missile causes abrasions on the

12  skin, but does not actually penetrate the skin.   If the gunpowder

13  totally burns prior to reaching the skin, there will be no

14  tattooing because the end product of the burn is gas.   Stippling is

15  burnt gun powder that strikes the skin and breaks the skin surface

16  but does not remain on the skin.   (RT 7853-59)  The gun powder that

17  rests on the surface of the skin but does not penetrate the skin

18  can be easily wiped off the skin.  Also, gunpowder which

19  accumulates in the hair usually can only be observed through a

20  microscope.   (RT 7860-61)

21     177.   During the experiment Dr. Bell conducted on December 12,

22  1987, the muzzle of Sergeant Wolfley's gun (Trial Exhibit 64) was

23  placed 18 inches from the arm of a live subject (defense counsel).

24  The gun was fired in such manner as to narrowly miss the arm.   This

25  was to determine if the gunpowder would penetrate human flesh at

26  that distance.  Upon examination of the arm after firing, Dr. Bell

27  found no penetration of the powder; that is, no stippling.   There

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  were possibly two small particles of powder that blew away from the

2  arm.  (RT 7869-70, 8903-04)  The gun was similarly discharged at

3  nonhuman targets at various distances up to forty-eight inches from

4  the muzzle of the gun.  (RT 7863-64)

5      178.  The ammunition used in Dr. Bell's experiment had been

6  provided to the court by Detective Amicone and identified as the

7  ammunition used by officers of the Rialto Police Department.

8  According to Dr. Bell, the gunpowder in this ammunition differed

9  from the powder used by criminalist Wallis when he conducted his

10  experiment with the cardboard targets.  Trial Exhibit 254.  The

11  gunpowder used by Mr. Wallis was much finer powder; such could have

12  had a major effect on the results of the experiment because finer

13  powder is less likely to penetrate or impede a target.  (RT 7864-

14  69)

15      179.  On December 13, 1987 a similar experiment was done

16  discharging the gun at a distance of 12 inches from the targets.

17  The experiment was videotaped.  The ammunition used was again that

18  provided by Detective Amicone to the court.  Dr. Bell was not

19  present at this firing due to a lack of funds.  The experiment was

20  conducted by the defense investigators.  (RT 7870-74)

21      180.  At a recess, the court made certain inquiries out of the

22  presence of the jury.  Mr. Wallis advised the court that the

23  ammunition used in his experiment (Trial Exhibit 254) was different

24  from the ammunition taken from Sergeant Wolfley's gun belt or from

25  the Rialto Police Department as used in Dr. Bell's experiment.  Mr.

26  Wallis' ammunition was obtained from the San Bernardino County

27  Crime Lab.  In addition, Dr. Bell advised the court that he had

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

compared the bullets taken from Sergeant Wolfley's speed loader and the live rounds used in the defense experiment and found that the ammunition in both contained disk flake powder of different colors. Dr. Bell also found that the ammunition in the speed loader contained more gunpowder in the cartridges than the ammunition used in the experiment.  Mr. Wallis agreed with Dr. Bell, and admitted that Mr. Wallis' experiment contained flattened ball powder.  The court then concluded that the gunpowder used in Mr. Wallis' experiment differed from the gunpowder found in Sergeant Wolfley's bullets or the bullets provided by the Rialto Police Department and used in the defense experiment.  The court ordered Dr. Bell and Mr. Wallis to perform additional experiments.  (RT 7879-95)

181.  A videotape of the defense's experiments was played to the jury with commentary.  (RT 7899)

182.  Dr. Bell was asked to assume the following facts:  that the victim had a gunshot wound to the face; that a substantial amount of blood gushed forth from the wound; that cotton was used to treat the wound; that mouth-to-mouth resuscitation was applied to the victim; and that the victim's face was cleansed in order to administer medical treatment.  Dr. Bell then stated his opinion that assuming such facts, if the gunpowder from the discharged bullets did not penetrate the victim's skin, the powder would be wiped away under such conditions and could not be observed on the skin  with the naked eye.  (RT 7904-06)  Dr. Bell was asked to further assume that the victim's body had been placed in a body bag and that the autopsy was done fourteen hours after the wound was inflicted.  Dr. Bell concluded that under such circumstances, it

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  was possible that gunpowder in the area of the wound could have

2  been lost by the time the autopsy was performed.  (RT 7907)

3      183.  Dr. Bell further testified that over the lunch recess he

4  compared the remaining cartridge released from the court exhibit to

5  a cartridge from Sergeant Wolfley's speed loader.  Dr. Bell found

6  that both cartridges employed disk flake gunpowder.  However, he

7  found that the speed loader cartridge had a greater quantity and a

8  different color than the other cartridge.  Moreover, Dr. Bell noted

9  that he had joined Mr. Wallis at his crime lab to make the

10  determination as to the kind of powder utilized in Mr. Wallis'

11  experiment.  At the lab, a cartridge was taken from Mr. Wallis'

12  drawer and examined.  Dr. Bell noted that there were a large number

13  of cartridges with different manufacturers present in the drawer.

14  (RT 7908-11)  Some manufacturers making the same caliber bullets

15  could use completely different gunpowder; many manufacturers are

16  primarily concerned with velocity, chamber pressure and the

17  reliability of the cartridge.  (RT 7912-16)

18      184.  In Dr. Bell's opinion, the discharge of Sergeant

19  Wolfley's gun using his own ammunition would not have caused any

20  stippling or tattooing on human targets.  (RT 7931)  In conducting

21  his experiment, Dr. Bell found that a few particles of gunpowder

22  traveled a distance of 48 inches and that a number of particles

23  travelled a distance of 18 to 24 inches.  (RT 7919-24)

24      185.  Dr. Bell, called as a prosecution witness, testified

25  that he and Mr. Wallis took apart the one live round left in

26  Sergeant Wolfley's gun.  Trial Exhibit 64-C.  They found that the

27  cartridge contained disk flake gunpowder similar in size and shape

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

to the powder used in Dr. Bell's experiment.  They also removed the

gun powder from cartridges used in Dr. Bell's experiment (Trial

Exhibit AA) and found such powder to be disk powder.  The powder in

Exhibit 64C weighed 9.1 grams.  The powder in Exhibit AA weighed

8.0 grams.  Furthermore, a cartridge taken from Sergeant Wolfley's

speed loader (Trial Exhibit LL) also contained disk flake powder.

Therefore, the ammunition in Sergeant Wolfley's gun and that in his

speed loader had more gunpowder than the cartridges used in Dr.

Bell's experiment.  (RT 7968-71)

    186.  There are various factors that affect the amount of

powder left on a target after a gun is discharged.  They include

the amount of powder in the cartridge; the burning characteristics

of the powder; the length of the gun barrel; the caliber of the

fire arm; the type of primer; the altitude level of the gun; and

the shape of the powder.  Dr. Bell believed that any criminalist

would know that there are three types of gunpowder.  (RT 7973-77)

    187.  Last night Dr. Bell did further experiments in the

company of Mr. Wallis, the defense team and the deputy district

attorney.  Sergeant Wolfley's gun was fired at cardboard targets at

various distances using disk flake gunpowder.  At a distance of 12

inches from the target (Trial Exhibit 281) Dr. Bell found fewer

particles in a smaller pattern of gunpowder compared to the

cardboard target used in Mr. Wallis' original experiment positioned

the same distance from the gun (Trial Exhibit 254-A).

Consequently, ammunition containing flake gunpowder fired from

Sergeant Wolfley's gun would have left a pattern more compact than

shown on Exhibit 254-A on the face of a victim.  (RT 7977-81)   In

1   addition, Dr. Bell also compared the target positioned at a

2   distance of 18 inches from the gun (Trial Exhibit 282) to the

3   target used in Mr. Wallis' experiment positioned at the same

4   distance from the gun (Trial Exhibit 254-B).  Dr. Bell found that

5   the gunpowder particles existing on Exhibit 254-B were much smaller

6   and greater in number covering 10-1/2 to 11 inches on the

7   cardboard; whereas the particles found on Exhibit 282 were larger

8   in size, many fewer in number and covering only 5-1/2 inches on the

9   cardboard.  Also, as the gun is rotated the powder residue left on

10  the target also rotates.  (RT 7981-85)  Finally, Dr. Bell examined

11  the cardboard target positioned a distance of 24 inches from the

12  gun.  Trial Exhibit 280.  Dr. Bell found powder existing in a

13  diameter of 8 inches with one area of heavy concentration measuring

14  4-1/2  inches in diameter.  He noted that the amount of powder at

15  this distance was considerably less than at a distance of 18

16  inches.  By comparison, the target used in Mr. Wallis' experiment

17  at a distance of 24 inches (Trial Exhibit 254-C) showed a somewhat

18  larger pattern of gunpowder measuring 9-1/2 inches in diameter,

19  with smaller and a greater number of particles.  (RT 7985-88)

20       188.  Dr. Bell concluded that if the purpose of an experiment

21  is to determine the adhesive qualities of gunpowder and the

22  presence of stippling or tattooing, the tester can draw no analogy

23  if the compared firings used flake powder compared to ball or

24  flattened ball powder.  A tester would expect to see stippling or

25  tattooing on the target if the cartridge contained flake powder as

26  used in his experiment at a maximum  distance of 18 to 24 inches.

27  Gun powder residue without any stippling or tattooing could adhere

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

to the skin when the gun is fired at a distance as much as fifty to two hundred feet. Furthermore, the closer the distance between gun and the target, the greater amount of powder is expected on the target surface. (RT 7988-91)

189. Dr. Bell further concluded that there was no way to determine from looking at the gunpowder on the cardboard at what distance the powder would penetrate human skin. In order to conclude that since there was no residue on Sergeant Wolfley's wound the gun must have been fired at a distance greater than 30 inches, the criminalist must first know at what distance the penetration of skin actually occurs - noting that the skin surface differs greatly from that of cardboard. The criminalist must also consider and know whether there are any intervening obstacles - e.g. the sleeve of a coat or the hair on the subject receiving the wound - to eliminate the possibility that an intervening object obstructed the flow of the gunpowder. (RT 7992-95) To make this determination, the criminalist should examine the outer garments of the victim under a microscope and test for the presence of nitrates. This test would indicate whether gunpowder was present. Also, the greater likelihood that the garment was handled the greater chance that any powder which existed on it was lost. (RT 8019-20)

190. Furthermore, Dr. Bell explained that if gunpowder is taken right off a target, the stippling mark can be seen but tattooing can be wiped away with hard scrubbing if not deeply imbedded in the skin. (RT 8004-05) In addition, a criminalist can never determine the exact distance gunpowder residue will travel.

He can only estimate a range of distance.  Also, once a cartridge is removed from the manufacturer's box, a criminalist  cannot tell what lot the cartridge came from so there is no way to determine lot number of the bullet taken from Sergeant Wolfley's gun.  (RT 7995-99)

191.  Mr. Wallis testified that he was not an expert in tattooing or stippling.  Further, he has observed Dr. Root remove residue from a body during an autopsy.  (RT 8024-26)

192.  Dr. Root testified that he did not use a microscope to examine Sergeant Wolfley's body for gunpowder residue.  Further, he did not examine Sergeant Wolfley's clothing for gunpowder residue. He acknowledged that gunpowder residue can be wiped away from the body.  (RT 8033-34)

193.  Dr. Root acknowledged that he did not have expertise in comparing the effect of ball, flattened ball and disk gunpowder burns on tattooing and stippling.  (RT 8035-40)

194.  Dr. Root stated that it was possible that a fall sustained after a shooting causing facial abrasions could obscure gunpowder residue or tattooing in those areas where the abrasions occurred.  For example, the following abrasions found on Sergeant Wolfley's face would have obscured stippling; the chin area, the cheek area, the nose area, two abrasions by the left eye, and an abrasion on the eyelid.  There was also an abrasion on the left lip and it could not be determined whether there was any tattooing at that location.  Moreover, it is also possible that when the blood was removed from Sergeant Wolfley's face, gunpowder residue was also removed from the wounds.  Dr. Root did not examine any of

Sergeant Wolfley's wounds under a microscope.  (RT 8041-58)

Therefore, Dr. Root's opinion that Sergeant Wolfley's gun was fired

beyond a certain distance was based on the fact that no stippling

or tattooing were found in the non-injured areas of the face only.

(RT 8071-80)

195.  Finally, Dr. Root acknowledged that it was possible that

at a distance of 18 inches, the gunpowder emanating from Sergeant

Wolfley's gun was not travelling at a velocity sufficient to

penetrate his skin.  Dr. Root did not determine what velocity gun-

powder must travel in order to penetrate Sergeant Wolfley's skin.

(RT 8085-86)

196.  According to Mr. Wallis, disk powder travels further

than flattened ball powder used in the cardboard experiment

previously conducted by him.  However, when Mr. Wallis did that

test, he was aware that different gun powders have different

adhesiveness to the target surface.  He did not attempt to

determine what gun powder was used in the ammunition used in

Sergeant Wolfley's gun.  (RT 8089-93)


                            II.

          PENALTY PHASE OF PETITIONER'S TRIAL

A.   PRELIMINARY MATTERS

197.  At the commencement of the penalty phase, Petitioner

requested the opportunity to confer with his family regarding a

motion to relieve defense counsel as attorney of record.  The

Petitioner further requested a one day continuance of the

proceedings.  Upon inquiry by the court, Petitioner explained what

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

errors he believed defense counsel made at the guilt phase:
counsel failed to present various witnesses demonstrating that
Sergeant Wolfley had a violent past and a propensity to harass
Black people.  Defense counsel responded that his investigator, Mr.
Lonsford, had investigated the issue of Sergeant Wolfley's past
violence.  The court denied Petitioner's motion to relieve defense
counsel Mr. Bristoll.  (RT 8465-82)

198.  The prosecution indicated its intention to introduce two
prior felony convictions; the court overruled defense objection
that the required notice of these prior convictions was untimely.
The court further ruled that the prosecution could introduce the
circumstances of each conviction.  (RT 8482-99, 8500-18)

B.   **PROSECUTION CASE**

199.  Mr. Mark Fister testified that on March 2,1986 he was
working as a clerk at the 7-11 store located at the corner of
Pepper and Foothill Streets near the Shell station located at
Eucalyptus and Foothill.  Mr. Fister was robbed between 11:00 p.m.
and 7:00 a.m. the next morning.  He identified Petitioner as the
person who entered his store and began purchasing sunflower seeds.
The Petitioner then drew a knife and asked for money located in the
cash box.  The knife used was a kitchen carving knife with an eight
to nine inch blade.  Petitioner cut Mr. Fister on his hand with the
knife.  After reaching for the money and taking it out of the cash
box, Petitioner rode away on a ten speed bicycle.  Mr. Fister was
in fear of his life during the robbery.  (RT 8526-30)

200.  After the defense reserved its cross-examination of Mr.
Fister due to late discovery, the prosecution read a stipulation

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

116

1  regarding Petitioner's two prior convictions to the jury.   It was

2  stipulated that:   on June 14, 1977, Petitioner, armed with a knife,

3  together with "three other Negro males" robbed a fifteen year old

4  boy of four dollars near the high school; and that on October 25,

5  1981, Petitioner and "two Negro females" stole merchandise from a

6  store and during the course of flight Petitioner pointed a gun at a

7  security guard.   (RT 8531-32)

8      201.   After Petitioner had the opportunity to speak with his

9  parents, he requested of the court not to proceed any further in

10  the penalty phase with current counsel.   He explained there was a

11  breakdown of the attorney-client relationship.   Petitioner

12  requested additional time to hire private counsel and further

13  indicated that he had names of people in the community who had been

14  subjected to violent confrontations with Sergeant Wolfley.   The

15  court responded that there was not a sufficient showing at that

16  time to relieve defense counsel.   However, the court did continue

17  the trial for approximately one week to permit Petitioner to seek

18  other counsel.   The court also appointed Petitioner an attorney to

19  represent him on the motion to relieve attorney Bristoll as

20  attorney of record.   (RT 8536-58, 8588-89, 8590-96, 8600-07)

21      202.   On January 4, 1988, the court held an in camera hearing

22  regarding the motion to relieve defense counsel Bristoll.   Defense

23  counsel urged the court to grant the motion and appoint new counsel

24  due to an irreconcilable attorney-client conflict.   The court

25  / /

26  / /

27  / /

28  / /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  denied the motion.  (RT 8659-8764, 8788-90)[5]  The court then

2  continued the penalty phase proceedings for approximately two weeks

3  from January 4, 1988 to January 19, 1988.  (RT 8770-71)

4      203.  Mr. Fister is 6'1" in height.  When he first was

5  interviewed by the police, Mr. Fister told them that the robber was

6  shorter than he was and that he looked down at the robber.  He

7  estimated the robber's height to be between 5'10" and 5'11", noting

8  the existence of a mark near the exit of the store that was placed

9  there for purposes of measuring the height of individuals coming in

10 and leaving the store.  The robber was also of average build and

11 not muscular.  The robber was Black, had no beard, no moustache, no

12 goatee and no tattoos.  He was wearing a baseball cap with a visor,

13 and no afro hair was visible.  He was wearing a gray jogging suit.

14 His age was between twenty to thirty years.  The robber came and

15 left on a bicycle.  (RT 8791-8801)

16     204.  Although the robber looked like Petitioner, the parties

17 stipulated that the police showed Mr. Fister a photo lineup shortly

18 after the robbery and Mr. Fister did not pick Petitioner out of the

19 lineup.  (RT 8798)  Mr. Fister was shown a photograph taken of

20 Petitioner at the time of his arrest.  Trial Exhibit 114.  The

21 photo showed Petitioner with hair on his chin and a moustache.  Mr.

22 Fister stated that the robber did not have facial hair as depicted

23 in the photo and that he would have remembered such a physical

24 feature.  Mr. Fister had come as close as one foot away from the

25 robber. (RT 8835-40)  He also believed that the robber weighed

26 _____

27     [5]   The facts adduced at the in camera hearing are discussed in
detail in Claim  XXVIII, infra.

28

approximately 115 to 120 pounds, perhaps a little heavier.  He
would have remembered if the robber was 6'3", over 200 lbs. as was
Petitioner.  (RT 8818-19)

205.  The knife held by the robber had a thinner blade than
Exhibit 62 (the knife found at the Shell station).  The robber's
knife appeared to be a carving knife from someone's kitchen and was
not rusty.  (RT 8801-03)  However the photos of the knife found at
the Shell station (Trial Exhibits 21 through 23) looked like the
knife that the robber possessed.  (RT 8825-27)

206.  After the robber entered the store, he obtained a small
bag of sunflower seeds.  The seeds were last seen on the store's
counter, and Mr. Fister did not know if the robber actually took
the seeds when he left the store.  (RT 8804, 8832-34, 8441-42)  The
robber produced the knife when he was obtaining change from Mr.
Fister for the purchase of the sunflower seeds.  The robber asked
for the cash from the drawer and then leaned over the counter to
grab the cash.  (RT 8807-08, 8828)

207.  There was nothing distinguishable about the robber's
face.  Mr. Fister knew Petitioner's name from subpoenas he received
from the district attorney.  (RT 8805-06)

208.  The parties stipulated that there were no fingerprints
of Petitioner found at the 7-11 store or on the knife found at the
Shell station.  (RT 8843)

209.  The court denied Petitioner's motion to dismiss the 7-11
robbery as an aggravating factor on grounds of insufficiency of
evidence.  (RT 8844-46)

/ /

210.   The court excluded the knife (Trial Exhibit 62) and the photos of the knife (Trial Exhibits 21-23) from the penalty phase, finding that the knife used in the robbery was not the knife found at the Shell station.   (RT 8847-49)

C.   **DEFENSE CASE**

211.   Sandra Brewer, Petitioner's mother, testified that Petitioner was born on June 13, 1959 in San Bernardino. Petitioner's natural father is Roy Mayfield who never married Mrs. Brewer.   Petitioner has a 29 year old brother, William Elliott. (RT 8851-52)

212.   Mrs. Brewer had some physical problems giving birth to Petitioner.   When Petitioner was nine months old, Mrs. Brewer met her husband, Spencer Brewer and the family moved to Riverside. When Petitioner was two years old, the family moved to Pasadena because Mr. Brewer was discharged from the service and obtained employment there.   Five years later, when Petitioner was approximately seven years old, the family moved to Oakland, California.   The next year, in July 1967, the family returned to Pasadena after the death of Mrs. Brewer's brother.   They remained living in Pasadena until the present.   In August 1967, Petitioner's sister, Donna, was born. Mrs. Brewer wanted the family to move to Pasadena so the children could grow up in an integrated area without street gangs and without hanging around liquor stores.   (RT 8852-58)

213.   At age seven, Petitioner was in the Cub Scouts, Boy Scouts and Little League.   He was a loving child and had a close relationship with his parents.   Petitioner's natural father, Roy

Mayfield, was not around at the time and provided no child support or clothing to the family.  Mr. Brewer served as Petitioner's father and took the family on outings and picnics.  When Petitioner was approximately thirteen to fourteen years old, he was told that Roy Mayfield, not Mr. Brewer, was his real father.  When Petitioner reached age fifteen, he began visiting Roy Mayfield.  However, this revelation did not affect Petitioner's relationship with the Brewer family and he continued to exchange gifts and express affection for the family.  (RT 8859-63, 8872-73)  In addition, when Petitioner was age fifteen, Mrs. Brewer was in the hospital suffering from injuries due to a car crash.  The family remained at home doing the chores and Petitioner would call her often to assure her that matters at home were taken care of.  When Petitioner was in both junior high school and high school, he played football and ran track, receiving trophies and medals in these sports.  During high school Petitioner also dated and worked odd jobs (e.g. delivering papers, working on cars, working for the Rose Parade).  (RT 8864-65, 8869)  As Petitioner was growing up, Mrs. Brewer was a Seventh Day Adventist and made religion a part of the family.  Finally, Petitioner had friends and relatives who often came to the house and spent time with him.  (RT 8870-71)

214.  Petitioner has a son, Dennis, Jr.  Petitioner is a loving father towards his son.  Petitioner's parents, sister, brother and son are very involved with his life.  (RT 8874-76) Petitioner's son currently lives with his mother's parents. Petitioner is not married to his son's mother, Sharon Story.  (RT

8876-80)  Petitioner held down some full time jobs in the 1980's. (RT 8885)

215.  If Petitioner was given a life sentence, Mrs. Brewer would continue to visit him and bring his young son to see his father.  Petitioner would be both a loving son to his mother and a loving father to his son.  (RT 8873-75)  Mrs. Brewer knows that Petitioner has been convicted of theft, a second felony, and a purse snatch where Petitioner was the driver of the vehicle. Petitioner had problems with the law even after his son was born. (RT 8882-84, 8887)

216.  Donna Brewer, Petitioner's sister, is a twenty year old college student.  Petitioner has always been loving to her.  She recalled that in high school, Petitioner won several awards for football.  Petitioner was affected when his uncle, Thomas Hester, who was a track star, died in a car crash; Petitioner participated in track and looked up to his uncle.  Petitioner's mother, Mrs. Brewer, has had back problems from her accident and suffers from a brain tumor causing headache pain and loss of memory.  (RT 8891-97)

217.  While Petitioner has been in prison, he has continued to have a close relationship with his sister and his son.  (RT 8898) When Petitioner and his sibling were being raised, the children were taught to be law abiding.  When Petitioner got in trouble with the law, the family told him to put his life in order, but apparently it didn't do any good.  (RT 8900-03)

218.  Gregory Snowden, age 32, is Petitioner's cousin.  Mr. Snowden currently works as a California Highway Patrol Officer.  He and Petitioner grew up as close as brothers.  If Petitioner was

permitted to live, Officer Snowden would continue his close
relationship and make sure that Petitioner's son would see his
father often.   Officer Snowden does not want Petitioner to die.
(RT 8904-07)

219.   Judith Snowden is Petitioner's aunt and has known him
all his life.   Mrs. Brewer is Mrs. Snowden's sister.   Mrs. Brewer
has a malignant tumor and has had two back operations because of an
injured disc.   (RT 8909-11)   When Petitioner was born, he was very
ill with a heart murmur and a 106 degree fever.   He suffered
possible brain damage.   (RT 8911-12)

220.   When Petitioner was growing up he was abused by his
father Mr. Brewer.   When Petitioner was as young as eighteen
months, Mr. Brewer beat him with his fist.   As the years went by,
Mr. Brewer beat Petitioner, whipped him with a belt, hit him in the
head, in the leg and in the back, resulting in welts and hematoma.
The beatings continued until Petitioner grew big enough to defend
himself from Mr. Brewer.   (RT 8913-15)   During the beatings, Mr.
Brewer also verbally abused Petitioner; he often used profanity and
constantly told Petitioner that he was stupid, ignorant, dumb and a
"nigger."   (RT 8916)   Mr. Brewer also abused Petitioner's mother
and brother.   (RT 8918-19)

221.   At times, Petitioner would live with Mrs. Snowden and
call her mom.   She has a warm and caring relationship with
Petitioner.   She believes that Petitioner needs to have close
contact with his son.   (RT 8917-18)

222.   When Petitioner was growing up, he idolized Thomas
Hester, his uncle, who was Mrs. Snowden's brother.   Mr. Hester was

1  a track star at Arizona State and had qualified for the Olympics.

2  When he suddenly died in a car accident, Petitioner took the death

3  hard and thought that G-d had killed his uncle.  In addition, when

4  Petitioner learned that Roy Mayfield was his natural father, he

5  became confused and angry with Mr. Brewer.  Petitioner figured that

6  Mr. Brewer had abused him because he had no concern for Petitioner.

7  (RT 8919-22)  As Petitioner was growing up, he was mentally slow

8  and had many emotional problems.  However, when he discovered that

9  Roy Mayfield was his father, he viewed Mr. Mayfield as his new

10  idol.  Mr. Mayfield was very interested in body building and

11  Petitioner began to lift weights to emulate Mr. Mayfield.  (RT

12  8926-28)

13      223.  Mrs. Snowden continues her close relationship with

14  Petitioner and wants him to live.  Mrs. Snowden had two brothers

15  killed eight months apart.  In the past when Petitioner was

16  convicted of crimes, he would tell Mrs. Snowden's children not to

17  get into trouble or get involved with gangs because prison life was

18  bad.  (RT 8923, 8925, 8929-30)

19  / /

20  / /

21  / /

22  / /

23  / /

24  / /

25  / /

26  / /

27  / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

124

# CLAIMS FOR RELIEF[6]

## JURY ISSUE CLAIMS

### I.

### THE NON-RANDOM SELECTION OF THE JURY CONSTITUTED A

### MATERIAL DEPARTURE FROM STATUTORY PROCEDURES AND

### VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS

Petitioner's conviction(s) and sentence(s) were rendered in violation of his rights to due process, a fair trial, to counsel, and to an impartial jury, by the non-random selection of the jury which constituted a material departure from statutory procedures, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

The facts supporting this claim, among others to be presented after full investigation, research, analysis, discovery and hearing, include the following:

1.   Petitioner refers to all of the allegations pled in Claims II through III and, by this reference, incorporates them herein as though set forth in full.

A.   FACTUAL BACKGROUND

2.   The jury voir dire was conducted in two main phases. First, after prospective jurors were excused for hardship, all remaining jurors were individually questioned on their views concerning capital punishment.  The order of the questioning was

---

[6] Additional facts exist which support the claims for relief herein.

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

essentially alphabetical; that is, jurors with last names beginning with the letter "A" were questioned first and those with last names beginning with other letters were questioned in alphabetical order. (RT 505-2340)

3. During voir dire, the court used a chart describing five categories of views on capital punishment.  The chart set forth groups A through E.  Under Group A were the words "will automatically vote for the death penalty."  Under Group B were the words "favors the death penalty but will not automatically vote to impose it in every case."  Under Group C were the words "neither favors nor opposes the death penalty."  Under Group D were the words "opposes or has doubts about the death penalty but will not automatically voted against it in every case."  Finally, under Group E were the words "will automatically vote for life imprisonment."  (4 RT 509)

4. Consequently, those jurors falling into Group B were those who most strongly favored the death penalty and were not excused for cause due to their views on capital punishment.  In contrast, Group D jurors were those who opposed or had the most doubts about imposing the death penalty, but were not excused for cause due to their views on capital punishment.  Group C jurors were neutral on their views about the death penalty.

5. The second phase of the voir dire consisted of general questioning of prospective jurors and the exercising of peremptory challenges.  (RT 2392-3226)  A review of the record shows that the jurors selected for voir dire in the second phase were only those

/ /

whose last names began with letters falling in the first half of the alphabet.[7]

6.   The jury which decided Petitioner's guilt and penalty phase verdicts consisted of ten jurors or 83% who fell into Group B and 2 jurors or 17% who fell into Group C.   None of the jurors fell into Group D.[8]   Consequently, Petitioner's jury was overwhelmingly pro-death penalty and prosecution prone.

7.   In contrast, there were approximately 35 jurors remaining after conclusion of the death qualification phase of jury selection who were excluded from the jury pool during general voir dire due to the fact that their last names began with the letters "N" through "Z".   (12 RT 1657 - 16 RT 2339)   Of these jurors, 4, or about 11%, fell into Group D; ten, or about 29%, fell into Group C; 3, or about 9%, fell into Group B/C; and 18, or about 51%, fell into Group B.[9]

_____

[7] More specifically, only those jurors whose last names began with the letter "A" through "M" were drawn.   Jurors with last names beginning with the letters "N" through "Z" were not drawn.   The number of jurors not drawn whose names fell into the latter category was approximately thirty-five.   The total number of prospective jurors who were not excused for cause in the first phase was approximately one-hundred three.   Consequently, about one-third of all prospective jurors who were available to be selected for the second phase were excluded based on the letters of their last names.

[8] The jurors who decided Petitioner''s case (66 RT 8409-8413) are listed by name and category: 1) B. Heskett, Group B (8 RT 1129); 2) F. Cordova, Group B (6 RT 783); 3) J. Lloyd, Group B (10 RT 1448); 4) S. Cromwell, Group B (6 RT 836); 5) F. Acuna, Group C (4 RT 509); 6) T. Bradford, Group B (5 RT 666); 7) T. Gueston, Group C (8 RT 1122); 8) B. Long, Group B (10 RT 1457); 9) R. Escoto, Group B (5 RT 795); 10) D. Bathauer, Group B (4 RT 593); 11) G. Chavez, Group B (6 RT 740); and 12) J. Brandon, Group B (5 RT 680).

[9] Group D jurors were: Rennick (12 RT 1719), Robinson (12 RT 1735), Thomas (13 RT 1939), and Statland (14 RT 1998)

(continued...)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1    8.   Therefore, 0% of the jurors who decided Petitioner's case

2  opposed or had doubts about the death penalty compared to 11% of

3  the excluded jurors who held these views.  Further, 17% of the

4  jurors who decided Petitioner's case were neutral on the death

5  penalty compared to about 29% from the excluded group.  Finally,

6  83% of the jurors who decided Petitioner's case strongly favored

7  the death penalty compared to 51% to 60% in the excluded group.

8    9.   At the conclusion of the guilt phase, Petitioner moved for

9  the appointment of new counsel.  He argued that trial counsel had

10  failed to provide effective representation.  Attorney S. Donald

11  Ames was appointed to represent Petitioner for that motion.  In

12  counsel's declaration, he averred that one of the grounds for find-

13  ing the ineffectiveness of trial counsel was his failure to object

14  to the non-random selection of the jury.  (Confidential CT 118-119)

15  See Claim XLI.A(4)(a).  If counsel's failure to object at the time

16  of jury selection is deemed a waiver of the issue, counsel's

17  failure denied Petitioner his Sixth Amendment right to the

18  effective assistance of counsel.

19  / /

20  / /

21  / /

22

23
     [9](...continued)
24      Group C jurors were: Ramirez (12 RT 1747), Romo (13 RT 1866),
     Smith (14 RT 1920), Santo (14 RT 1969), Shelton (14 RT 2015), Thomas
25   (14 RT 2052), Turner (15 RT 2147), Thometz (15 RT 2181), Wertz (15 RT
     2241), and Williams (16 RT 2324).
26
        Group B/C jurors were: Roylance (14 RT 2090), Westhoff (15 RT
27   2209, and White (16 RT 2336).  The remaining jurors were in Group B,
     with a few in Group A/B.
28
     P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

                                    128

B.   **THE EXCLUSION OF VENIRE PERSONS WHOSE LAST NAMES BEGAN WITH THE LETTERS "N" THROUGH "Z" WAS A "MATERIAL DEPARTURE" FROM PRESCRIBED PROCEDURES.**

10.   "Trial juries for criminal actions are formed in the same manner as trial juries in civil actions." Pen. Code § 1046. Once the panel of prospective jurors is drawn "in a manner to insure random selection" (former Code Civ. Proc. § 246), the panel is sent to the trial court in order to select a jury therefrom. Former Code Of Civil Procedure § 600 provided that the clerk "must draw from the trial jury box of the court the ballot containing the names of the jurors, until the jury is completed, or the ballots are exhausted." People v. Wright, 52 Cal.3d 367, 394 (1990). The practice in California has always been to select juries to be voir dire'd by drawing their names from the trial jury box, which implies a random process. See People v. Scoggins, 37 Cal.2d 676, 679 (1969); Taylor v. Western Pacific R.R. Company, 45 Cal. 323, 329 (1873). The standard procedure would seem to be to draw the names from the box without "look[ing] at the slips before [drawing] them" (Fall v. Coastline, 116 Cal.App.2d 345, 350 (1953)), or where there is a drum or "wheel" in place of the box to "spin . . . the jury wheel and draw . . . the names of the jurors . . ." (Association of Municipal Court Clerks of California, Criminal Procedures Manual (no date) 87), which is a process of random selection. The former language of Section 246, directing the clerk to fold the slips or ballots so that the names are concealed, was evidently meant to inhibit conscious selection of particular names and therefore implied that the names should be selected in an

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  "unplanned sequence" -- i.e., a random order.  See Code of Civ.

2  Proc. § 193.2.

3      11.  "[A] party is constitutionally entitled to a petit jury

4  that is as near an approximation of the ideal cross-section of the

5  community as the process of random draw permits."  People v.

6  Wheeler, 22 Cal.3d 258, 277 (1978).  The failure to comply with the

7  procedure set forth in former Code of Civil Procedure section 600

8  may require reversal when there is a "material departure" from the

9  prescribed procedures.  People v. Wright, supra, 52 Cal.3d at 395.

10     12.  In the instant case, the exclusion of jurors whose last

11 names began with the letters "N" through "Z" cannot reasonably be

12 attributed to mere coincidence.  The clerk selecting the names of

13 jurors to be questioned during the general voir dire must have

14 divided those jurors into two groups.  The first group included

15 those jurors whose last names began with letters in the first half

16 of the alphabet and the second group included those jurors whose

17 names began with letters in the second half of the alphabet.

18 Accordingly, an entire select portion of prospective jurors who

19 were available to be selected to serve on the jury in this case

20 were excluded from consideration.  Such a process was a "material

21 departure" from the random selection process prescribed by statute

22 and required by the Constitution.

23     13.  For example, in People v. Johnson, 104 Cal. 418 (1894),

24 the jurors were not selected by a random draw of names from the

25 trial jury box.  In that case, the bailiff selected twelve

26 prospective jurors from among the veniremen present in the

27 courtroom and those twelve persons ultimately served on the jury

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

without objection from defense counsel. Although this court held
that the failure to object waived any claim of error, the court
noted that "[t]his mode of impaneling a jury differs materially
from that prescribed in the statutes of the state, and if it had
been done against the objection of defendant, it would have
constituted sufficient reason for reversal." Id. at 419.
Similarly, here, the clerk apparently excluded a large segment of
potential jurors. Although a single person did not select the
jurors as did the bailiff in Johnson, the pool of prospective
jurors was improperly limited in an arbitrary fashion. The result
here was the same as in Johnson: the jury was not selected in a
random fashion. Moreover, unlike in Johnson, Petitioner did raise
objection during the motion for appointment of new counsel.

   14. In addition, discrimination against a certain class of
persons in the selection of jurors can require reversal. It is the
"opportunity" for discrimination, rather than proof of actual
discrimination in the selection process, which is sufficient.

   15. In Avery v. Georgia, 345 U.S. 559 (1953), the defendant,
a Black, was convicted by a jury selected from a venire of 60
Whites. The names for the venire were drawn from a box containing
the names of White persons on white tickets and the names of Black
persons on yellow tickets; the opening of the box was wide enough
that the person drawing the tickets could see the color of the
tickets. Id., at 560; concurring opn. at 564. Based on their
percentages in the community, on the tax records from which the
jury list was drawn, and on the jury list, Blacks should have
constituted, respectively, 25%, 14%, or 5% of the venire. Id.,

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

concurring opn. at 563.  The uncontradicted testimony of the judge who drew the tickets for the venire was that he had never discriminated.  After the tickets were drawn, they were handled by other court personnel who ultimately typed up a jury list.  <u>Id.</u>, at 561.

16.  The United States Supreme Court held that a <u>prima facie</u> case of discrimination in jury selection had been made out where "even if the white and yellow tickets were drawn from the jury box without discrimination, opportunity was available to resort to it at other stages in the selection process."  <u>Id.</u>, at p. 562.

17.  In <u>Whitus v. Georgia</u>, 385 U.S. 545, 549 (1967), the names of veniremen were drawn from a jury box containing tickets on which names from tax records had been written, and in the tax records Blacks were designated by a "(c)" after their names.  It was not known how many Blacks were included in the jury list of 600 persons, but there was evidence that 25-30% of the names were of Blacks, which would approximate the percentage of Blacks (27%) on the tax records.  <u>Id.</u>, at 552, fn. 2.  Nevertheless, only 3 out of 33 of the names drawn for grand jury service were of Blacks, and on the venire of 90 persons from which Whitus' jury was selected, only 7 were Blacks.  The probability of having only 7 Blacks on the venire, if 27% were on the jury list, was .000006.  <u>Id.</u>, at 552, fn. 2.

18.  Even though the jury commissioners testified that they were unaware of the "(c)" designations on the tax records, that they had never excluded anyone on the basis of race, and that the jury list did not contain the racial designation, the Supreme Court

1  reversed Whitus' conviction on the ground that "[u]nder such a

2  system the opportunity for discrimination was present and we cannot

3  say on this record that it was not resorted to by the

4  commissioners." Id., at 552.

5      19.  Petitioner suffered actual harm from the exclusion of the

6  class of jurors.  The excluded class was decidedly and

7  significantly more pro-defense or neutral than the jury which sat

8  on the case.  Petitioner was, therefore, deprived of the

9  opportunity to select jurors from the excluded class which, as a

10 group appeared to hold views more favorable to the defense.

11     20.  The exclusion of these jurors reduced the diversity of

12 viewpoints and attitudes represented on the jury.  A "jury can

13 speak for the community only insofar as the pool of jurors from

14 which it is drawn represents the full range of relevant community

15 attitudes." Hovey v. Superior Court, 28 Cal.3d 1, 73 (1980).

16 Diminishing the diversity of viewpoints and attitudes represented

17 on a jury "make[s] the jury less accurate in its fact finding and

18 less reliable in its application of community standards." Id. at

19 69, fn. 117.

20     21.  In the present case, the opportunity for discrimination

21 in the non-random drawing of names for the voir dire process was

22 present, and the record on this appeal does not show that it was

23 not resorted to.  Reversal is required because of the possibility

24 of corruption of the jury selection process.

25     22.  The court's method of selecting only those jurors whose

26 last names began with the letters "A" through "M" was a prejudicial

27 / /

28

1 and "material departure" from that required by the Penal Code.

2 Accordingly, Petitioner's convictions must be reversed.

3      23.   Moreover, the erroneous limitation of the Petitioner's

4 exercise of his peremptory challenges violated his Sixth Amendment

5 right to an impartial jury and his Fifth and Fourteenth Amendment

6 due process right to a fair trial.   See <u>United States v. Salamone</u>,

7 800 F.2d 1216 (3rd Cir. 1986); <u>United States v. Claiborne</u>, 765 F.2d

8 784, 799 (9th Cir. 1985); <u>Hines v. Enomoto</u>, 658 F.2d 667 (9th Cir.

9 1981).   The error was not harmless beyond a reasonable doubt and

10 reversal of the convictions is required.

11

12                                    II.

13      <u>THE PROSECUTOR'S DISCRIMINATORY EXERCISE OF PEREMPTORY</u>

14      <u>CHALLENGES VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS</u>

15      Petitioner's conviction(s) were rendered in violation of his

16 rights to an impartial jury and to equal protection by the

17 prosecutor's discriminatory exercise of peremptory challenges, all

18 in violation of Petitioner's federal constitutional rights as

19 guaranteed by the Sixth  and Fourteenth Amendments to the United

20 States Constitution.

21      The facts supporting this claim, among others to be presented

22 after full investigation, research, analysis, discovery and

23 hearing, include the following:

24      1.   Petitioner refers to all of the allegations pled in Claim

25 I and, by this reference, incorporates them herein as though set

26 forth in full.

27 / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

A.   **INTRODUCTION**

2.   Although the slavery of Blacks was officially abolished over a century ago, "we...cannot deny that...racial and other forms of discrimination still remain a fact of life in the administration of justice in our society as a whole." Rose v. Mitchell, 443 U.S. 545, 558-559 (1979).   The Supreme Court has recognized that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate'." Batson v. Kentucky, 476 U.S. 79, 96 (1986) (citation omitted). Similarly, the state supreme court has recognized the potential for prosecutorial abuse of peremptory challenges where such challenges are exercised to remove prospective jurors on the sole ground of group bias, that is, based upon a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds. People v. Wheeler, 22 Cal.3d 258, 276 (1978).[10]

3.   In Wheeler, the state supreme court held that the discriminatory use of peremptory challenges to remove prospective jurors on the ground of group bias deprives a defendant of "...one of the most sacred and important of the guarantees of the Constitution...": the right to a trial by jury drawn from a representative cross-section of the community, guaranteed by Article I, section 16 of the California Constitution and by the Sixth Amendment to the federal constitution.   22 Cal.3d at 272,

----

[10] That race continues to play a pervasive role in the imposition of capital punishment is a demonstrable reality.   See McClesky v. Kemp, 481 U.S. 279 (1987); see also Coleman v. Risley , 839 F.2d 434 (9th Cir. 1988)(diss. opn. of Reinhardt, J.).

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

276-277.  Also, the exercise of peremptory challenges based solely on race violates the equal protection clause of the Fourteenth Amendment.  Batson v. Kentucky, supra 476 U.S. 79; see Powers v. Ohio, 499 U.S. 400, 113 L.Ed.2d 411, 111 S.Ct. 1364 (1991).

4.  A defendant making a Wheeler motion must initially establish a prima facie case of systematic exclusion of jurors on the ground of group bias.  The prima facie case is made when the defendant:  (1) makes as complete a record of the circumstances as possible; (2) establishes that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule;[11] and (3) demonstrates a strong likelihood that persons are challenged on the basis of group bias alone.  People v. Turner, 42 Cal.3d 711, 717-718 (1986), citing the Wheeler standard. Group bias may be demonstrated by a showing that the prosecutor has struck most or all of the members of the identifiable group from the jury panel or has exercised a disproportionate number of challenges against a cognizable group; that the defendant is a member of the excluded group and the alleged victim is a member of the group to which a majority of the jurors belong; and/or that those individuals excluded shared no characteristic other than their membership in the group.  People v. Wheeler, supra, 22 Cal.3d at 280-281.

5.  Once the court determines on the basis of this evidence that a prima facie case has been made, the burden shifts to the

---

[11] The first two prongs were satisfied below by showing that the prosecutor had exercised three of his first thirteen peremptory challenges to exclude three Black jurors.  See People v. Snow, 44 Cal.3d 216 (1988); People v. Hall, 35 Cal.3d 161 (1983).

prosecutor to show that the peremptory challenges in question were not predicted on group bias. People v. Hall, 35 Cal.3d 161, 167 (1983).   In order to meet his burden, the prosecutor must demonstrate that he excluded the jurors for reasons of specific bias relating to the particular case on trial. People v. Johnson, 47 Cal.3d 1194, 1216 (1989); People v. Wheeler, supra, 22 Cal.3d at 272.   The prosecutor cannot rebut the prima facie case merely by denying he had a discriminatory motive or affirming his good faith in making individual selections. Batson v. Kentucky, supra, 476 U.S. at 98; Turner v. Marshall, 63 F.3d 807, 311-814 (9th Cir. 1995) (prima facie case for Batson claim found despite fact that nine members of racial minority groups on jury at time claim raised); Burks v. Borg, 27 F.3d 1424 (9th Cir. 1994), cert. denied, 513 U.S. 1160, 130 L.Ed.2d 1085, 115 S.Ct. 1122 (1995) (Ninth Circuit uses "comparative analysis" to review state court's Batson/Wheeler ruling); People v. Johnson, supra, 47 Cal.3d at 1216.

B.   **FACTUAL BACKGROUND**

6.   The prosecutor exercised two of his first eleven peremptory challenges (RT 2895-2897, 3038-3039, 3172) to excuse two Black jurors, Carla Hunter (RT 3038) and Franklin Atkins (RT 3172). This prompted a motion for mistrial made by Petitioner, claiming constitutional error on grounds that the prosecutor had systematically and purposefully excluded Blacks from the jury.   (RT 3175)   The court responded that it had "ordered transcripts" and would take the matter under submission until the transcripts could be read.   The court scheduled a hearing on the motion for the next

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

137

1  morning.  Further, the court instructed that at the hearing it
2  would ask the prosecutor to "justify the excusal of those two
3  jurors."  The court stated its intention to proceed with the voir
4  dire for the remainder of the day.  (RT 3175)

5      7.  The deputy district attorney voiced "surprise" at the
6  court's scheduling a <u>Wheeler</u> hearing.  The court responded that it
7  had anticipated a <u>Wheeler</u> motion after the prosecutor had excused
8  the second Black juror.  The court further noted that of the jury
9  panel presently in the courtroom, only one other Black juror,
10  Harris Jones, remained.  (RT 3176-3177)

11      8.  The voir dire continued with a very brief questioning of
12  one juror by the prosecutor.  After the Petitioner accepted the
13  jury, the prosecutor exercised his thirteenth peremptory challenge
14  to excuse Harris Jones, the third Black juror.[12]  At the request of
15  defense counsel, the court recessed for the day to take up the
16  <u>Wheeler</u> motion the next morning without conducting further voir
17  dire.  (RT 3182-3184)

18      9.  At the commencement of the hearing, the court noted
19  certain facts for the record.  First, the three jurors excused by
20  the prosecution, Carla Hunter, Franklin Atkins and Harris Jones,
21  were all Black.  (RT 3189-3190)  Second, two Black jurors, Thomas
22  Gueston and Sheila Duncan, remained on the panel of jurors.[13]

23

24

25  [12] The prosecutor had likewise excused prospective juror Atkins
after the Petitioner had accepted the jury.  (RT 3172)

26  [13] The court used a system whereby the four alternates were
27  selected at random at the end of the guilt phase from among sixteen
jurors who heard the evidence.  Mr. Gueston served on the jury which
returned the verdicts.  Ms. Duncan was an alternate.  (RT 8409)

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

138

1  Finally, another Black juror, Crystal Cherry, had been excused by

2  stipulation due to educational hardship.  (RT 3189)[14]

3      10.  Defense counsel contended that the three Black jurors had

4  been excluded due to their race.  He pointed out that all three

5  jurors had a middle class background, no strong opposition against

6  the death penalty and no apparent reason for exclusion other than

7  race.  Carla Hunter, age 25, was an accounting technician employed

8  at Norton Air Force Base.  She had a military background and her

9  husband was currently in the military.  The couple had two

10  children.  (CT 2352-2354; RT 2690-2692)  In addition, Ms. Hunter

11  stated that she would follow the court's instructions and impose

12  the appropriate penalty as required by law.  (RT 1285)  In response

13  to the district attorney's questions, she stated that she could

14  vote for the death penalty if the Petitioner had taken another's

15  life ("if he took someone's life, why not take his life" (RT 1289);

16  (like "an eye for an eye, a tooth for a tooth.") (RT 1288)).

17      11.  Franklin Atkins, age 31, worked for the United States

18  Postal Service.  He was married and had two children.  (CT 2337-

19  2339)  Mr. Atkins also stated that he had been the victim of

20  violent crime on three separate occasions.  (RT 2822, 2823)  In

21  addition, Mr. Atkins explained that his belief about the death

22  penalty is "that whatever the crime warrants, that's what a person

23  should receive."  (RT 564)  He also voiced a necessity to keep the

24  death penalty law on the books because there are certain people who

---

26  [14]  Crystal Cherry was excused by stipulation after lengthy
   Witherspoon voir dire (RT 748) and general voir dire (RT 2392-2422).
27  The court initiated the request of counsel to stipulate to excusal of
   the juror.  (RT 2504-06)
28
   P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  must be deterred by the threat of capital punishment.  (RT 565)

2  Finally, Mr. Atkins agreed with the prosecutor that "the more

3  severe the crime, the more severe the punishment should be for that

4  crime."  (RT 565)

5      12.  Harris Jones, age 51, worked for the Rialto school

6  district as a maintenance worker.  He was single and had two

7  children by a prior marriage.  (CT 2322-2323; RT 3060, 3062)  He

8  previously played basketball in the Air Force.  (RT 3062)  In

9  addition, Mr. Jones stated that he fell into Group C; namely that

10  he favored the death penalty in some circumstances and opposed it

11  in others.  (RT 1241)  He stated that if he concluded death was

12  appropriate he could surely vote for death.  (RT 1247)  He promised

13  to follow the law and return a fair and unbiased verdict.  (RT

14  1248)  Moreover, in response to the prosecutor's questions, Mr.

15  Jones said he would vote at the ballot box to keep the death

16  penalty (RT 1249) and that he had no reservations about returning a

17  death verdict (RT 1250).

18      13.  Defense counsel further argued that the prosecutor had

19  spent a "great deal of more time on the Blacks than he has the

20  Whites in terms of his voir dire."  Moreover, he noted that the

21  prosecutor had instigated an argument with prospective juror Atkins

22  and erroneously accused Mr. Atkins of an inability to communicate

23  with him.  Finally, counsel cited the prosecutor's excusal of three

24  Blacks out of thirteen prospective jurors.  (RT 3190-3194)[15]

25  _____

26      [15] Defense counsel also stated that he had previously represented
Black defendants in a homicide and a robbery case where the same

27  deputy district attorney, Mr. Glazier, was the prosecutor.  In each

    (continued...)

28

14.  The court stated that the Petitioner had not sustained his burden of establishing a prima facie case.  However, the court indicated that it was going to "require" the prosecutor "for the record" to indicate his explanation for excusing each of the three Black jurors.  (RT 3194)

15.  The prosecutor cited several factors justifying the excusal of Carla Hunter: namely, reluctance to impose the death penalty and the juror's expressed nervousness and desire to not serve on this case.  (RT 3197)  Likewise, Ms. Hunter's responses to questions about her attitudes about the death penalty were quite similar to those of Ms. Long.  For example, Ms. Hunter stated that she had "uneasy feelings about someone's life being taken away." (9 RT 1280)  Similarly, Ms. Long responded that she did not "think it's any better for society to kill somebody than it is for that person to kill somebody else."  (RT 1401)  More importantly, however, Ms. Hunter clearly stated that she could vote for the death penalty.  (9 RT 1288-1289)

16.  In addition, the prosecutor sought to justify the excusal of Franklin Atkins for these reasons:  the juror's varied beliefs about imposition of the death penalty; the juror's comment that it was the duty of defense counsel to keep the district attorney honest; strong differences of opinion between the juror and prosecutor; and the juror's comment that at times the wrong person may be charged.  (RT 3198-3201)  The prosecutor stated that it was

[15](...continued)
of those cases, defense counsel "noted a strong tendency on the part of Mr. Glazier to exclude Blacks from the juries. . ."  (RT 3205)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

141

1  difficult to pin down Mr. Atkins on his attitude regarding the

2  death penalty.  (RT 3198)  The record shows, however, that Mr.

3  Atkins thought the death penalty was necessary as a deterrent, and

4  that a severe crime should warrant a severe punishment.  (4 RT

5  560-564)  Furthermore, his responses were similar to those given by

6  Mr. Acuna who stated that he fell within categories B, C, and D on

7  a chart utilized by the parties.  (4 RT 509)

8        17.  Finally, the prosecutor addressed the excusal of Harris

9  Jones.  The reasons given for excusal were primarily subjective and

10 factually unspecific.  The prosecutor first cited the juror's

11 ambiguity as to voting to impose the death penalty and his

12 purported reluctance to do so.  He next cited the juror's "cavalier

13 and indifferent" attitude in response to defense counsel's

14 questions, particularly a comment about not obeying the 55

15 mile/hour speed limit.  Finally, the prosecutor expressed concern

16 that Mr. Jones had not made eye contact with him, leading to the

17 prosecutor's "gut feeling" against keeping Mr. Jones on the jury.

18 (RT 3201-3205)  Mr. Jones had stated, however, that he favored the

19 death penalty, he would vote for capital punishment at the ballot

20 box, and he had no reservations about returning a death verdict.

21 (9 RT 1247-1250)  His statements were far stronger than those of

22 either Ms. Long or Mr. Acuna.  The prosecution's indignation at Mr.

23 Jones' failure to follow the speed-limit (22 RT 3203) was

24 surprising and suspect in light of the prosecutor's own

25 acknowledgment that everyone may be somewhat guilty of disobeying

26 speed laws.  (22 RT 3140-3141)

27 / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

18. The court reiterated that Petitioner did not present a prima facie case. The court further stated that the jurors were excused not based on group bias, but on specific bias. (RT 3206)

C. **PETITIONER MADE A PRIMA FACIE CASE OF WHEELER ERROR.**

   1. **THE TRIAL COURT'S INQUIRY ABOUT THE PROSECUTOR'S JUSTIFICATIONS FOR EXCUSAL OF THE BLACK JURORS ESTABLISHED AN IMPLIED FINDING OF A PRIMA FACIE CASE.**

19. As the state supreme court recognized in People v. Fuentes, 54 Cal.3d 707 (1991), " . . . [W]e have consistently held that when the trial court inquires about the prosecutor's justifications . . . the court has made 'at least an implied finding' of a prima facie showing." Id. at 716; People v. Hayes, 52 Cal.3d 577, 605 (1990) ("By requesting the prosecutor to explain his reasons for these challenges [against Black jurors], the trial court impliedly found that defendant had established a prima facie case"); People v. Johnson, supra, 47 Cal.3d at 1217; People v. Turner, 42 Cal.3d 711, 718-719 (1986).

20. Moreover, the court in Fuentes also stressed "that once the trial court has ruled, expressly or by implication, that a prima facie case has been made and that the burden has shifted to the prosecution, the court may not then 'return to the screening process. The sole issue then pending is the adequacy of the justifications'" Fuentes, supra, at 717, quoting People v. Granillo, 197 Cal.App.3d 110, 122 (1987). Further, the United States Supreme Court has reached the same conclusion with respect to Batson motions. In Hernandez v. New York, 500 U.S. 352, 114 L.Ed.2d 395, 111 S.Ct. 1859 (1991), the Court explained: "Once a

1  prosecutor has offered a race-neutral explanation for the

2  peremptory challenges and the trial court has ruled on the ultimate

3  question of intentional discrimination, the preliminary issue of

4  whether the defendant had made a prima facie showing becomes moot."

5  Id., 114 L.Ed.2d at 405.

6      21.  Accordingly, in the instant case, the trial court's

7  inquiry about the prosecutor's justifications for excusal of the

8  three Black jurors showed at least an implied finding of a prima

9  facie showing.  Indeed, the court asked the prosecutor to respond

10 to the allegations of group bias; the court and counsel reviewed

11 daily transcripts of the voir dire examinations of the subject

12 jurors; and the court considered the prosecutor's race-neutral

13 explanations for his excusal of the jurors.  In the event this

14 Court concludes that the trial court did not make an implied

15 finding of a prima facie case, then Petitioner submits the trial

16 court erred, for defense counsel made such a showing.

17     2.  <u>DEFENSE COUNSEL ESTABLISHED A PRIMA FACIE CASE BY</u>

18         <u>DEMONSTRATING A STRONG LIKELIHOOD THAT THE JURORS WERE</u>

19         <u>EXCLUDED ON GROUNDS OF GROUP BIAS.</u>

20     22.  As required by <u>Wheeler</u> trial counsel must demonstrate a

21 strong likelihood that the excluded jurors were challenged on the

22 basis of group bias alone.  <u>People v. Wheeler</u>, <u>supra</u>, 22 Cal.3d at

23 280.  One among various alternative methods of establishing this

24 element is to show that the prosecutor has struck most or all of

25 the members of the identifiable group from the venire.  <u>Ibid.</u>;

26 <u>People v. Hall</u>, <u>supra</u>, 35 Cal.3d 161.  In the instant case, the

27 prosecutor struck three of the five Black venire-persons, and the

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

second and third Black jurors were each struck after the Petitioner had accepted the jury panel as constituted.  On the authority of <u>Wheeler</u> and <u>Hall</u>, such factor alone demonstrates a strong likelihood that the prosecutor exercised his peremptory challenges against Blacks on grounds of group bias.[16]

23.  Additional factors support this finding.  First, no single characteristic other than race was shared by these individuals.  <u>People v. Wheeler</u>, <u>supra</u>, 22 Cal.3d at 280; <u>People v. Turner</u>, 42 Cal.3d 711, 719 (1986).  Of the three Black jurors, two were currently married and one was single.  They ranged in age from 25 to 51 years, and they worked in diverse occupations, ranging from accounting to maintenance work at a school.  In addition, the Petitioner, who is Black, is a member of the excluded group and the alleged victim, Sergeant Wolfley, who was White, was a member of the group to which a majority of the jurors belonged.  <u>People v. Wheeler</u>, <u>supra</u> at 280-281.

/ /

---

[16]  The fact that the prosecutor eventually "passed" or accepted a jury containing two Blacks does not rebut a case of group bias.  As the state court recognized in <u>People v. Snow</u>, <u>supra</u>, 44 Cal.3d at 225, "...to so hold would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion."  Indeed "...[i]f the presence on the jury of members of the cognizable group in question is evidence of intent not to discriminate, then any attorney can avoid the appearance of systematic exclusion by simply passing the jury while a member of the cognizable group that he wants to exclude is still on the panel.  This ignores the fact that other members of the group may have been excluded for improper racially motivated reasons."  <u>People v. Motton</u>,, 39 Cal.3d 596, 607-608  (1985); see <u>United States v. Battle</u>, 836 F.2d 1084, 1085-1086 (8th Cir. 1987) (government's use of five of its six (83%) allowable peremptory challenges to strike five of the seven (71%) Blacks from the jury panel sufficient to establish a prima facie case).

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

24. Secondly, the three prospective jurors did not express views indicating a partiality towards the defense and, in some respects, any partiality seemed to favor the prosecution. See, e.g. <u>People v. Allen</u>, 23 Cal.3d 286 (1979), <u>People v. Turner</u>, <u>supra</u>. For example, Carla Hunter, perhaps emphasizing her military background, expressed the strong view that if an accused is proven guilty of a crime he should get what he deserves: "like an eye for an eye, tooth for a tooth," "I don't feel that no person has the right to take nobody's life." (RT 1288) Moreover, Franklin Atkins stated that he favored retaining the death penalty in California and that the more severe the crime, the more severe should be the penalty. (RT 565) Mr. Atkins also explained that he was the victim of a violent crime on three occasions and he opposed persons, other than the police, using guns to settle disputes. (RT 2822-2824) Finally, Harris Jones stated that he would vote to retain the death penalty in California and had no reservations about imposing it (RT 1249-50) because it was appropriate in certain cases. (RT 1249) In sum, such jurors, if anything, seemed to favor the prosecution over the defense.

25. Third, the prosecutor's voir dire of the Black jurors evidenced a combative style leading to miscommunication. See <u>Batson</u>, <u>supra</u>, 476 U.S. at 97 (the prosecutor's questions or statements may support inference of discrimination). During the voir dire of Mr. Atkins, the prosecutor acknowledged: "Mr. Atkins, I guess I owe you an apology. After we recessed, a few of the people made some comments that they thought that I was coming on pretty strong to you." (RT 2827) This assessment was correct.

The prosecutor accused Mr. Atkins of believing that he (the prosecutor) would use "underhanded" tactics at trial, which was a misinterpretation. (RT 2820-2822)  Another misunderstanding occurred where the prosecutor similarly misinterpreted a comment made by Mr. Jones about not judging a book by its cover. (RT 3143)

26. Generally, in reviewing a trial court's determination of whether a prima facie case has been made, the state supreme court has relied on the trial court's ability "to distinguish a true case of group discrimination from a spurious claim interposed simply for purposes of harassment or delay." People v. Wheeler, supra, 22 Cal.3d at 281.[17]  In this case, however, any such reliance is inappropriate. Defense counsel made an adequate record, established that those targeted for exclusion were members of a cognizable group, and demonstrated a strong likelihood that they were challenged on grounds of group bias alone. Sufficient facts and circumstances were presented "to raise an inference that the prosecutor used the challenges to exclude jurors on account of race." United States v. Chinchilla, 874 F.2d 695, 698 (9th Cir. 1989). Moreover, the trial court's directive to the prosecutor to provide reasons for his challenges constituted an "implied finding of group discrimination, and shifted the burden of justification to the prosecutor"; otherwise, the court would have had "no basis for

---

[17] Nevertheless, "in some cases, the reviewing court may conclude that the [prosecutor's] explanation is inherently implausible in light of the whole record. And even when there is no doubt of the prosecutor's good faith, the issue of whether a given explanation constitutes a constitutionally permissible - i.e., nondiscriminatory - justification for the particular peremptory challenge remains a question of law." People v. Turner, supra, 42 Cal.3d at 720, fn.6.

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  asking the prosecutor to 'explain' the reasons for his peremptory

2  challenges." People v. Turner, supra, 42 Cal.3d 711, 719.

3  D.   THE PROSECUTOR FAILED TO REBUT THE PRIMA FACIE CASE FOR GROUP

4        BIAS.

5        27.   After the prima facie case is shown, the prosecutor is

6  required to come forward with explanation to the court that

7  demonstrates other bases for the challenge.   The court, in turn,

8  "must make 'a sincere and reasoned attempt to evaluate the

9  prosecutor's explanation in light of the circumstances of the case

10  as then known...'"  People v. Johnson, supra, 47 Cal.3d at 1216,

11  citing People v. Hall, supra, 35 Cal.3d at 167 (emphasis added);

12  accord, People v. Fuentes, supra, 54 Cal.3d 707, 716-717; see also,

13  People v. Walker, 47 Cal.3d 605, 625 (1988); People v. Snow, supra,

14  44 Cal.3d at 222; People v. Turner, supra, 42 Cal.3d at 721.

15       28.   This the trial court plainly failed to do.   Both prior to

16  and immediately after hearing the prosecutor's remarks, the court

17  stated its belief that the jurors had not been excluded on grounds

18  of group bias.   Consequently, no serious attempt was made by the

19  trial court to evaluate the prosecutor's explanation "for the

20  purpose of determining whether it was bona fide," (People v.

21  Turner, supra, 42 Cal.3d at 721, quoting People v. Hall, supra, 35

22  Cal.3d at 168) and the trial court cannot be presumed to have

23  undertaken the required "sensitive inquiry into such circumstantial

24  and direct evidence of intent as may be available.'"  Batson v.

25  Kentucky, supra, 476 U.S. at 98. Therefore, the trial court's

26  statement accepting the prosecutor's explanation can be viewed as

27  no more than a merely perfunctory comment.

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

148

29.   Moreover, the prosecutor was required to "articulate a neutral explanation related to the particular case to be tried." Batson, supra, 476 U.S. at 98; People v. Fuentes, supra, 54 Cal.3d at 721.  Although he had the benefit of an overnight recess to review voir dire transcripts and craft his reasons for excusal (plus the experience of having tried five prior death penalty cases (RT 3202)), his explanation offered inaccurate and misleading references to the record and pretextual reasons indicative of presumed group bias.  The court, having read the transcripts and listened to the explanations, should have recognized that the exclusion of Blacks from the jury panel was based on a discriminatory purpose.

30.   This is most clearly illustrated by the prosecutor's reasons for excluding Harris Jones.  The prosecutor's first reason for excluding Harris Jones was that Mr. Jones was non-responsive to questions about the death penalty and would try to avoid imposition of the death penalty.  The prosecutor cited pages 1246 through 1251 of the transcript in support thereof.  (RT 3201)  The prosecutor's characterization of the voir dire is misplaced.

31.   After Mr. Jones' initial confusion regarding the legal process was clarified, he stated adamantly in response to defense counsel's questions that if, after hearing the evidence, he concluded death was appropriate, he "could bring that verdict in, sure."  (RT 1247)  Also, in response to the prosecutor's question: "Do you have any kind of reservations or hesitancy in serving on a case where the death penalty is a possibility,?"  Mr. Jones responded:  "None whatsoever."  (RT 1250)  Further, with respect to

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

Mr. Jones' comment that he hoped and prayed that he would never have to think or wonder about the penalties, which the prosecutor interpreted as avoidance, Mr. Jones explained that it was "terrible" or "hideous" to impose such severe penalties on another person, but "under certain circumstances I could - I would say it's warranted...you need something, I think, because of this world we live in." (RT 1251-1252) Consequently, the prosecutor could not reasonably have been concerned about Mr. Jones' position on the death penalty any more than other non-Black jurors who had similar attitudes, but were not excused peremptorily.[18]  See <u>People v. Hall</u>, <u>supra</u>, 35 Cal.3d at 168 (where prosecutor's reasons are contradicted by the record and could have applied equally to non-Black jurors he did not challenge, "[s]uch disparate treatment is strongly suggestive of bias...")).

/ /

---

[18] For example, Fred Acuna, who served on the jury showed uncertainty about his position on the death penalty.  When asked which of the five groups he fit into, Mr. Acuna said: "Well, I think I fall in B, C, and D, but mostly C."  (RT 509)  Also, Mr. Acuna recognized the difficulty in imposing a penalty: "...it's kind of hard to decide on someone's fate."  (RT 508)

Similarly, Betty Long, who also served on the jury, said she was "ambivalent" about her views on capital punishment.  (RT 1459)  In fact, the prosecutor cited Ms. Long's questionnaire where she stated that life without possibility of parole is preferable to the death penalty, if enforced, and registered his belief that she opposed the death penalty.  (RT 1459)  Moreover, Ms. Long articulated that "...intellectually, I don't think it's any better for society to kill somebody than it is for that person to kill somebody else."  (RT 1401)  Furthermore, Ms. Long concluded: "If a life sentence without possibility of parole really means that, with no loopholes, then I'd be willing to go that way if it seemed more appropriate than the death penalty."  (RT 1462)  Finally, Ms. Long acknowledged that she "might be reluctant" to decide the matter of penalty, but she thought she could make a decision.  (RT 1464)

1    32.  The prosecutor's next reason was that during defense

2  counsel's questioning, Mr. Jones showed a "very cavalier and

3  indifferent attitude," particularly his disregard for the 55 mile

4  per hour speed limit.  (RT 3201-3202)  However, "the record

5  contains ample reason to suspect that the proffered explanation was

6  not bona fide."  <u>People v. Turner</u>, <u>supra</u>, 42 Cal.3d at 725.  The

7  record shows that Mr. Jones stated that the 55 mile per hour speed

8  limit "didn't bother" him, but that he had ignored the law.  (RT

9  3062)  But, as the prosecutor himself acknowledged "all of us may

10  be somewhat guilty" of disobeying the speed limit and in some

11  places "you almost have to go more than fifty-five or get run

12  over."  (RT 3140-3141)  More significantly, and with direct bearing

13  on the case at bar, Mr. Jones said that "laws ought to be obeyed"

14  (RT 3141), that he understood that the court's instructions are to

15  be obeyed (RT 3002), and that he would give both sides a fair trial

16  (RT 3145).  The prosecutor's claim of indifference was therefore a

17  specious excuse without justification under <u>Wheeler</u> (See <u>People v.</u>

18  <u>Fuller</u>, 136 Cal. App.3d 403, 421 (1982) ("the risk of inattention

19  is not the proper basis for a peremptory challenge" under <u>Wheeler</u>).

20    33.  Finally, the prosecutor explained that Mr. Jones refused

21  to make "eye contact" with him and he had a "gut feeling" making

22  him feel "uncomfortable" leaving Mr. Jones on the jury.  (RT 3202-

23  3204)  In <u>People v. Trevino</u>, <u>supra</u>, 39 Cal.3d 667, the court found

24  that the prosecutor's reason for excluding a juror "based on his

25  body language and mode of answering certain questions, is

26  particularly untenable in light of <u>Wheeler's</u> requirement of a

27  showing of specific bias."  <u>Id.</u> at 692.  Similarly, to conclude

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  that alleged lack of eye contact or a gut feeling about a juror

2  rises to a level of specific bias in the _Wheeler_ context "is to

3  reduce the constitutional guarantee to meaningless

4  superficialities." _Trevino_, _supra_, 39 Cal.3d at 692, fn. 25.[19]

5  Indeed, it may be a prosecutor's own conscious or unconscious

6  racism that leads him to such perceptions about a Black juror and

7  for precisely this reality _Wheeler_ and _Batson_ require the

8  prosecutor to demonstrate specific bias.[20]  Specific bias is not

9  demonstrated by sham excuses such as those offered here which have

10 no support in the record.  See _People v. Granillo_, _supra_, 197

11 Cal.App.3d 110, 117, 118-119, 120-121 (specific bias was not shown

12 by prosecutor's uncorroborated claim that Hispanic juror

13 demonstrated a reluctance to deal with the subject matter of death,

14 appeared afraid of the case because it involved murder, would be

15 unable to find someone guilty of such a serious charge, and moved

16 her eyes between the two attorney's tables and the bench during

17 voir dire, indicating she was not being completely candid).

18    34.  The Ninth Circuit reversed a California state judgment

19 where the record did not support the prosecutor's reasons for his

20 peremptory challenge to one African-American prospective juror.

21 _Johnson v. Vasquez_, 3 F.3d 1327 (9th Cir. 1993).  Even if some of

22 _____

23    [19]  Although in _People v. Johnson_, _supra_, 47 Cal.3d at 1221, the
   court disapproved of _Trevino_ to the extent _Trevino_ was inconsistent

24 with _Johnson_, Petitioner submits that _Johnson_ would not condone such
   superficial reasons enunciated here.

25
   [20]  Justice Marshall in _Batson_ recognized: "A prosecutor's own

26 conscious or unconscious racism may lead him easily to the conclusion
   that  a  prospective  black  juror  is  'sullen'  or  'distant';  a

27 characterization that would not have come to his mind if a white juror
   had acted identically." _Batson_, _supra_, 476 U.S. at 106.

28

the reasons given by the prosecutor are racially-neutral, reversal is required so long as race plays any role in the prosecutor's exercise of a peremptory challenge.  Howard v. Senkowski, 986 F.2d 24, 26-30 (2d Cir. 1993).

35.  In sum, the peremptory excusal of Mr. Jones, like that of Ms. Hunter and Mr. Atkins, violated Wheeler.  People v. Granillo, supra, 197 Cal.App.3d at 23 ("If a single peremptory excuse is not justified, the presumption of validity is rebutted."); People v. Fuller, supra, 136 Cal.App.3d at 421 (even if two of three jurors were justifiably excused, there remained a third juror whose peremptory excusal was not justified; Wheeler states presumption of validity is rebutted if the burden of justification is not sustained as to any juror); People v. Wheeler, supra, 22 Cal.3d at 282 ("if the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted.").  Similarly, under Batson, "the striking of a single Black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when there are valid reasons for the striking of some Black jurors."  United States v. Gordon, 817 F.2d 1538, 1541 (11th Cir. 1987) citing United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986); United States v. Battle, 836 F.2d 1084, 1086 (8th Cir. 1987).

E.   **THE TRIAL COURT'S REFUSAL TO GRANT A MISTRIAL IS REVERSIBLE ERROR.**

36.  Petitioner met each of the requirements set out in Wheeler in establishing a prima facie case of group discrimination.

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  A close review of the reasons articulated by the prosecutor for

2  dismissing the majority of prospective African-American jurors

3  shows that those reasons are not supported by the record.   The

4  prosecutor's explanations were implausible and strongly indicative

5  of bias.   The trial court should have granted Petitioner's

6  Wheeler/Batson motion, instead, however, the trial court failed to

7  fulfill its duty to carefully evaluate those explanations.   The

8  error is reversible per se, and a new guilt phase trial is

9  required.   People v. Wheeler, supra, 22 Cal.3d at 283; see also,

10  People v. Snow, supra, 44 Cal.3d at 226-227.[21]

11

12                               III.

13  **THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN EXCLUDING**

14  **PROSPECTIVE JURORS LUNA AND VILLASENOR WITHOUT DETERMINING**

15  **THEIR WILLINGNESS TO PERFORM THEIR DUTIES IN ACCORDANCE**

16  **WITH THEIR INSTRUCTIONS AND THEIR OATH IN VIOLATION OF**

17  **PETITIONER'S RIGHT TO AN IMPARTIAL JURY GUARANTEED BY**

18  **THE SIXTH AND FOURTEENTH AMENDMENTS**

19       Petitioner's sentence(s) were rendered in violation of his

20  rights to an impartial jury by the trial court's exclusion of

21  prospective jurors Luna and Villasenor without determining their

22  willingness to perform their duties in accordance with their

23  instructions and their oath, all in violation of Petitioner's

24

25

26

27  [21]   The constitutional violation here was made more egregious by
the prosecutor's improper injection of racial concerns into the guilt
and penalty phase trials.   See Claim XL, infra.

28
P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

federal constitutional rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

The facts supporting this claim, among others to be presented after full investigation, research, analysis, discovery and hearing, include the following:

1.   Petitioner refers to all of the allegations pled in Claims I through II and, by this reference, incorporates them herein as though set forth in full.

A.   **INTRODUCTION**

2.   In _Witherspoon v. Illinois_, 391 U.S. 510 (1968), the United States Supreme Court recognized that a capital defendant's right to an impartial trial under the Sixth and Fourteenth Amendments prohibits state courts from excluding prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522.   Instead, the Court concluded, states were permitted to exclude only those prospective jurors who were categorically committed to vote against imposing the penalty without regard to any evidence that might be developed at trial or whose views would prevent them from being impartial on the question of guilt, i.e., prospective jurors who would be unable to act in accordance with the facts and law of the case.   _Id_. at 522.

3.   In the two decades since deciding _Witherspoon_, the Supreme Court has consistently reaffirmed that the federal constitution limits the states' authority to exclude jurors from capital cases. In subsequently clarifying the _Witherspoon_ standard in _Adams v. Texas_, 448 U.S. 38 (1980) and _Wainwright v. Witt_, 469 U.S. 412

(1985), the Court explained that the controlling inquiry is whether the juror conveyed the "definite impression" that his penalty views would "'prevent or substantially impair the performance of his duties as a juror in accordance with <u>his instructions and his oath</u>.'"  <u>Wainwright v. Witt</u>, <u>supra</u>, 469 U.S. at 424, quoting <u>Adams v. Texas</u>, <u>supra</u>, 448 U.S. at 45 (emphasis added); <u>People v. Hamilton</u>, 48 Cal.3d 1142, 1165 (1989).  While great deference is accorded a trial judge's assessment of ambiguous or equivocal responses, the removal of a "<u>Witherspoon</u>" juror "must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve."  <u>Gray v. Mississippi</u>, 481 U.S. 648, 652, n. 3 (1987).  More specifically, the record must demonstrate that the excused "jurors' scruples about the death penalty were so strong that they would not merely heighten the jurors' sense of responsibility, but rather would prevent them from acting in accordance with their oaths. . . ."  <u>Ibid.</u>  As Chief Justice Rehnquist observed, "the group of 'Witherspoon-excludables' includes <u>only</u> those who cannot and will not conscientiously <u>obey the law</u> with respect to one of the issues in a capital case. . . ."  <u>Lockhart v. McCree</u>, 476 U.S. 162, 176 (1986)(emphasis added).

4.  Moreover, the California Supreme Court, in adopting the clarification of <u>Witherspoon</u> articulated in <u>Witt</u>, emphasized that the crucial inquiry is whether the juror can perform his duties regardless of his personal views on capital punishment.  The court stressed in <u>People v. Johnson</u>, 47 Cal.3d 1194, 1223 (1989) the "new standard is whether a juror's views would 'prevent or substantially

1 impair the performance of his duties as a juror in accordance with

2 his instructions and his oath.'"

3      5.   Despite the Supreme Court's pronouncements in Witt, the

4 trial court below informed counsel that it chose not to follow the

5 Witt decision, but rather would be guided by "California decisions"

6 addressing the death qualification process.   (RT 78-79)   Perhaps

7 because the court employed an incorrect standard, it never

8 determined, nor does the record reflect,[22] that prospective jurors

9 Virginia Luna and Adeline Villasenor would not be able to perform

10 their duties as jurors in accordance with their instructions and

11 oath.   Moreover, the trial court's refusal to employ the Witt

12 standard itself violated Petitioner's federal constitutional rights

13 to an impartial jury.   See People v. Mickey, 54 Cal.3d 612,680-681

14 (1991).

15 **B.   VOIR DIRE OF PROSPECTIVE JUROR VIRGINIA LUNA**

16      6.   Prospective juror Virginia Luna was questioned only by

17 defense counsel.   At the end of the questioning, the prosecutor

18 challenged for cause and the court granted it.   (RT 1438)   However,

19 the record reflects that the juror's views on capital punishment

20 were varied and would not have prevented her from performing her

21 duties as a juror.

22      7.   Towards commencement of the voir dire, the prospective

23 juror was asked to examine the court's chart and indicate which

24 group most accurately expressed her views on capital punishment.

25 ───────────────

26      [22]   Parenthetically, in People v. Coleman, 46 Cal.2d 749   (1988)
   the court instructed that when the basis of the trial court's ruling
27 on a challenge is not clear from the record, the trial court "should
   set out reasons for the determination."   Id. at 768, fn. 12.
28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

157

Ms. Luna selected Group C (RT 1437) which read "neither favors nor opposes the death penalty."   (RT 509)[23]   Counsel's questioning further elicited the prospective juror's views:

> Q:   That's what we want to know, how you feel.   You don't like the death penalty.   However, you feel that if you felt it was appropriate you'd vote for it; Is that right?
>
> A:   Yes.   (RT 1437-1438)
>
> Q    (By Mr. Bristol):   C says that you don't favor the death penalty particularly and you aren't particularly against it.   Is that correct?
>
> A:   Right.
>
> Q:   It also kind of says that if you thought the circumstances were right, you feel the death penalty should be imposed.   If you felt the circumstances were not right, you would feel life in prison should be imposed. Is that right?
>
> A:   Right.
>
> Q:   It also kind of says that you as a person are going to vote the way you think the evidence that you hear in the court, all the evidence tells you to vote, either yes, if it's right I'll vote for it, no, it's wrong, I'll vote against it.
>
> A:   Right.
>
> Q:   We're talking this case under the facts we're talking here, right?
>
> A:   Right.

---

[23]   During voir dire, the court used a chart describing five categories of views on capital punishment.   The chart set forth groups A through E.   Under Group A were the words "will automatically vote for the death penalty."   Under Group B were the words "favors the death penalty but will not automatically vote to impose it in every case"; under Group C were the words "neither favors nor opposes the death penalty"; under Group D were the words "opposes or has doubts about the death penalty but will not automatically vote against it in every case"; and under Group E were the words "will automatically vote for life imprisonment."   (RT 509)

Q:   Do you have any question about that?  Is that really
     the way you feel?

A:   Well, the real -- the way I feel, I don't like the
     death penalty, okay?

Q:   That's what we want to know, how you feel.  You
     don't like the death penalty.  However, you feel
     that if you felt it was appropriate you'd vote for
     it; Is that right?

A:   Yes.  (RT 1437-1438)

8.   Immediately thereafter the prospective juror indicated
that she would never impose the death penalty.  The court excused
the prospective juror without comment or questioning of the juror
by the court.  The voir dire proceeded as follows:

Q:   Now we're going to be talking back and forth.  After
     I'm finished talking to you, the other gentleman is
     going to talk to you, and he's going to try to get
     you to say that you'd never vote for the death
     penalty.  And if that's really how you feel, tell
     us.  Would you vote for the death penalty if you
     thought it was right?

A:   No.

Q:   You wouldn't?

A:   Huh-uh.

Q:   So you're saying that regardless of what the
     evidence showed to you, you could never vote to put
     someone to death?

A:   Right.

Mr. Bristoll:  No further questions.

The Court:   Mr. Glazier.

Mr. Glazier:   Challenge.

The Court:   Grant.  Do you wish to argue?

Mr. Bristoll:  No.

1    The Court:      Thank you very much.  Miss Luna, I'm going
2                    to excuse you from this case...."   (RT
     1438)

3
C.   **VOIR DIRE OF PROSPECTIVE JUROR ADELINE VILLASENOR**

4
     9.   Prospective juror Adeline Villasenor's initial expression

5
of her beliefs regarding the death penalty was that she opposed it

6
"in some cases."  (RT 2226)   Although expressing a preference to

7
not impose the death penalty "if it can be avoided," Ms. Villasenor

8
did express the view that what penalty she would impose would

9
depend on factors of age and viciousness of the murder.   At the

10
conclusion of defense counsel's voir dire, the prospective juror

11
indicated that she did not think she would impose the death

12
penalty.   The pertinent parts of defense counsel's voir dire were

13
as follows:

14
                Q:   What if the evidence is so strong pointing towards
15                   death in your mind that you really think the death
                    penalty is an appropriate punishment?  Are you still
16                  going to vote for   life in prison without the
                    possibility of parole?

17
                A:   Well, that depends.
18
                Q:   Depends on what?
19
                A:   Well, the way I see it, it depends on, for instance,
20                  how young is the person, how vicious was the murder.

21              Q:   I kind of hear you saying that there are some
                    circumstances that you think maybe the death penalty
22                  should be imposed then;  Is that correct?

23              A:   Well, not if it can be avoided again, you know.
                    Anything to get away from it.
24
                Q:   Then I hear you saying that -- I'm going to have to
25                  take you back to where we are.  You're sitting here,
                    you're a juror, you've heard all the evidence, and
26                  you've convicted, found guilty of murder in the
                    first degree, you've found that a police officer was
27                  killed in the course of his duties.

28
P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

160

Now, then, as a juror you have two choices.  And the law says you may make either one you want, but that choice must be based on the evidence that you hear in the trial, the trial  being both the guilt phase and the penalty phase.

A:   Okay.

Q:   All that put together, talking with the other jurors and then listening to the law the judge gives to you, then you  have to make a decision between imposing death and imposing life in prison without the possibility of parole.

I want you to assume just for our questioning that you've done all that and in your mind the crime, with all the factors in aggravation, everything that you've heard, tells you that you think the appropriate penalty in this case is the death penalty.  Okay?

A:   Uh-huh.

Q:   Could you vote for the death penalty under those circumstances?

A:   I don't think so.

Q:   You don't think so.  You think that because you have that other alternative you'd vote for life in prison without the possibility of parole?

A:   Yes.   (RT 2131-2132)

10.   During his voir dire, the prosecutor elicited statements from the prospective juror indicating that she would never vote for the death penalty:

Q:   From what I understand you're saying is that where the death penalty can be avoided that you would always make that selection that would avoid imposing the death penalty.  Is that true?

A:   Yes, sir, it's true.

Q:   So what I hear you saying is that if you were selected on this particular case, and knowing that there is somewhere in the penalty phase a possibility of voting for life in prison without the possibility of parole, that you would always in

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1          every opportunity that you had vote for that
        and never vote for the death penalty. Is that true?

2      A:  Yes, sir.

3      Mr. Glazier: Thank you. (RT 2233)

4  The court excused the juror without further questioning or

5  argument. (RT 2234)

6  D.   <u>THE EXCUSAL OF PROSPECTIVE JURORS LUNA AND VILLASENOR VIOLATED</u>

7       <u>PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.</u>

8      11. Prospective Jurors Luna and Villasenor could be excluded,

9  consistent with Petitioner's constitutional rights only if the

10  jurors would "not conscientiously obey the law" (<u>Lockhart v.</u>

11  <u>McCree</u>, <u>supra</u>, 476 U.S. at 176), and would thereby "frustrate the

12  State's legitimate interest in administering constitutional capital

13  sentencing schemes by not following their oath[]." <u>Wainwright v.</u>

14  <u>Witt</u>, <u>supra</u>, 469 U.S. at 423. The record, however, does not

15  reflect any such unwillingness to follow the law. It is not enough

16  that the prospective jurors may have expressed strongly held

17  scruples against infliction of the death penalty in general.

18  Qualification to be a juror does not require the conversion of a

19  death penalty opponent into one who supports the sanction. It

20  requires only that the prospective juror be "willing to <u>temporarily</u>

21  <u>set aside</u>" such scruples. <u>Lockhart v. McCree</u>, <u>supra</u>, 476 U.S. at

22  176 (emphasis added). "The real question is whether the juror's

23  attitude will 'prevent or substantially impair the performance of

24  his duties as a juror in accordance with his instructions and his

25  oath.' [Citation}. A prospective juror personally opposed to the

26  / /

27

28

1   death penalty may nonetheless be capable of following his oath and

2   the law."  People v. Kaurish, 52 Cal.3d 648, 699 (1990).

3       12.  Prospective Juror Luna reaffirmed in her answers to

4   several questions that she would impose the death penalty if

5   appropriate considering the evidence presented.  Indeed, her own

6   ranking in Group C indicated that she had no strong opinion on

7   imposition of the death penalty and would approach her task as

8   juror with an open mind.  This was precisely the type of juror who

9   cannot be excluded for cause.  The fact that the juror appeared to

10  adopt a position refusing to impose the death penalty in response

11  to follow-up questions should not have changed the circumstances,

12  at least not without clarification by the court.  It was never

13  adequately shown that prospective juror Luna could not honor her

14  oath nor perform her duties as a juror, under the law.

15      13.  Prospective juror Villasenor also expressed various views

16  about the death penalty.  Under questioning by defense counsel, Ms.

17  Villasenor left open the possibility that she would impose the

18  death penalty in some cases despite her inclination against it.

19  She cited such factors as age (of the defendant or victim depending

20  on interpretation) and the viciousness of the murder as important

21  factors affecting her choice of penalty.  On the other hand, the

22  prospective juror responded to the prosecutor's questioning that

23  she would never vote for the death penalty.  The trial court failed

24  to determine whether such views would prevent the juror from

25  performing her duties in accordance with instructions and her oath

26  as required under the Witt standard.

27  / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

14.   The error of excusing prospective jurors Luna and Villasenor is further underscored by recent cases of the California Supreme Court upholding excusals under <u>Witt</u>.  Excusals were found proper where the prospective juror "unequivocally announced her inability to vote for the death penalty" (<u>People v. Walker</u>, 47 Cal.3d 605, 624 (1988)), or demonstrated "an inflexible inability to impose death."  <u>People v. Ghent</u>, 43 Cal.3d 739, 768 (1987). They were also proper where the juror stated that she could not follow her oath as a juror and would be compelled to disobey when confronted with voting for the death penalty.  <u>People v. Boyde</u>, 46 Cal.3d 212, 246 (1988) (prospective juror Warne).  Also, an excusal was upheld where the prospective juror stated an inability to imagine a set of circumstances under which he/she would vote for death regardless of the severity in aggravation.  <u>People v. Boyde</u>, <u>supra</u> 46 Cal.3d at 245 (prospective juror Bennett); <u>People v. Guzman</u>, 45 Cal.3d 915, 956 (1988).

15.   The facts of the instant case are distinguishable. Neither prospective juror was "unequivocal" in refusing to impose the death penalty in all cases.  Taking the voir dire exam <u>en toto</u>, each juror's somewhat contradictory views did not leave a definite impression that they could not follow their oath as jurors and abide by the court's instructions.[24]  Indeed, neither juror, unlike

_____

[24]   Such equivocation was also not grounds for excusal under the <u>Witherspoon</u> standard used by the trial court.  In <u>Witherspoon v. Illinois</u>, <u>supra</u>, 391 U.S. at 516, fn. 9, the Court explained: "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." See <u>People v. Williams</u>, 71 Cal.2d 614, 628 (1969); <u>People v. Vaughn</u>, (continued...)

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1  in <u>Boyde</u>, was asked, nor did she state, that she would disobey her

2  oath or instructions.  Despite any personal belief held by

3  prospective jurors Luna and Villasenor opposing capital punishment,

4  unless it was demonstrated that they could not set aside those

5  beliefs in deference to the rule of law, their excusal cannot be

6  justified.

7       16.  Thus, the excusals of Ms. Luna and of Ms. Villasenor were

8  not "supported by specific causes or reasons that demonstrated

9  that, as a matter of law," they were "not qualified to serve."

10  <u>Gray v. Mississippi</u>, <u>supra</u>, 481 U.S. at 652, fn. 3.  Accordingly,

11  they were erroneously excluded from the jury.

12       17.  Traditionally, <u>Witherspoon</u> error requires <u>per se</u> reversal

13  of the penalty verdict. See <u>Davis v. Georgia</u>, 429 U.S. 122 (1976);

14  <u>People v. Washington</u>, 71 Cal.2d 1170, 1177 (1969).  Moreover, since

15  the <u>Witt</u> standard is rooted in the constitutional right to

16  impartial jury, harmless error analysis does not apply and the

17  error is prejudicial per se.  <u>Gray v. Mississippi</u>, <u>supra</u> 481 U.S.

18  at 668.  As such, the <u>Witherspoon-Witt</u> error below mandates

19  reversal of Petitioner's death sentence.  See <u>People v. Ashmus</u> , 54

20  Cal.3d 932, 962 (1991).

21  / /

22  / /

23  _____

24       [24](...continued)
    71 Cal.2d 406, 412-413 (1969) (exclusion for cause was <u>Witherspoon</u>
25  error).  <u>See</u> <u>also</u> <u>People v. Velasquez</u>, 26 Cal.3d 425, 440, fn. 11
    (1980), <u>vacated</u> <u>and</u> <u>remanded</u> <u>sub</u> <u>nom</u> <u>California v. Velasquez</u>, 445,
26  U.S. 139 (1980), <u>reissued in its entirety</u> 28 Cal.3d 461 (1980)
    ("[<u>Witherspoon</u>] does not permit disqualification if the automatic vote
27  is derived by a speculative decision into the venireperson's mental
    process").

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

IV.

<u>THE PROSECUTOR COMMITTED MISCONDUCT BOTH IN JURY SELECTION</u>

<u>AND IN CLOSING ARGUMENT BY STATING HIS PERSONAL BELIEF</u>

<u>REGARDING GUILT AND THE CREDIBILITY OF A WITNESS.</u>

Petitioner's conviction(s) were rendered in violation of his rights to due process, to effective assistance of counsel, to confront witnesses, to be tried by a jury and to a reliable, individualized and non-arbitrary determination that death is an appropriate punishment.  These violations were caused by prosecutorial misconduct both in the jury selection and in closing argument, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  <u>United States v. Young</u>, 470 U.S. 1 (1985); <u>Beck v. Alabama</u> 447 U.S. 625 (1980).

The facts supporting this claim, among others to be presented after full investigation, research, analysis, discovery and hearing, include the following:

1.  Petitioner refers to all of the allegations pled in Claims I through III and, by this reference, incorporates them herein as though set forth in full.

A.   <u>INTRODUCTION</u>

2.  In <u>United States v. Young</u>, 470 U.S. 1, 8 (1985), The United States Supreme Court recognized that, "Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence.  Accordingly, the legal profession, through its codes of professional responsibility, and the federal courts, have tried

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

166

to police prosecutorial misconduct.  In complementing these efforts, the American Bar Association's Standing Committee on Standards for Criminal Justice has promulgated useful guidelines, one of which states that:

> [I]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

ABA Standards For Criminal Justice 3-5.8(b), 2d.Ed.1980.

3.  Similarly, the California Supreme Court has held that the prosecutor "may not express a personal belief in defendant's guilt, in part because of the danger that jurors may assume there is other evidence at his command on which he bases this conclusion." People v. Thompson, 45 Cal.3d 86, 112 (1988); People v. Bain, 5 Cal.3d 839, 848 (1971).

4.  In the instant case, the prosecutor committed blatant misconduct.  At the close of jury selection, he expressed his personal belief in the Petitioner's guilt.  And, during closing argument in the guilt phase, he expressed his personal belief that the Petitioner was a liar.

B.   **FACTS**

5.  Shortly before both parties accepted the jury, the following colloquy occurred between a prospective juror and the Deputy District Attorney presumably in the presence of the jurors who were eventually seated to hear this case.

> Q:   Would you agree that if I'm going to step out and make those kinds of charges that I should be pretty much convinced about the evidence that I have to present?

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1    A:   Definitely.

2    MR. BRISTOLL:  Calls for conclusion and speculation.

3    THE COURT:     I'll allow it, however.

4    Q:   (BY MR. GLAZIER):  Would you expect me to make those
         kind of charges and not be convinced that I could back
5        them up?

6    A:   No.

7    Q:   You wouldn't expect me to just say, well, hey, I'm a
         Deputy District Attorney, I can file criminal charges, I
8        think I'll just file these.  You'd expect me to be able
         to back that up, wouldn't you?

9    A:   That's correct.
10
     Q:   You'd expect me to believe in my case, wouldn't you?
11
     A:   Definitely.
12
     Q:   You would think it would be kind of strange, <u>if I come in</u>
13       <u>trying to convince you twelve people that these charges</u>
         <u>are true if I'm not convinced on my own?</u>
14
     A:   That's correct (RT 3291-3292).[25]
15
16      6.  Also, in the prosecutor's argument to the jury

17   at the conclusion of the guilt phase, he argued:

18       It's not very often that I come right out and call an
         individual a liar, but sometimes you have to call a spade a
         spade.  And I think that that's what he did, and I'll point
19       out to you some of these areas where I feel it's obvious,
         blatant, that he was lying. (RT 8170)
20   / /

21   / /

22   / /

23   / /

24   ─────────────────────
25       [25]  When the prosecutor attempted to repeat his contention
     immediately prior to both parties accepting the jury, the court,
26   responded to a defense objection, "Well, the fact that you do or do
     not believe that you have sufficient evidence really is not relevant
27   in this case, or your own conviction as to the truthfulness of the
     charges by way of evidence is not really relevant either." (RT 3322)
28

This reference was part of the prosecutor's argument that the Petitioner wilfully provided false testimony and that such testimony would permit the jury to reject his entire testimony.[26]

7.   Later, the prosecution argued:

When [Petitioner] went back along the wall, and I told you yesterday I had a chance to go look at the wall before I cross-examined him, he said that down at the east side that he had to get up on it to see over to see what was going on.  You know that's not true.... (RT 8383)

8.   The prosecution also acted improperly when he appeared as an unsworn witness in a videotape of the scene, and then referred to his visit to the scene to express his personal belief in Petitioner's guilt.  (RT 8383)

C.   PROSECUTORIAL MISCONDUCT

9.   The prosecutor's comments during jury selection were particularly egregious because evidence in the case had not as yet been presented.  See People v. Kirkes, 39 Cal.2d 719, 723-724 (1952) (a prosecutor who asserts his or her personal opinion of the defendant's guilt commits misconduct because such an opinion is in all likelihood based in part on facts no in evidence); People v. Bain, 5 Cal.3d 839, 848 (1971); People v. Modesto, 66 Cal.2d 695, 715 (1967); People v. Hidalgo, 78 Cal.App.2d 926, 936 (1947).

10.   The prosecution also committed misconduct by expressing personal beliefs with respect to the credibility of witnesses and accusing defense witnesses of perjury.  See People v. Perez, 58 Cal.2d 229, 246 (1962) (expression of personal belief constitutes

---

[26] Petitioner has argued elsewhere that this argument was further misconduct because it injected racial issues into the case. See Claim XL.

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   prosecutorial misconduct whether it is used to support the People's
2   case or discredit the case presented by the defense); See People v.
3   Ellis, 65 Cal.2d 529, 539 (1966); People v. Reese, 220 Cal.App.2d
4   143, 146-147 (1963); United States v. Morris, 568 F.2d 396, 402
5   (5th Cir. 1978).

6       11.  At Petitioner's trial, the prosecution made it clear to
7   the jury at the outset of the case and during argument that he
8   personally believed in the Petitioner's guilt and that the
9   Petitioner's claims of innocence were lies.  These comments
10  constituted prosecutorial misconduct because they were not
11  arguments based on evidence.  Indeed, the comments made in jury
12  selection occurred before any evidence was presented and the
13  comments made during closing argument were a personal attack on
14  Petitioner's credibility.

15  D.  **OBJECTIONS NOT WAIVED**

16      12.  Petitioner did not waive this issue for failure to
17  object.  If this issue is deemed waived, then Petitioner was denied
18  his Sixth Amendment right to effective assistance of counsel
19  protected by the United States Constitution.  See People v. Lewis,
20  50 Cal.3d 262, 282-283 (1990)(a claim of prosecutorial misconduct
21  may be heard on the merits despite the defense's failure to object
22  to such misconduct at the time of trial in order to forestall a
23  claim of ineffective assistance of counsel).

24      13.  Moreover, it was futile for the defense to raise such an
25  objection and had the defense raised such an objection no
26  admonition would have cured the harm caused by the prosecution's
27  comments.  People v. Green, 27 Cal.3d.1, 28 (1980).

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

14.   Furthermore, Petitioner objected to the prosecution's similar line of questioning during jury selection.   The trial court overruled this objection indicating that it would permit such a line of questioning to continue.   Consequently, further objection from the defense would have been futile.

15.   In addition, a defense objection during argument may have resulted in further prejudicing the Petitioner by causing the trial court to repeat the prosecution's racial reference to the Petitioner as a "spade" and "liar."   This would have only served to further exacerbate, rather than mitigate, the harm already caused by the prosecution's comments.   See People v. Johnson, 121 Cal.App.3d 94, 103-104 (1981); People v. Ortiz, 95 Cal.App.3d 926, 934, n. 6 (1979); People v. Love, 56 Cal.2d 720, 733 (1961); People v. Bross, 240 Cal.App.2d 157, 172 (1966).   This misconduct was particularly harmful because during closing argument which is an especially critical part of any trial. People v. Pitts, 223 Cal.App.3d 606, 694 (1990).

16.   The failure to object should also be overlooked because there was "plain error" on the face of the record; that is, "highly prejudicial error that affects substantial rights." United States v. Lancellotti, 761 F.2d 1363, 1367 (9th Cir. 1985).

17.   If it is deemed that Petitioner waived this issue by failing to make a timely objection to the prosecution's prejudicial comments, than this failure constitutes a violation Petitioner's right to due process, equal protection and effective assistance of counsel guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article 1, section

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

1   15 of the California Constitution.  People v. Ledesma, 43 Cal.3d

2   171, 215 (1987).  The prosecutor's expression of his personal

3   opinion as to the truth of the charges and the dishonesty of the

4   Petitioner was clear misconduct.  Defense counsel should have

5   recognized this and taken appropriate recourse.

6   E.   CONCLUSION

7       18.   The prosecutor's misconduct here was prejudicial.  The

8   prosecutor pursued a theme in this case pitting his personal belief

9   in the truth of the charges against the Petitioner's credibility.

10  During jury selection, before any evidence was presented, the

11  prosecutor assured the jury that he would not have brought these

12  charges if he did not believe them to be true.  People v. Alverson,

13  60 Cal.2d 803, 805 (1965).  Moreover, during his lengthy cross-

14  examination of Petitioner, the prosecutor continuously abused

15  Petitioner and attempted to demean him in the eyes of the jury.

16  Then, in rebuttal, the prosecutor personally made a videotape in

17  which he appeared as proof that the Petitioner was not credible.

18  Finally, in closing argument, the prosecutor told the jury that he

19  believed that the Petitioner was a "liar".

20      19.   In a case, as here, where Petitioner's credibility was

21  critical to the jury's determination, the misconduct of the

22  prosecutor had a profound impact on the jury's decision.  The

23  prosecutor improperly prejudiced the jury against Petitioner and

24  caused it to decide this case, not based on evidence, but based on

25  the prosecutor's assurances that he personally believed in the

26  Petitioner's guilt.  This constitutes reversible error.

27  / /

28

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

## V.

**JURY MISCONDUCT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS WHEN
MULTIPLE JURORS SLEPT DURING THE GUILT AND PENALTY PHASES OF HIS
TRIAL AND EXTRANEOUS EVIDENCE IN THE FORM OF A POSTED SIGN
ENCOURAGING PETITIONER'S CONVICTION WAS CONSIDERED BY THE JURY.**

Petitioner's conviction(s) and sentence(s) were rendered in
violation of his rights to due process of law including the right
to have questions of guilt or innocence decided by a panel of
twelve jurors based on the evidence and law and to have questions
of guilt or innocence and sentencing free from misinformation of
constitutional magnitude; to a fair and impartial jury; to a
meaningful confrontation of witnesses; to the effective assistance
of counsel; to notice and an opportunity to be heard; to equal
protection under the laws; to a reliable determination of his guilt
or innocence of capital murder; and to a reliable, individualized,
and non-arbitrary death-penalty determination by, all in violation
of Petitioner's federal constitutional rights as guaranteed by the
First, Fifth, Sixth, Seventh, Eighth, Thirteenth and Fourteenth
Amendments to the United States Constitution.

The facts supporting this claim, among others to be presented
after full investigation, research, analysis, discovery and
hearing, include the following:

1.  Petitioner refers to all of the allegations pled in Claims
I through IV and, by this reference, incorporates them herein as
though set forth in full.

/ /

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

## A.   SLEEPING JURORS

2.   The jury's deliberations on the question of guilt or innocence were fatally contaminated by jurors sleeping during the presentation of evidence during the guilt phase of the trial.   This unconstitutional deprivation further infected the penalty phase of the trial, by serving to eliminate the lingering doubt which might have been the literal difference between a sentence of life or death for Petitioner.

3.   The problem of sleeping jurors was brought to the attention of the trial court.   Initially, the court received a hand-written letter from one of the jurors.   The letter read:   "We are becoming increasingly concerned about Paul Kingsford sleeping during this testimony.   We have tried to handle this ourselves with no results.   We want you to be aware of this concern and would appreciate your assistance in this matter." (50 RT 6701)

4.   At a hearing on the matter, the court said that it had observed Mr. Kingsford with his eyes getting closed, but the court could not determine whether Mr. Kingsford was sleeping.   Defense counsel then informed the court that he had observed at least five jurors identified for the court sleeping during the presentation of evidence.   Defense counsel did not request a hearing on the matter. The trial court simply responded by stating that all concerned should "keep our eyes open."   (50 RT 6731-6732)

5.   At another court session, the court questioned various jurors about their observations of Mr. Kingsford.   The jurors confirmed that Mr. Kingsford had slept during substantial portions

/ /

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

of the trial. (59 RT 7588-7599)  Mr. Kingsford was eventually

removed from the jury by stipulation. (66 RT 8389)

6.  At a later court session, the district attorney observed

that: "Sometimes when you're asleep, you think you're only asleep

for a second and you've been to sleep for much longer."  The court

responded: "Well, you can make that accusation against almost every

member of my jury.  At times, I think most people got sleepy."  (59

RT 7603)

7.  Sandra Brewer, Petitioner's mother, stated that she was

present as an observer in the courtroom virtually every day of the

guilt and penalty phase trials.  She recalled observing several

jurors sleeping from time to time during the trial.  She wrote the

court a letter and handed it to defense counsel Gene Bristoll to

show to the judge.  Mr. Bristoll informed Mrs. Brewer that such

would not be appropriate and the judge was never apprised of Mrs.

Brewer's observations.  1994 State Habeas Exhibit 18, Declaration

Of Sandra Brewer.[27]

8.  The fact that as many as five jurors were observed

sleeping during the guilt phase denied Petitioner his

constitutional right to a fair trial by twelve competent jurors.

"The duty to listen carefully during a presentation of evidence at

trial is among the most elementary of a juror's obligations.  Each

juror should attempt to follow the trial proceedings and to

---

[27]  Defense counsel's failure to inform the judge of Mrs.
Brewer's observations was negligent since her observations
corroborated defense counsel's statement that he saw five jurors
sleeping during the trial.  These observations were not speculative
and therefore demanded serious examination. People v. Espinoza, 3
Cal.4th 806 (1992).

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED

evaluate the strengths and weaknesses of the evidence and arguments adduced by each side so that the jury's ultimate determinations of the factual issues presented to it may be based on the strongest foundation possible.  Were the rule otherwise, litigants could be deprived of the complete, thoughtful consideration of the merits of their cases to which they are constitutionally entitled.  U.S. Const., 6th & 7th Amends.; Cal. Const., Article I, Section 16; Hasson v. Ford Motor Company, 32 Cal.3d 388, 411 (1982); See also People v. Winters, 242 Cal.App.2d 711, 718 (1966); People v. Leyick, 189 Cal. 599, 609-610 (1922).

9.  At the very least, the trial court was required "...to make whatever inquiry is reasonably necessary to determine if there was, in fact, any misconduct, and if such be found, whether the [offending] juror should be discharged...." People v. Adcox, 47 Cal.3d 207, 253 (1988).  The trial court's failure to determine to what extent jurors were sleeping during the trial deprived Petitioner of his constitutional and statutory rights.

10.  Trial counsel negligently and prejudicially failed to make an appropriate motion before the court, such as a motion for mistrial or a motion to voir dire the jury, in the face of some five jurors sleeping during the trial.

B.  JUROR CONTAMINATION BY EXTRA-RECORD SIGN

11.  The jury's deliberations on the question of guilt or innocence were fatally contaminated by the jury's exposure to a highly prejudicial sign, the effect of which was to eliminate some jurors' reasonable doubts as to Petitioner's culpability.  This unconstitutional intrusion further infected the penalty phase of

P:\HABEAS\MAYFIELD\PLEADING\PETITION.FED